**IN THE UNITED STATES DISTRICT COURT OF MARYLAND**
BALTIMORE DIVISION

| | |
|---|---|
| **THE ESTATE OF HENRIETTA LACKS**<br>1304 Kitmore Road<br>Baltimore, Maryland 21239<br><br>**PLAINTIFF**<br><br>VS-<br><br>**THERMO FISHER SCIENTIFIC INC.**<br>*Serve: Capitol Corporate Services, Inc.*<br>*Resident Agent*<br>3206 Tower Oaks Blvd.<br>4th Floor<br>Rockville, Maryland 20852<br><br>**DEFENDANT** | Civil Case No.: _____ |

**CIVIL COMPLAINT AND REQUEST FOR JURY TRIAL**

Plaintiff The Estate of Henrietta Lacks ("Plaintiff" or "Ms. Lacks"), by and through their undersigned counsel, brings this Complaint against Defendant Thermo Fisher Scientific, Inc. ("Thermo Fisher Scientific" or the "Company"), and states as follows:

**INTRODUCTION**

1. This case is about a multibillion-dollar biotechnology corporation, Thermo Fisher Scientific, making a conscious choice to sell and mass produce the living tissue of Henrietta Lacks, a Black woman, grandmother, and community leader, despite the corporation's knowledge that Ms. Lacks' tissue was taken from her without her consent by doctors at Johns Hopkins Hospital and a racially unjust medical system.

2. Medical research has a long, troubled racial history. The exploitation of Henrietta Lacks represents the unfortunately common struggle experienced by Black people throughout US

history.  Indeed, Black suffering has fueled innumerable medical progress and profit, without just compensation or recognition.  Various studies, both documented and undocumented, have thrived off the dehumanization of Black people.

3. In the 1950s, a group of white doctors at Johns Hopkins preyed on Black women with cervical cancer.  While treating Black women in racially segregated wards, the white doctors would cut away tissue samples from their patients' cervixes without their patients' knowledge or consent.  A leading figure in this conspiracy—Dr. George Gey, then head of tissue culture research at Hopkins—once proclaimed himself "the world's most famous vulture, feeding on human specimens almost constantly."

4. To be clear, these tissue samples were not taken for purposes of medical treatment or with the informed consent of those operated upon.

5. Henrietta Lacks was one of the victims of this conspiracy.  Ms. Lacks was admitted to the racially segregated ward at Johns Hopkins Hospital—one of the only hospitals that would treat Black patients—for a malignant tumor on her cervix.  On February 5, 1951, during a surgical procedure and with her under anesthesia, a white doctor at Johns Hopkins used a sharp knife to cut two parts of Ms. Lacks' cervix away under the guise of treating her cervical cancer with radium.  This surgical procedure to harvest Ms. Lacks' tissue was not medically necessary and was not an operation to which Ms. Lacks consented.  Nor was she warned about the risks of the aggressive course of treatment she was subjected to, which left her infertile.  Months later, when Ms. Lacks was told that the course of treatment for her cancer had left her infertile, she stated clearly that she would never have agreed to be treated had she been informed of the risk of infertility.  The treatment was also completely ineffective.  Henrietta Lacks ultimately died of cervical cancer on October 4, 1951.

- 3 -

6. The cells taken from Henrietta Lacks have unique properties. While most cell samples die shortly after they are removed from the body, Ms. Lacks' cells survived and reproduced in the laboratory. This exceptional quality meant that it was possible to cultivate Ms. Lacks' cells into a cell line that could reproduce indefinitely in laboratory conditions—an immortal cell line. Indeed, Ms. Lacks' cells were the first known immortalized human cell line. Medical researchers refer to Henrietta Lacks' cultivated cell line as the HeLa cell line, using the first letters of Ms. Lacks' first and last names.

7. The origins of this cell line were not known to medical researchers outside Johns Hopkins for decades after Ms. Lacks' death. Before the revelation that HeLa cells were obtained without Ms. Lacks' consent, medical researchers used HeLa cells to develop a huge number of scientific and medical innovations, including the polio vaccine, gene mapping, in vitro fertilization and many more. The HeLa cell line is one of the most important and widely used cell lines in human history. But Henrietta Lacks was never told why her tissue was taken and never gave permission for her cells to be used as they have been.

8. Today, however, the origins of the HeLa cell line have been widely publicized—including by a bestselling book, a film starring Oprah Winfrey, and thousands of media reports. The publicity surrounding Ms. Lacks' cells is such that no reasonable person who works with HeLa cells could be unaware of the fact the cell line was wrongfully taken from Henrietta Lacks' body without her consent or knowledge. There is a widespread consensus today that the theft of Ms. Lacks' cells was profoundly unethical and wrong.

9. Despite this, one of the largest biotechnology companies in the world—Thermo Fisher Scientific—has continued to mass-produce and sell Ms. Lacks' bodily tissue for its own

profit without permission of Ms. Lacks' Estate. To this day, Thermo Fisher Scientific cultivates and sells HeLa cells in multiple product lines to buyers across the globe.

10. In other words, Thermo Fisher Scientific literally sells Ms. Lacks' cellular material, develops and manufactures cellular products incorporating HeLa cells, and seeks intellectual property rights on these products, staking a claim to the genetic material of Ms. Lacks. Thermo Fisher Scientific has appropriated Ms. Lacks' genetic material for its own pecuniary gain, all without payment, permission, or approval from the Lacks Estate or family.

11. In the last several years, Thermo Fisher Scientific has made staggering profits by using the HeLa cell line—all while Ms. Lacks' Estate and family haven't seen a dime. In 2020, Thermo Fisher Scientific recorded $32.22 billion in revenue. These commercialization efforts occurred after the widespread publicity around the origins of the HeLa cell line. Thermo Fisher Scientific has known that HeLa cells were stolen from Ms. Lacks and chose to use her body for profit anyway. A human being—Henrietta Lacks—is behind every cell, every sample sold by Thermo Fisher Scientific.

12. Because of Thermo Fisher Scientific's actions, Henrietta Lacks' children and grandchildren have been forced to live with the reality that living tissue of their mother or grandmother is being sold by a large corporation against her and her family's will. This robs the family of one of the most basic comforts any grieving person can ask for—the knowledge that a loved one's body has been treated with respect.

13. Beyond this harm, the widespread dissemination of Henrietta Lacks' tissue means Ms. Lacks' genetic information is now commonly available—and, as a consequence, some of the most private information about Ms. Lacks and her family has been exposed to the general public.

14. Thermo Fisher Scientific's choice to continue selling HeLa cells in spite of the cell lines' origin and the concrete harms it inflicts on the Lacks family can only be understood as a choice to embrace a legacy of racial injustice embedded in the US research and medical systems. Black people have the right to control their bodies. And yet Thermo Fisher Scientific treats Henrietta Lacks' living cells as chattel to be bought and sold.

15. The Estate of Henrietta Lacks brings a single cause of action—unjust enrichment—against Thermo Fisher Scientific for its choice to profit from the unlawful conduct of Johns Hopkins' doctors. Under settled law, as articulated in the Third Restatement of Restitution "a defendant who is enriched by misconduct and who acts [] with knowledge of the underlying wrong to the claimant" is a conscious wrongdoer liable for its profits. Restatement (Third) of Restitution and Unjust Enrichment § 51(3) (2011). Put simply, because it made the conscious choice to profit from the assault of Henrietta Lacks, Thermo Fisher Scientific's ill-gotten gains rightfully belong to Ms. Lacks' Estate.

**PARTIES**

16. Plaintiff Henrietta Lacks was a natural person, resident of Baltimore County, Maryland, and citizen of the state of Maryland. The executor of Ms. Lacks' estate is Ron L. Lacks, Ms. Lacks' grandson.

17. Thermo Fisher Scientific Inc. is a Delaware corporation headquartered in Waltham, Massachusetts. As used in this complaint, "Thermo Fisher Scientific" refers both to Thermo Fisher Scientific Inc. and to its subsidiaries, affiliates, agents, and other entities within its control that have owned, manufactured, distributed, monitored, or sold HeLa cells or related products.

18. Thermo Fisher Scientific is one of the largest biotechnology companies in the world. Its stock trades on the New York Stock Exchange and as a component of both the S&P 100

and S&P 500. It has a market capitalization of more than $200 billion and revenues of more than $30 billion. In 2019, its CEO, Marc Casper, received approximately $20 million in compensation.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over the subject matter of this action based upon diversity of citizenship pursuant to 28 U.S.C. § 1332 in that Plaintiff is not from the same state as Defendants, and the amount in controversy exceeds $75,000.

20. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

21. Thermo Fisher Scientific has purposefully availed itself of this forum. Thermo Fisher Scientific maintains major laboratories and cell storage sites in Fredrick, Maryland and Rockville, Maryland. These facilities are used for cell therapy clinical trial support services. On information and belief, these facilities are one of the major hubs of Thermo Fisher Scientific's commercialization of HeLa cells.

22. Thermo Fisher Scientific has further purposefully availed itself of this forum by commercializing HeLa cells despite its knowledge that the cells were obtained in Baltimore County, Maryland, through the unlawful conduct described elsewhere in the complaint.

## FACTS

23. In 1951, the chair of gynecology at Johns Hopkins—Dr. Richard Wesley TeLinde—faced widespread criticism for his practice of frequently removing the cervix, uterus, and substantial portions of the vagina of patients with carcinoma in situ, a condition not believed to be deadly at the time.

24. TeLinde believed that by showing that carcinoma in situ behaved similarly to other forms of cervical cancer that were known to be deadly in the laboratory, he would be able to prove

his aggressive surgical techniques were justified, and repair his tarnished reputation.  TeLinde thus proposed to Dr. George Gey, then head of tissue research at Johns Hopkins, that TeLinde would provide samples of cervical cancer, taken from his patients without their knowledge or consent to Gey, if Gey would use those sample in his research and attempt to cultivate those cells in a form that could survive in a laboratory.

25. TeLinde's offer meshed well with Gey's research interests.  Virtually all human cell samples at the time died quickly in laboratory conditions.  Gey wanted to attempt to cultivate a cell line that would be able to survive indefinitely in a lab—an immortal cell line.  Gey had little understanding of why human cells died in laboratory conditions.  And thus, Gey tried repeating the process of creating human cell samples that could survive in laboratory conditions over and over again—a process that required more and more samples.  TeLinde's proposal of an endless supply of samples thus suited Gey perfectly, and he agreed to the deal.

26. To get Gey samples, TeLinde directed the doctors under his supervision to take tissue samples from Black patients in Johns Hopkins' segregated wards with cervical cancer.  While treating Black women in racially segregated wards, the white doctors under TeLinde's supervision would cut away tissue samples from their patients' cervixes without their patients' knowledge or consent.  As one doctor acting under TeLinde's supervision callously summarized, "Hopkins, with its large indigent [B]lack population, had no dearth of clinical material."

27. This horrifying dehumanization of Black patients and abuse of trust sadly had all too much precedent in then-recent medical history.  At the same time as TeLinde and Gey concocted their scheme, the U.S. Public Health Service, working with the Tuskegee Institute in Macon, Alabama, denied hundreds of Black men widely available treatment for syphilis to enable them to study how the disease progressed when untreated.  By the time this abusive study was

disclosed to the public in July 1972, 28 participants had died from syphilis, 100 more had passed away from related complications, at least 40 spouses had been diagnosed with it, and the disease had been passed to 19 children at birth.

28. The list of abuses is long. Another example is the medical practice known as the "Mississippi Appendectomy" beginning in the 1920s. The Mississippi Appendectomy was the systematic forced sterilization of poor Black women without the women's knowledge or consent. Doctors performed the hysterectomies under the pretense of appendectomies in order to prevent poor Black women from reproducing and to give young, inexperienced doctors the opportunity to practice the hysterectomy procedure. These sterilizations reflected a blatant disregard for basic human rights.

29. Similarly, in the Second World War, the United States tested mustard gas and other chemical agents on Black men, and then threatened the soldiers who complained with prison time to keep them quiet. Too often, the history of medical experimentation in the United States has been the history of medical racism.

30. In January 1951, Henrietta Lacks was diagnosed with cervical cancer at Johns Hopkins.

31. Henrietta Lacks' treating doctor—acting under TeLinde's supervision—recommended an aggressive course of treatment: inserting rods of radium, a radioactive substance, into her body. This treatment approach required that Lacks be placed under anesthesia—providing an opportunity for a surgeon working for TeLinde to collect the tissue samples from Ms. Lacks. This procedure was also certain to render Ms. Lacks infertile.

32. Henrietta Lacks was not informed that Johns Hopkins planned to take samples of her cervix. She did not consent to this surgical procedure or any such sampling. Taking a tissue

sample is not medically necessary to conduct radium treatment, nor was it common practice in radium treatment at the time. Ms. Lacks was also not told that the radium treatment she would be subjected to would render her infertile.

33. On February 5, 1951, while Henrietta Lacks was unconscious, a surgeon working under TeLinde's supervision cut two circular samples of tissue, each about three quarters of an inch across, from her cervix. These samples were then given to Gey for experimentation.

34. Gey then attempted, once again, to create a cell line that could survive in laboratory conditions. Gey's efforts in cultivating the HeLa cell line were not meaningfully different than his prior, failed efforts. However, unknown to Gey—and for reasons that the scientific community would not come to understand until decades later—Ms. Lacks' cells had unique properties that meant they were able to survive in laboratory conditions. Gey was finally able to create the immortal cell line he craved.

35. As Gey worked to cultivate the stolen cells, Henrietta Lacks died of cervical cancer on October 4, 1951. She was buried in an unmarked grave.

36. Indeed, around the same time Henrietta Lacks passed away, Gey appeared on television, holding a vial of Ms. Lacks' cells, to present his purported contribution to the fight against cancer. Gey introduced to the world the first successfully grown "immortal" human cell line.

37. Scientists all over the world were given HeLa cells for free to conduct their own studies. Because HeLa cells were the first human cells that could survive indefinitely in laboratory conditions, scientists were able to use them for medical research that might well not have been possible without them. In the decades that followed, the HeLa cell line became an essential resource for medical research in labs worldwide. HeLa was used to test the first polio vaccine, to

understand the effects of radiation on human cells, to develop treatment for sickle cell anemia, and in countless scientific papers.

38. However, Ms. Lacks' estate and family never received any part of the billions of dollars that HeLa cells brought (and continue to bring) to many companies. In fact, despite the widespread use of HeLa cells, for decades, the facts surrounding the origin of the HeLa cell line were unknown. Gey and Johns Hopkins went to great lengths to keep the origins of the HeLa cell line secret. As a result, for decades, the global scientific and medical communities were unaware that the HeLa cell line was the product of the assault of Henrietta Lacks. Indeed, for many years, even Henrietta Lacks' real name was not known to the public—Gey claimed the cells came from a person named Helen Lane to conceal the cells' true origin.

39. In recent years, the origins of the HeLa cell line have become widely known. Today, the fact that HeLa cells were taken from Henrietta Lacks without her knowledge or consent has been extensively publicized. The extensive publicity of the taking of parts of Henrietta Lacks' body without her consent includes:

(a) A nonfiction book which spent 75 weeks on the New York Times Best Seller list, including a substantial period in the number one slot;

(b) Mentions in more than 2,700 academic articles discussing issues of patient consent and medical ethics;

(c) A movie starring Oprah Winfrey that aired on HBO;

(d) Tens of thousands of media articles in the international, national, and local press; and

(e) Official recognition of Henrietta Lacks' contributions to medical science by the United States House of Representatives.

40. Any reasonable person working with HeLa cells—especially a person with the resources of Thermo Fisher Scientific—would be aware of the origin of the HeLa cell line, including that the cells were taken from Ms. Lacks without her consent.

41. Indeed, Thermo Fisher Scientific has publicly admitted that it is aware of the fact HeLa cells were taken from Henrietta Lacks without her consent. The company hosts an article on its corporate website that states HeLa cells were removed from Ms. Lacks and used for scientific research despite the fact that "[Ms.] Lacks and her family were unaware that her tissue was used in this way." Similarly, in another article on its corporate website, Thermo Fisher Scientific acknowledges "the widespread but unsanctioned use of HeLa cells from Henrietta Lacks."

42. Despite their awareness of the origins of the HeLa cell line, Thermo Fisher Scientific made the choice to use Henrietta Lacks' body for their own profit. Thermo Fisher Scientific began mass producing HeLa cells for commercial research use, reaping millions of dollars in profits that would never have been possible without Henrietta Lacks' cells. Thermo Fisher Scientific never sought or received permission from the Estate of Henrietta Lacks to do so.

43. To this day, Thermo Fisher Scientific cultivates and sells HeLa cells, including the following product lines—each of which is currently available for sale on the company's website:

  (a) Pierce HeLa Protein Digest Standard

  (b) Pierce HeLa Digest/PRTC Standard

  (c) T-REx HeLa Cell Line

  (d) Cervical Adenocarcinoma (HeLa-S3) Total RNA

  (e) Human Cervical Adenocarcinoma (HeLa-S3) Total RNA

  (f) Cell Sensor ESRE-bla HeLa Cell Line

  (g) Cell Sensor HSE-bla HeLa Cell Line

  (h)  LanthaScreen c-Jun (1-79) HeLa Cell Line

  (i)  Cell Sensor T-REx NICD CSL-bla HeLa Cell Line

  (j)  Cell Sensor T-REx FOXO3 DBE-bla HeLa Cell Line

  (k)  1-Step Human Coupled IVT Kit – DNA

  (l)  1-Step Human High-Yield Maxi IVT Kit.

44. On information and belief, Thermo Fisher Scientific's efforts to commercialize HeLa cells are not limited to the HeLa cell lines available for sale to the public. The company also offers contract development and manufacturing services to other biotechnology companies. Those services involve using HeLa cells to support scientific research by other companies—in exchange for substantial payments to Thermo Fisher Scientific. Additionally, HeLa cells are also a part of other products the company manufactures, sells, or otherwise profits from.

45. In other words, Thermo Fisher Scientific's business is to commercialize Henrietta Lacks' cells—her living bodily tissue—without the consent of or providing compensation to Ms. Lacks' Estate. All the while, Thermo Fisher Scientific understands—indeed, acknowledges on its own website—that this genetic material was stolen from Ms. Lacks. Thermo Fisher Scientific's business is nothing more than a perpetuation of this theft.

46. Thermo Fisher Scientific has made and continues to make vast amounts of money—in the millions of dollars—from its commercialization of HeLa cells.

## COUNT I
## FOR UNJUST ENRICHMENT

47. Plaintiff incorporates ¶¶1-46 by reference.

48. Thermo Fisher Scientific was unjustly enriched because it received a benefit from Henrietta Lacks, understood it received a benefit from Ms. Lacks, and did so in circumstances in which acceptance or retention of the benefit was inequitable without payment or permission.

49. Acceptance or retention of the HeLa cell line was inequitable without payment or permission because the HeLa cell line was created through breach of a relation of trust and confidence.

50. Acceptance or retention of the HeLa cell line was inequitable without payment or permission because the HeLa cell line was created through the unlawful conduct described above.

51. Acceptance or retention of the HeLa cell line was inequitable without payment or permission because of the totality of circumstances surrounding the creation and acquisition of the HeLa cell line.

52. Thermo Fisher Scientific acted with knowledge of the underlying wrong to Henrietta Lacks or despite a known risk that the conduct in question violated the rights of Ms. Lacks. Defendants are thus liable for their net profits incurred as a result of their unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff requests that the Court, after trial on the merits, grant the following relief and judgment:

A. Order Thermo Fisher Scientific to disgorge the full amount of its net profits obtained by commercializing the HeLa cell line to the Estate of Henrietta Lacks;

B. Enter an order permanently enjoining Thermo Fisher Scientific from using the HeLa cell line without the permission of the Estate of Henrietta Lacks;

C. Impose a constructive trust in favor of the Estate on all HeLa cells possessed by Thermo Fisher Scientific, all related intellectual property, and all proceeds related to use thereof;

D. Awarding plaintiff her reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.	Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

| | |
|---|---|
| DATED:  October 4, 2021 | /s/ Kim Parker |
| | Kim Parker, Esquire |
| | Federal Bar No.: 23894 |
| | **LAW OFFICES OF KIM PARKER, P.A.** |
| | 2123 Maryland Ave. |
| | Baltimore, MD 21218 |
| | Telephone: 410-234-2621 |
| | Fax: 443-486-1691 |
| | kp@kimparkerlaw.com |
| | |
| | Christopher A. Seeger* |
| | Jeffrey S. Grand* |
| | Christopher L. Ayers* |
| | James Bilsborrow* |
| | Nigel P. Halliday* |
| | **SEEGER WEISS LLP** |
| | 55 Challenger Road, 6th Floor |
| | Ridgefield Park, NJ  07660 |
| | Telephone: 212-584-0700 |
| | Fax: 212-584-0799 |
| | cseeger@seegerweiss.com |
| | jgrand@seegerweiss.com |
| | cayers@seegerweiss.com |
| | jbilsborrow@seegerweiss.com |
| | nhalliday@seegerweiss.com |
| | |
| | Ben Crump* |
| | Christopher O'Neal* |
| | **BEN CRUMP LAW, PLLC** |
| | 717 D Street, N.W. Suite 310 |
| | Washington D.C. 20004 |
| | Telephone: 860.922.3030 |
| | ben@bencrump.com |
| | chris@bencrump.com |
| | |
| | *\*Application for Pro Hac Vice Admission Pending* |
| | ATTORNEYS FOR |
| | THE ESTATE OF HENRIETTA LACKS |

- 15 -

Case 1:21-cv-02524   Document 1   Filed 10/04/21   Page 15 of 15

- 15 -