**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**Northern Division**

**RON L. LACKS, PERSONAL**
**REPRESENTATIVE OF THE ESTATE OF**
**HENRIETTA LACKS,**

              **PLAINTIFF,**

    **VS.**

**THERMO FISHER SCIENTIFIC INC.,**

              **DEFENDANT.**

**Case No. 1:21-cv-02524-DLB**

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 4

   A.  Physicians at Johns Hopkins Unlawfully and Unethically Assaulted Henrietta Lacks by Surgically Removing Her Tissue. ................................................... 4

   B.  Mrs. Lacks's Tissue Has Unique Properties That Allowed the Cells to Survive and Reproduce in a Laboratory Setting. ....................................................... 5

   C.  There Is Widespread Knowledge Within the U.S. Research and Medical Systems— Including TFS's Knowledge—of the Unethical and Unlawful Origins of HeLa Cells. ............................................................................................... 6

   D.  TFS Chose to Unfairly and Unjustly Profit from the Wrongful Conduct of Johns Hopkins' Physicians. .......................................................................... 6

STANDARD OF REVIEW .............................................................................................. 8

ARGUMENT ................................................................................................................... 9

   I.  THE COMPLAINT PLEADS A COGNIZABLE UNJUST ENRICHMENT CLAIM. ............................................................................................................ 9

      A.  The Elements of Unjust Enrichment Are Sufficiently Alleged. ................... 9

      B.  Plaintiff Sufficiently Alleges Unjust Enrichment Based on Tortious Conduct. ........................................................................................... 10

      C.  Plaintiff Sufficiently Alleges That TFS Was Not a Bona Fide Purchaser for Value. ........................................................................................... 15

   II.  PLAINTIFF'S UNJUST ENRICHMENT CLAIM IS NOT TIME-BARRED. ............ 18

      A.  The Statute of Limitations Is an Affirmative Defense and Rarely Should Be Resolved at The Motion to Dismiss Stage. ............................................... 18

      B.  TFS's Reliance on Extrinsic Evidence Is Improper. ................................ 22

      C.  In Any Event, Plaintiff's Allegations Sufficiently Allege That This Action Is Timely. ....................................................................................... 24

         1.  Plaintiff's Claim Cannot Be Time-Barred Because TFS Continues to Sell Mrs. Lacks's Genetic Material to This Day, and Each Instance in Which TFS Sells HeLa Cells Constitutes a Separate Act of Unjust Enrichment. ............. 24

         2.  Alternatively, Plaintiff's Claim Is Not Time-Barred Because the Continuing Violations Doctrine Tolls the Statute of Limitations. ............................ 27

CONCLUSION ............................................................................................................... 34

i

## **TABLE OF AUTHORITIES**

Cases                                                                                        Page(s)

*78/79 Assoc. v. Rand*,
   175 Misc. 2d 960 (N.Y. Civ. Ct. 1998) ................................................................. 30

*Abbott v. Gordon*,
   2009 WL 2426052 (D. Md. Aug. 6, 2009) .............................................................. 26

*Abdullahi v. Pfizer, Inc.*,
   562 F.3d 163 (2d Cir. 2009) ................................................................................... 12

*Allstate Lien & Recovery Corp. v. Stansbury*,
   126 A.3d 40 (Md. 2015) ......................................................................................... 10

*American Housing Preservation, LLC v. Hudson SLP, LLC*,
   2016 WL 7496181 (Md. Ct. Spec. App. Dec. 20, 2016) ........................................ 26

*American Prairie Construction Co. v. Hoich*,
   560 F.3d 780 (8th Cir. 2009) .................................................................................. 23

*ARCO National Construction, LLC v. MCM Management Corp.*,
   2021 WL 4148456 (D. Md. Sept. 10, 2021) ....................................................... 9, 18

*Bank of America Corp. v. Gibbons*,
   918 A.2d 565 (Md. Ct. Spec. App. 2007) ............................................................... 13

*Bell Atlantic Corporation v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................. 8

*Blake v. JP Morgan Chase Bank NA*,
   927 F.3d 701 (3d Cir. 2019) ............................................................................ 25, 26

*Bodner v. Banque Paribas*,
   114 F. Supp. 2d 117 (E.D.N.Y. 2000) .............................................................. 29, 30

*Cain v. Midland Funding, LLC*,
   256 A.3d 765 (Md. Ct. App. 2021) ............................................................. 30, 31, 32

*Catler v. Arent Fox, LLP*,
   71 A.3d 155 (Md. Ct. Spec. App. 2013) ................................................................ 19

*Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*,
   794 F. Supp. 2d 602 (D. Md. 2011) ....................................................................... 22

*Clark Office Building., LLC v. MCM Cap. Partners, LLLP,*
   245 A.3d 186 (Md. Ct. Spec. App. 2021).............................................. 14

*Coakley & Williams, Inc. v. Shatterproof Glass Corporation,*
   706 F.2d 456 (4th Cir. 1983) ......................................................... 25

*Com. Union Insurance Company v. Porter Hayden Company,*
   698 A.2d 1167 (Md. Ct. Spec. App. 1997)............................................ 27

*Duke Street Limited. Partnership v. Board of County Commissioners,*
   684 A.2d 40 (Md. Ct. Spec. App. 1996)............................................ 30, 33

*E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.,*
   637 F.3d 435 (4th Cir. 2011) ....................................................... 9, 15

*Ely v. Science Applications International Corporation,*
   716 F. Supp. 2d 403 (D. Md. 2010)................................................... 26

*FDIC v. Dosland,*
   298 F.R.D. 388 (N.D. Iowa 2013) .................................................... 21

*Firemans Fund Insurance Co. v. R J Kiln & Co.,*
   2012 WL 13012430 (C.D. Cal. Mar. 15, 2012)......................................... 24

*Frederick Road. Limited Partnership v. Brown & Sturm,*
   756 A.2d 963 (Md. 2000) ............................................................ 21

*Goines v. Valley Community. Services Board,*
   822 F.3d 159 (4th Cir. 2016) ...................................................... 8, 22

*Goldfarb v. Mayor & City Council of Baltimore,*
   791 F.3d 500 (4th Cir. 2015) ....................................................... 23

*Goodman v. Praxair, Inc.,*
   494 F.3d 458 (4th Cir. 2007) ................................................. 3, 18, 19

*Haley v. Corcoran,*
   659 F. Supp. 2d 714 (D. Md. 2009).................................................. 15

*Hall v. DIRECTV, LLC,*
   846 F.3d 757 (4th Cir. 2017) ....................................................... 16

*Hill v. Cross Country Settlements, LLC,*
   936 A.2d 343 (Md. 2007) ....................................................... 9, 10, 13

*Hobbs v. Martin,*
   2017 WL 105675 (D. Md. Jan. 11, 2017)............................................ 16, 17

iii

*In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prod. Liability
Litigation*, 2021 WL 2407566 (D. Md. June 11, 2021) ............................................................ 23

*Jason v. National Loan Recoveries, LLC*,
134 A.3d 421 (Md. Ct. Spec. App. 2016) ...................................................................... *passim*

*Johnson v. Silver Diner, Inc.*,
2019 WL 3717784 (D. Md. Aug. 7, 2019) ............................................................................ 26

*Johnson v. Valu Food, Inc.*,
751 A.2d 19 (Md. Ct. Spec. App. 2000) ............................................................................... 13

*Jones v. Speed*,
577 A.2d 64 (Md. 1990) ...................................................................................................... 28

*Limantour v. Cray Inc.*,
432 F. Supp. 2d 1129 (W.D. Wash. 2006) ............................................................................ 24

*Linton v. Consumer Protection Division*,
225 A.3d 456 (Md. 2020) ..................................................................................................... 14

*Litz v. Maryland Department of the Environment*,
76 A.3d 1076 (2013) ................................................................................................. 27, 28, 29

*MacBride v. Pishvaian*,
937 A.2d 233 (2007) ............................................................................................................ 33

*Malfatti v. Mortgage Electronic Registrations Systems, Inc.*,
2013 WL 3157868 (N.D. Cal. Jun. 20, 2013) ...................................................................... 29

*Maryland Casualty Company v. Blackstone International Limited*,
114 A.3d 676 (Md. 2015) ..................................................................................................... 10

*McCaffrey v. Chapman*,
921 F.3d 159 (4th Cir. 2019) ................................................................................................. 8

*McClees v. Cohen*,
148 A. 124 (Md. 1930) ......................................................................................................... 12

*Monterey Mushrooms, Inc. v. HealthCare Strategies, Inc.*,
2021 WL 1909592 (D. Md. May 12, 2021) ........................................................................... 11

*Nemet Chevrolet, Limited. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) ................................................................................................. 8

*Newell v. Richards*,
  594 A.2d 1152 (Md. 1991) ..................................................................................... 19

*Nichols v. Stone*,
  2008 WL 11367533 (D. Md. Aug. 15, 2008) ......................................................... 20

*Owings v. Currier*,
  47 A.2d 743 (Md. Ct. App. 1946) .......................................................................... 13

*Peete-Bey v. Educational Credit Management Corp.*,
  131 F. Supp. 3d 422 (D. Md. 2015)........................................................................ 26

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014) ............................................................................................... 25

*Plitt v. Greenberg*,
  219 A.2d 237 (1966)......................................................................................... 14, 17

*Quinteros v. Sparkle Cleaning, Inc.*,
  532 F. Supp. 2d 762 (D. Md. 2008)........................................................................... 8

*Sard v. Hardy*,
  379 A.2d 1014 (Md. 1977) ..................................................................................... 12

*Shell Oil Co. v. Parker*,
  291 A.2d 64 (Md. 1972) ......................................................................................... 28

*Singer Co., Link Simulation Sys. Div. v. Baltimore Gas & Electric Co.*,
  558 A.2d 419 (Md. Ct. Spec. App. 1989)............................................................... 21

*Smith v. Hogan*,
  794 F.3d 249 (2d Cir. 2015) ................................................................................... 22

*State v. Housekeeper*,
  16 A. 382 (Md. Ct. App. 1889) .............................................................................. 12

*Summers Manufacturing Company, Inc. v. Tri-County AG, LLC*,
  300 F. Supp. 3d 1025 (S.D. Iowa 2017) ................................................................ 20

*UBS Financial Services., Inc. v. Thompson*,
  94 A.3d 176 (Md. Ct. Spec. App. 2014).................................................................. 13

*Walton v. Network Solutions*,
  110 A.3d 756 (Md. 2015)................................................................................... 30, 32

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*,
  728 F.3d 354 (4th Cir. 2013) .................................................................................. 23

*Williams v. Williams*,
   63 Md. 371 (1885) .................................................................................... 13

*Williamson v. Prince George's County, Md.*,
   2011 WL 280961 (D. Md. Jan. 26, 2011).............................................. 13

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
   780 F.3d 597 (4th Cir. 2015) ............................................................. 9, 22

Statutes

Md. Code, Cts. & Jud. Proc. § 5-101 .................................................... 19, 26

Rules

Fed. R. Evid. 901(a).................................................................................. 23

Other Authorities

*Human Body*, 21 Annals of Health Law 1 (2012) .................................. 10

Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011)....................................... 11

Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011)..................................... 14

Restatement (Third) of Restitution and Unjust Enrichment § 44 (2011)..................................... 15

Restatement (Third) of Restitution and Unjust Enrichment § 70 (2011)..................................... 25

## INTRODUCTION

This case is not simply about the tragic treatment of Henrietta Lacks decades ago. More fundamentally, it is about the current actions of defendant Thermo Fisher Scientific ("TFS"), which reaps massive profits from the sale of Henrietta Lacks's genetic material *today*. Despite TFS's suggestion that it was an innocent recipient of Mrs. Lacks's genetic material, if not a victim here, Plaintiff's allegations—which must be accepted as true at this stage—reveal that TFS has profited handsomely from its *own* wrongdoing. Far from offering even one word of remorse or regret, TFS instead erects a flimsy barrier of legal arguments to avoid answering for its serious misconduct.

The underlying events surrounding Henrietta Lacks are by now well known. Mrs. Lacks was assaulted by physicians at Johns Hopkins Hospital who—like so many others in medical research at the time—benefitted from the exploitation and dehumanization of Black people in the United States. Mrs. Lacks's tissue was unlawfully taken by Johns Hopkins' physicians during a unnecessary surgical procedure that was unrelated to her medical treatment, without her knowledge or consent. That tissue became known as the HeLa cell line—one of the most important and widely used cell lines in human history. The cell line is uniquely valuable because it can survive and multiply in perpetuity in a laboratory setting. To this day, HeLa cells have helped scientists develop drugs to treat everything from HIV, polio, leukemia, Parkinson's disease, and hemophilia.

The exploitation and dehumanization of Henrietta Lacks to fuel medical progress and profit, without just compensation or recognition, represents the unfortunately common struggle experienced by Black people through history. TFS's ongoing choice to commercialize Mrs. Lacks's genetic material for its own profit despite its knowledge of the HeLa cells' origin and the

1

concrete harms its conduct inflicts on Mrs. Lacks's Estate and her family can only be understood as a choice to embrace a legacy of racial injustice.

TFS's ill-gotten gains rightfully belong to Mrs. Lacks's Estate.  Plaintiff brings a single cause of action—unjust enrichment—against TFS for its conscious choice to profit from the unethical and unlawful conduct of Johns Hopkins' physicians.  Formed in 2006, TFS *knew* the profoundly unethical and unlawful origins of the HeLa cell line, but instead chose to profit from those physicians' misconduct by cultivating, mass-producing, and selling Mrs. Lacks's genetic material for its own profit, without permission of Mrs. Lacks's Estate or family.  Fortunately, the law provides a remedy for this egregious conduct.  Under settled law in Maryland, and as articulated by the American Law Institute, "a defendant who is enriched by misconduct and who acts [] with knowledge of the underlying wrong to the claimant" is a conscious wrongdoer liable for its profits.  *Restatement (Third) of Restitution and Unjust Enrichment* ["*Restatement of Restitution*" or "*Restatement*"] § 51(3) (2011).

TFS attacks the underlying cause of action for unjust enrichment and contends that the claim is time barred.  With respect to the elements of unjust enrichment, Plaintiff's complaint sufficiently alleges the elements of unjust enrichment based on a tortious act and that TFS was not—and never could be deemed—a bona fide purchaser for value.  Under Maryland law, the claim of unjust enrichment allows recovery against those who profit from a breach of a confidential relationship or from tortious conduct.  The wrongful taking of Henrietta Lacks's tissue without her consent by her physicians for no medical purpose both breached a confidential relationship between doctor and patient and was tortious conduct.  And because TFS has profited from cultivating, mass-producing, and selling HeLa cells, it is liable under Maryland law.  What is more, TFS is not a bona fide purchaser for value because it knew *at all relevant times* the origins of the

2

HeLa cell line, including the shameful physical violation of Mrs. Lacks and abuse of trust by her physicians.

TFS's argument that Plaintiff's claim is untimely rests on a flawed focus solely on the unlawful taking of Mrs. Lacks's tissue in 1951.  But TFS is simply wrong in arguing that—even knowing such injustices—it should be permitted to cultivate, mass-produce, and sell for profit Mrs. Lacks's genetic material *today* without just compensation.  Plaintiff's allegations concern TFS's commercialization efforts and unjust and unfair profiteering, which occurred well after the widespread publicity around the origins of the HeLa cell line.  In the last several years, TFS has made staggering profits by using the HeLa cell line—all while Mrs. Lacks's Estate and family have remained uncompensated.  In 2020 alone, TFS recorded $32.22 billion in revenue—and Plaintiff believes that the evidence will show that much of that revenue stems from TFS's cultivation, production, and sales of products derived from the HeLa cell line.

The *Restatement of Restitution*—which Maryland courts have adopted—was expressly written and widely adopted to provide a viable cause of action for injustices like this one.  TFS cannot escape liability by claiming that this lawsuit is time-barred.  What TFS fails to grasp is that the statute of limitations for Plaintiff's unjust enrichment claim is based on TFS's ongoing ill-gotten gains, *not* the initial assault at the hands of the physicians in which Mrs. Lacks had placed her trust.  TFS simply ignores *its* treatment of Henrietta Lacks's genetic material as chattel to be bought and sold today, not 70 years ago.  Finally, TFS ignores well-established law that statute of limitations issues should be resolved on a 12(b)(6) motion to dismiss only in "rare circumstances." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

## FACTUAL BACKGROUND

The legal grounds for Plaintiff's unjust enrichment claim cannot be fully understood without a full background of events dating back to 1951.

### A.    Physicians at Johns Hopkins Unlawfully and Unethically Assaulted Henrietta Lacks by Surgically Removing Her Tissue.

In 1951, Henrietta Lacks was diagnosed with cervical cancer and later admitted to the racially segregated ward at Johns Hopkins.  ¶ 30.[1]  Unbeknownst to Mrs. Lacks, a group of Caucasian physicians at Johns Hopkins routinely preyed on Black women suffering from cervical cancer.  ¶¶ 3, 23-26.  While treating Black women in racially segregated wards, they would surgically cut away tissue samples from their patients' cervixes without their patients' knowledge or consent.  *Id.*  A leading figure in this wrongdoing—Dr. George Gey, then head of tissue culture research at Hopkins—once proclaimed himself "the world's most famous vulture, feeding on human specimens almost constantly."  ¶¶ 3, 24-26.  These tissue samples were not taken for any medical treatment purposes or with the informed consent of those operated upon.  In other words, Johns Hopkins' physicians assaulted their Black patients, who had placed their trust and lives in their physicians' care.  ¶¶ 4, 23-27.

Henrietta Lacks was one of the victims of this wrongful conduct perpetrated by physicians at Johns Hopkins.  ¶ 5.  During a surgical procedure and with her under anesthesia, a Caucasian physician at Johns Hopkins used a sharp knife to cut two parts of Mrs. Lacks's cervix away.  ¶¶ 5, 33.  This surgical procedure to harvest Mrs. Lacks's tissue was not medically necessary and was not an operation to which Mrs. Lacks consented.  ¶¶ 5, 32.  At the time, Mrs. Lacks's cervical cancer was being treated with exposure to radium.  Importantly, Mrs. Lacks was never told why

---

[1] Unless otherwise noted, "¶" or "¶¶" refers to paragraphs of the Amended Complaint (ECF No. 36).

her tissue had been taken and never gave permission for her cells to be used as they have been.[2] ¶¶ 7, 32.

This dehumanization of Black patients and abuse of trust sadly had all too much precedent. Medical research has a long, troubled racial history.  ¶¶ 2, 27-29.  The list of abuses is long and includes numerous studies, both documented and undocumented, such as the Tuskegee syphilis study that earned notoriety for its unethical experimentation on Black men in the rural South, the systematic forced sterilization of poor Black women known as the "Mississippi Appendectomy," and the routine testing of mustard gas and other chemical agents on Black men during the Second World War, among numerous others.  ¶¶ 27-29.  Too often, the history of medical experimentation in the United States has been the history of medical racism.

**B.     Mrs. Lacks's Tissue Has Unique Properties That Allowed the Cells to Survive and Reproduce in a Laboratory Setting.**

The tissue wrongfully taken from Mrs. Lacks have unique properties.  ¶¶ 6, 34.  While most tissue samples die shortly after they are removed from the body, Mrs. Lacks's cells survived and reproduced in the laboratory.  This exceptional quality meant that it was possible to cultivate Mrs. Lacks's cells into a cell line that could reproduce indefinitely in laboratory conditions—an immortal cell line.  *Id.*  Indeed, Mrs. Lacks's cells were the first known immortalized human cell line.  Medical researchers refer to Henrietta Lacks's cultivated cell line as the HeLa cell line, using the first two letters of Mrs. Lacks's first and last names.  ¶ 6.

---

[2] Nor was Mrs. Lacks warned about the risks of the aggressive course of radium treatment she was subjected to, which left her infertile.  ¶¶ 5, 31.  Months later, when Mrs. Lacks was told that the course of treatment for her cancer had left her infertile, she stated clearly that she would never have agreed to be treated had she been informed of the risk of infertility.  ¶¶ 5, 32.  The treatment was also completely ineffective.  Mrs. Lacks died of cervical cancer on October 4, 1951.  ¶¶ 5, 35.

Because HeLa cells were the first human cells that could survive indefinitely under laboratory conditions, scientists were able to use them for medical research that would not have been possible without them.  ¶ 37.  Indeed, before the revelation that HeLa cells were obtained without Mrs. Lacks's consent or knowledge, medical researchers used HeLa cells to develop a staggering number of scientific and medical innovations, including the polio vaccine, gene mapping, in vitro fertilization, HIV, Parkinson's disease, and many more.  ¶¶ 7, 37.  In the decades that followed, the HeLa cell line has become an essential resource for medical research in laboratories worldwide.  *Id.*

### C. There Is Widespread Knowledge Within the U.S. Research and Medical Systems—Including TFS's Knowledge—of the Unethical and Unlawful Origins of HeLa Cells.

The origins of HeLa cells are widely known and extensively publicized including by a bestselling book that spent 75 weeks on the New York Times paperback nonfiction best-seller list, a film starring Oprah Winfrey, and tens of thousands of media reports.  ¶¶ 7, 39-40.  The publicity surrounding Mrs. Lacks's cells is such that no reasonable person who works with HeLa cells could be unaware of the fact the cell line was wrongfully taken from Henrietta Lacks's body without her consent or knowledge.  ¶¶ 7, 40-41.  There is consensus today that the theft of Mrs. Lacks's tissue was profoundly unethical and wrong.  *Id.*  Indeed, TFS has publicly admitted that it is aware of the fact HeLa cells were taken from Henrietta Lacks without her consent.  Its website states that "[Mrs.] Lacks and her family were unaware that her tissue was used in this way," and TFS acknowledges "the widespread but unsanctioned use of HeLa cells from Henrietta Lacks."  ¶ 41.

### D. TFS Chose to Unfairly and Unjustly Profit from the Wrongful Conduct of Johns Hopkins' Physicians.

TFS, one of the largest biotechnology companies in the world, was formed through the merger of Thermo Electron and Fisher Scientific in 2006.  Despite knowledge of the origins of the

HeLa cell line (*i.e.*, Johns Hopkins physicians' assault of Mrs. Lacks), TFS has chosen to profit from that unlawful conduct *today* and cultivate, mass-produce, and sell Mrs. Lacks's stolen genetic material for its own profit without permission of Mrs. Lacks's Estate. ¶¶ 9,15, 42-46. To this day, TFS cultivates and sells HeLa cells in multiple product lines to buyers across the globe. ¶ 43. In other words, TFS sells Mrs. Lacks's genetic material, develops and manufactures products incorporating HeLa cells, and seeks intellectual property rights on these products, staking a claim to Mrs. Lacks's stolen tissue. ¶¶ 9, 45. TFS has appropriated Mrs. Lacks's genetic material for its own pecuniary gain, all without payment to or permission from the Lacks Estate or family. ¶¶ 9, 15, 41-46.

In the last several years, TFS has made staggering profits by using the HeLa cell line—all while Mrs. Lacks's Estate and family have never been compensated. In 2020, TFS recorded $32.22 billion in overall revenue, and no doubt a significant portion of that revenue stems directly from HeLa-based sales. ¶¶ 11, 46. To be clear, TFS's commercialization efforts occurred *after* the widespread publicity around the origins of the HeLa cell line. ¶¶ 11, 14-15, 39-41. TFS has known that HeLa cells were stolen from Mrs. Lacks during a medically unnecessary surgical procedure and serious breach of trust by her physicians. Yet, despite that knowledge, the company has deliberately chosen to use her body for profit. *Id.* Henrietta Lacks is behind every HeLa cell, every HeLa sample, and every HeLa-based product sold by TFS, and the basis for every dollar made as a result.

Because of TFS's actions, Mrs. Lacks's family members have been forced to live with the reality that genetic material of their mother or grandmother is being sold by a large corporation *today* against her and her family's will. This robs the family of one of the most basic comforts any grieving person can ask for—the knowledge that a loved one's body has been treated with

dignity.  ¶¶ 12, 15.  Beyond this harm, the widespread dissemination of Henrietta Lacks's genetic material means Mrs. Lacks's genetic information is now commonly available—and, as a consequence, some of the most private information about Mrs. Lacks and her family has been exposed to the general public.  ¶ 13.  Put simply, TFS treats Henrietta Lacks's living cells as chattel to be bought and sold to add to the company's coffers.  ¶ 14.  Because it made the conscious choice to profit from the assault of Henrietta Lacks, TFS's ill-gotten gains rightfully belong to Mrs. Lacks's Estate.  ¶ 15.

## <u>STANDARD OF REVIEW</u>

"[I]n considering a motion to dismiss under Rule 12(b)(6), a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff."  *McCaffrey v. Chapman*, 921 F.3d 159, 163-64 (4th Cir. 2019) (citation and internal quotation marks omitted).  A plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A "complaint's factual allegations" need only "produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'"  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 570).  "The issue in reviewing the sufficiency of the pleadings in a complaint is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims."  *Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762, 767 (D. Md. 2008).

In evaluating the sufficiency of a complaint, a court is "generally limited to a review of the allegations of the complaint itself."  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016).  "Consideration of extrinsic documents by a court during the pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment."  *Zak v. Chelsea*

*Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015); *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011) (error for district court to consider evidence beyond complaint and draw inferences from it).  "This conversion is not appropriate when the parties have not had an opportunity to conduct reasonable discovery."  *Zak*, 780 F.3d at 606.

With respect to the statute of limitations in particular, "[o]rdinarily, [that] defense . . . is not considered in the context of a motion to dismiss."  *ARCO Nat'l Constr., LLC v. MCM Mgmt. Corp.*, No. ELH-20-3783, 2021 WL 4148456, at *13 (D. Md. Sept. 10, 2021) (citing cases).

## ARGUMENT

### I. THE COMPLAINT PLEADS A COGNIZABLE UNJUST ENRICHMENT CLAIM.

#### A. The Elements of Unjust Enrichment Are Sufficiently Alleged.

Under Maryland law, "[a] person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment."  *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 352 (Md. 2007) (citing authorities; internal quotation marks omitted).  In order to prove a claim of unjust enrichment, a party must establish:

1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

*Allstate Lien & Recovery Corp. v. Stansbury*, 126 A.3d 40, 44 n.7 (Md. 2015) (citing cases).  At the same time, however, "[u]njust enrichment is a claim [] that may not be reduced neatly to a golden rule"—it is a flexible doctrine that frequently depends on fact-specific inquiries.  *Hill*, 936

A.2d at 351; *accord Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 114 A.3d 676, 690 (Md. 2015) ("[U]njust enrichment is both elemental and elusive.").

TFS does not contend that Plaintiff failed to allege any of the essential elements of unjust enrichment.  Nor could it.  Plaintiff has sufficiently alleged each element of the claim.  Indeed, there is no serious question that a benefit was conferred upon TFS by Mrs. Lacks.  The HeLa cell line mass-produced and sold by TFS consists of genetic material wrongfully taken from Mrs. Lacks without her valid consent or knowledge.  ¶¶ 9, 15, 41-46.  This highly valuable cell line is a benefit to TFS, which has commercialized it for its own handsome profit.  ¶¶ 11, 14-15, 41.  There is likewise no genuine question that TFS knew and appreciated the unethical and unlawful origins of the HeLa cell line, ¶¶ 7, 39-41, and has accepted and retained the benefits.  ¶¶ 9, 45.  In essence, TFS's business is nothing more than a perpetuation of the theft of Mrs. Lacks's tissue and the harms that this theft inflicted on Mrs. Lacks and her family.[3]

Instead, TFS complains that Plaintiff (1) did not bring a separate cause of cause for the underlying assault and theft by Mrs. Lacks's doctors and (2) did not use the words "bona fide purchaser of value" when alleging that TFS knew of the tortious conduct and breach of trust against Mrs. Lacks.  TFS Mem. at 19, 22.[4]  TFS's hyper-technical arguments lack any basis in law or fact.

### B.    Plaintiff Sufficiently Alleges Unjust Enrichment Based on Tortious Conduct.

TFS argues that unjust enrichment cannot be brought as a solitary claim.  TFS Mem. at 19. Not surprisingly, TFS cites no relevant authority for this flawed theory.  "[B]oth the Maryland

---

[3] Indeed, legal scholars have independently recognized that this fact pattern would support an unjust enrichment claim.  *HeLa Cells and Unjust Enrichment in the Human Body*, 21 Annals of Health Law 1 (2012).

[4] "TFS Mem." refers to pages of the Memorandum of Law in Support of TFS's Motion to Dismiss (ECF No. 20-1).

Court of Special Appeals and the United States District Court for the District of Maryland have permitted cases to go forward with a sole claim for unjust enrichment remaining." *Monterey Mushrooms, Inc. v. HealthCare Strategies, Inc.*, No. CCB-20-3061, 2021 WL 1909592, at *3 (D. Md. May 12, 2021) (citing cases). The cases that TFS cites stand for a far narrower proposition— that when a plaintiff alleges that a defendant was unjustly enriched because of an alleged underlying tort, but the court determines that the conduct alleged was not tortious, then the defendant cannot have been unjustly enriched. *See id.* (explaining this distinction).

In the first place, no underlying tort is required. Restitution based on a defendant's unjust enrichment is an independent cause of action that does not depend on any other violation of the law. *E.g.*, Doug Rendleman & Caprice Roberts, Remedies: Cases and Materials 517 (9th ed. 2018). The central purpose of restitution is to undo a defendant's unjust enrichment: "A person who is unjustly enriched at the expense of another is subject to liability in restitution." *Restatement of Restitution* § 1. Here, Plaintiff sufficiently alleges that TFS has unjustly benefitted from commercializing Mrs. Lacks's genetic material for its own profit and unjustly retain those benefits without the consent of or compensation to Mrs. Lacks' Estate. Plaintiff, thus, may disgorge TFS's ill-gotten gains without alleging any underlying tortious conduct by TFS or anyone else.

In any case, Plaintiff unequivocally alleges gravely unethical and wrongful conduct by Johns Hopkins' physicians—both tortious conduct and breach of a confidential relationship. ¶¶ 3-5, 23-7, 31-5. The complaint sufficiently alleges that the very genetic material TFS now sells for profit was the product of a medically unnecessary surgical procedure by Mrs. Lacks's physicians without Mrs. Lacks's knowledge or consent. ¶¶ 9, 15, 42-46. For over 130 years, Maryland courts have recognized that physicians must obtain a patient's consent before they are legally entitled to performing medical procedures. *See, e.g.*, *State v. Housekeeper*, 16 A. 382, 384 (Md. Ct. App.

11

1889) (stating where a patient does not consent to surgery, doctor may be liable); *McClees v. Cohen*, 148 A. 124, 128 (Md. 1930) (dentist held liable for pulling patient's teeth when patient requested different medical procedure be performed); *see also Sard v. Hardy*, 379 A.2d 1014, 1019 (Md. 1977) ("The doctrine of informed consent . . . follows logically from the universally recognized rule that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient.") (citing cases).

Maryland's approach is widely supported.  Indeed, nonconsensual medical research is "contrary to the principles of the law of nations as they result from usages established among civilized peoples, from the laws of humanity, and from the dictates of public conscience." *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 178-79 (2d Cir. 2009) (stating that the Nuremberg Code's first principle declared that "[t]he voluntary consent of the human subject is absolutely essential"). The *New England Journal of Medicine* has called the Nuremberg Code, formulated in 1947— years before the wrongful conduct by Johns Hopkins physicians—"the most important document in the history of the ethics of medical research."  Evelyn Schuster, *Fifty Years Later: the significance of the Nuremberg Cod*e, 337 New Eng. J. Med. 1436, 1436 (1997).  Furthermore, according to the U.S. Department of Health and Humans Services, the Code "provided the first explicit international guidelines for the ethical treatment of human subjects in research." Https://ori.hhs.gov/education/products/RCRintro/c03/1c3.html (last visited Feb. 11, 2022).

Such conduct by Mrs. Lacks's physicians was also a breach of a confidential relationship. The doctor-patient relationship is a confidential relationship because it is "one in which 'two persons stand in such a relation to each other that one must necessarily repose trust and confidence in the good faith and integrity of the other.'"  *UBS Fin. Servs., Inc. v. Thompson*, 94 A.3d 176, 186

(Md. Ct. Spec. App. 2014), *aff'd*, A.3d 125 (Md. 2015); *see also Owings v. Currier*, 47 A.2d 743, 746 (Md. Ct. App. 1946) (recognizing the "physician and patient" relationship is one of trust and confidence); *Williams v. Williams*, 63 Md. 371, 404 (1885) (same).  A physician's removal of his patient's tissue without her consent or knowledge for the purpose of his personal gain is a breach of the doctor-patient relationship.  ¶¶ 4, 23-27.

Alternatively, the complaint's facts plainly make out the elements of the simple common law tort of battery.  The Johns Hopkins physicians' excision of tissue from Mrs. Lacks without her knowledge or permission represented non-consensual bodily trauma.  *See Williamson v. Prince George's Cty., Md.*, No. DKC 10-1100, 2011 WL 280961, at *5 (D. Md. Jan. 26, 2011) ("'The elements of the tort of battery consist of the unpermitted application of trauma by one person upon the body of another person.'") (quoting *Johnson v. Valu Food, Inc.*, 751 A.2d 19, 21 (Md. Ct. Spec. App. 2000)).

TFS cannot seriously contend this conduct was not tortious in one form or another and offers no argument beyond a bare assertion to that effect.  Instead, TFS contends that because *it* did not engage in this wrongful conduct, but merely profited as a result, it has not been unjustly enriched.  TFS Mem. at 21.  The argument is not only morally offensive but legally unavailing.  A benefit need not come from the plaintiff directly.  *Hill*, 936 A.2d at 353-54 (citing cases).  "[A] cause of action for unjust enrichment may lie against a transferee with whom the plaintiff had no contract, transaction, or dealing, either directly or indirectly."  *Bank of Am. Corp. v. Gibbons*, 918 A.2d 565, 571 (Md. Ct. Spec. App. 2007); *accord Plitt v. Greenberg*, 219 A.2d 237, 241 (1966) ("It has been held that a plaintiff could recover money from even an innocent transferee who was without knowledge that he possessed the plaintiff's money.").

The only authority that TFS cites for its approach is the *Restatement of Restitution*, which is followed by Maryland courts.  *See Linton v. Consumer Prot. Div.*, 225 A.3d 456, 466 (Md. 2020); *Clark Off. Bldg., LLC v. MCM Cap. Partners, LLLP*, 245 A.3d 186, 197 (Md. Ct. Spec. App. 2021).  But the *Restatement* says exactly the *opposite* of what TFS argues.  It explicitly and forcefully *rejects* the idea that the underlying wrongful conduct to support an unjust enrichment claim needs to have been committed by the *defendant*.  Indeed, the specific provisions of the *Restatement* upon which Plaintiff bases its claims make clear that unjust enrichment as a result of another's wrongful conduct *can* indeed be a basis for recovery, provided that the defendant profited from the wrongful conduct:

> A person who obtains a benefit: (a) in breach of a fiduciary duty, (b) in breach of an equivalent duty imposed by a relation of trust and confidence, or (c) *in consequence of another's breach of such a duty*, is liable in restitution to the person to whom the duty is owed.

*Restatement of Restitution* § 43 (emphasis added).  The commentary to this section reinforces this important point: "Benefits derived from a fiduciary's breach of duty may therefore be recovered from third parties, not themselves under any special duty to the claimant, who acquire such benefits with notice of the breach."  *Id.* at comment g.  Likewise,

> (1) [a] person who obtains a benefit by conscious interference with a claimant's legally protected interests (*or in consequence of such interference by another*) is liable in restitution as necessary to prevent unjust enrichment, unless competing legal objectives make such liability inappropriate.

> (2) For purposes of subsection (1), interference with legally protected interests includes conduct that is tortious, or that violates another legal duty or prohibition (other than a duty imposed by contract), if the conduct constitutes an actionable wrong to the claimant.

*Restatement of Restitution* § 44 (2011).

Thus, far from supporting TFS, both of these *Restatement* sections flatly undermine its argument.  Undertaking a surgical procedure without her knowledge or consent for no medically necessary reason was both a breach of the doctor-patient relationship (supporting a claim under Section 43 of the *Restatement*) and tortious conduct (supporting a claim under Section 44 of the *Restatement*).  ¶¶ 4, 23-27.  TFS, by its own public admission, has profited from this wrongful conduct. ¶¶ 9,15, 42-46.  Black-letter law squarely defeats TFS's attempt to avoid Plaintiff's unjust enrichment claim.

### C.   Plaintiff Sufficiently Alleges That TFS Was Not a Bona Fide Purchaser for Value.

Next, TFS argues that Plaintiff failed to plead that TFS was not a bona fide purchaser.  TFS Mem. at 22.  Again, TFS is wrong.

Under Maryland law, a plaintiff cannot state a claim for unjust enrichment against a bona fide purchaser for value.  *Haley v. Corcoran*, 659 F. Supp. 2d 714, 724 (D. Md. 2009).  There is no requirement, however, that the precise words "bona fide purchaser" be used in the complaint.  *Cf. E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 447-48 (4th Cir. 2011) (quoting authority for the proposition that a plaintiff is not required "to include magic words in order to survive a motion to dismiss").  Rather, a plaintiff must allege *either* that (i) the defendant was aware that it was wrongful to acquire the property at issue, *or* (ii) the defendant did not pay sufficient consideration for the property received.  *Haley*, 659 F. Supp. 2d at 724.  Here, as discussed above, Plaintiff has set forth sufficient facts to allege both that TFS was aware that the HeLa cells from which it profited were wrongfully acquired, *and* that it did not pay sufficient consideration for those cells.  ¶¶ 9, 15, 41-46.

The complaint is replete with allegations of both TFS's knowledge that it had wrongfully acquired Mrs. Lacks's genetic material and that it did not provide just consideration for it.  For example, Plaintiff alleges:

- [TFS] has continued to mass-produce and sell Mrs. Lacks's tissue … without permission of Mrs. Lacks's Estate … [and] without payment, permission, or approval from the Lacks Estate or family.  *¶¶* 9-10; *see also* ¶¶ 42, 45.

- [TFS] has known that HeLa cells were stolen from Mrs. Lacks and chose to use her body for profit anyway … from the unlawful conduct of Johns Hopkins' doctors[;]... it made the conscious choice to profit from the assault of Henrietta Lacks.  ¶¶ 11, 15; *see also* ¶¶ 22, 41.

- [TFS's] choice to continue selling HeLa cells in spite of the cell lines' origin and the concrete harms it inflicts on the Lacks family can only be understood as a choice to embrace a legacy of racial injustice embedded in the US research and medical systems.  ¶ 14.

Thus, the complaint clearly alleges that TFS was *fully* aware that it had wrongfully acquired Mrs. Lacks's cells and that it never provided compensation to Henrietta Lacks's Estate or family for them.  Accepting each of the above factual allegations as true, as is required at the motion to dismiss stage, the complaint sufficiently states a claim for relief that is plausible on its face.  *See Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017) ("[T]the district court misapplied the plausibility standard set forth in *Twombly* and *Iqbal* by subjecting Plaintiffs to evidentiary burdens inapplicable at the pleading stage").

This Court's decision in *Hobbs v. Martin*, No. JKB-16-749, 2017 WL 105675 (D. Md. Jan. 11, 2017), provides a useful framework for evaluating whether a plaintiff has sufficiently alleged that a defendant was not a bona fide purchaser for value at the pleading stage.  There, the plaintiff had loaned money to a nonparty who had fraudulently transferred a portion of it to the defendant. The Court held that the plaintiff sufficiently pled both the defendant's bad faith and lack of consideration.  Notably, the plaintiff in *Hobbs* had not conclusively stated that the defendant knew that the funds were obtained wrongfully.  Rather, the plaintiff pled various facts that, taken

16

together, "allow[ed] a sufficient inference of bad faith by [d]efendant in retaining [p]laintiff's money." *Id.* at *4. *Hobbs* thus makes clear that where a complaint pleads various facts that, when taken together, support an *inference* of bad faith, that is sufficient to sustain a pleading.[5]

Finally, TFS's suggestion that Plaintiff could not amend the complaint to allege in good faith that TFS was not a bona fide purchaser because it "played no part in the original collection of HeLa cells from Mrs. Lacks" (TFS Memo. at 23) is squarely contrary to Maryland law. The elements of the bona fide purchaser requirement are in the disjunctive, such that even if the defendant did pay consideration for the property, that defendant will lose its bona fide purchaser status if it had *notice* that the acquisition of the property was wrongful. As discussed above, there is no requirement whatsoever that a defendant itself participate in the wrongful activity. This is underscored by *Hobbs*, 2017 WL 105675, where the plaintiff did not allege—and was not required to allege—that the defendant had participated in the fraud. The inference of the defendant's awareness of the fraud, as discussed above, was sufficient.

---

[5] On the issue of consideration, *Hobbs* contemplated a situation where consideration may have been paid, but equity might nevertheless dictate a return of the proceeds. The Court held that "if [d]efendant had been the creditor in the $500,000 loan memorialized in the demand note, then his serving as the lender to [the nonparty] may arguably have represented acceptable consideration to justify his retention of the $500,000 transferred from [p]laintiff." *Id.* at *4. Even so, the Court concluded that it was "conceivable (though by no means certain) that upon review of the circumstances surrounding any consideration paid by [d]efendant, equity might demand a return of some portion or all of the money transferred from [p]laintiff's account." *Id.* Thus, even assuming *arguendo* that TFS paid a third party a sum of money for a quantity of HeLa cells (as to which there are no allegations in the complaint), that still would not shield TFS from an unjust enrichment claim if—as is the case here—it would nevertheless be inequitable to retain the benefit it received. *See also Plitt v. Greenberg*, 219 A.2d 237, 241 (Md. 1966) (even one who purchases property non-tortiously and without notice that another has beneficial ownership of it is, upon discovery of the facts, under a duty to account for the value of use to him). Such unusual equitable considerations are present here because, without relief, TFS will be able to continue to reap unjust benefits from the sale Mrs. Lacks's genetic material with impunity against the wishes of her Estate.

## II.    PLAINTIFF'S UNJUST ENRICHMENT CLAIM IS NOT TIME-BARRED.

Unable to attack the validity of the claims, TFS resorts to saying that the claims are time-barred.  To put TFS's argument in stark terms, the company is asking this Court to hold that company has permission to continue to profit from the HeLa cells in perpetuity—without ever having to worry about sharing those ill-gotten gains with Mrs. Lacks's Estate.  Fortunately, the law does not countenance such a morally offensive position.

"[A] claim for unjust enrichment that seeks the remedy of restitution of money is subject to the general three-year statute of limitations."  *Jason v. Nat'l Loan Recoveries, LLC*, 134 A.3d 421, 429 (Md. Ct. Spec. App. 2016).  The statute of limitations period begins running when all elements of the claim accrue.  *Id.*  This means that the statute of limitations clock for an unjust enrichment claim cannot start running *until the defendant is enriched*, even if the unjust conduct that led to the defendant's enrichment occurred before the statute of limitations period.  *See id.* at 430-31.  Unjust enrichment claims are subject to the discovery rule.  *Id.* at 429.  In all events, a motion to dismiss is not the proper place to adjudicate the statute of limitations arguments raised by TFS.

### A.    The Statute of Limitations Is an Affirmative Defense and Rarely Should Be Resolved at The Motion to Dismiss Stage.

TFS's argument that Plaintiff's claim is time-barred (TFS Mem. at 10-19) is based on a fundamental misapprehension of how statutes of limitations work.  "[A] defense based on the statute of limitations must be raised by the defendant through an affirmative defense and the burden of establishing the affirmative defense rests on the defendant."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  Because of this, "[o]rdinarily, the defense of limitations is not considered in the context of a motion to dismiss."  *ARCO Nat'l Constr., LLC v. MCM Mgmt. Corp.*, No. ELH-20-3783, 2021 WL 4148456, at *13 (D. Md. Sept. 10, 2021) (citing cases); *see also*

18

*Newell v. Richards*, 594 A.2d 1152, 1157 (Md. 1991) ("The statute of limitations, as a defense that does not go to the merits, is disfavored in law and is to be strictly construed."). Only in "rare circumstances" is it possible to decide a statute of limitations defense on a Rule 12(b)(6) motion to dismiss. *Goodman*, 494 F.3d at 464.

More specifically, a party may raise a statute of limitations defense in a motion to dismiss only "if all facts necessary to the affirmative defense clearly appear *on the face of the complaint*." *Id.* The running of the statute of limitations is not triggered until the cause of action accrues, *see* Md. Code, Cts. & Jud. Proc. § 5-101, and, in turn, "a cause of action does not accrue until all of its elements are present." *Catler v. Arent Fox, LLP*, 71 A.3d 155, 171 (Md. Ct. Spec. App. 2013). This means that, to meet its burden, TFS must show that *each* of the elements of Plaintiff's unjust enrichment claim was present more than three years before this action was commenced. Incredibly, TFS fails even to acknowledge the high hurdle it must satisfy at the motion to dismiss stage.

This is not the rare case in which a statute of limitations defense should be decided on a motion to dismiss; it simply cannot be said that all of the facts necessary to decide TFS's affirmative defense appear on the face of the complaint. Not only does TFS not identify when each element of an unjust enrichment claim was present, but it does not even discuss what those elements are. Instead, TFS attempts to shift the focus onto when the Plaintiff "knew or reasonably should have known" of the underlying tortious conduct (*i.e.*, the horrifying exploitation, dehumanization, and assault of Henrietta Lacks and abuse of trust by her doctors), contending that this knowledge alone is enough to trigger the running of the statute of limitations. *See* TFS Mem. at 15 (quoting *Jason v. Nat'l Loan Recoveries, LLC*, 134 A.3d 421, 430 (Md. Ct. Spec. App. 2016)). But the *Jason* decision itself shows this is not enough. In *Jason*, the Court of Special

Appeals of Maryland *reversed* a trial court decision that had dismissed an action as time-barred based solely on the plaintiff's purported knowledge of the underlying tortious conduct prior to the expiration of the limitations period.  As the appellate court reasoned, the record "[did] not clearly establish the date on which [the defendant] was allegedly enriched."  134 A.3d at 430.

The court noted that, even assuming that the plaintiff "was on inquiry notice" of the wrongful conduct against him, the statute of limitations did not begin running until the defendant was actually enriched—an essential element of any unjust enrichment claim.  *Id.* at 431.  Here, the holes in TFS's time-bar argument are even starker—not only has TFS failed to identify when it was enriched, it has not identified when any of the elements of Plaintiff's claim accrued.  Plaintiff alleges that TFS is being unjustly enriched *today* (well within the statute of limitations), not decades ago.[6]  ¶¶ 9, 43.  TFS also does not contend that Plaintiff even had knowledge of TFS's unjust enrichment outside of the statutory period.  Unlike the abuse and theft by Mrs. Lacks's physicians, TFS's wrongful activities were not (and are not) widely known.  At bottom, TFS's statute of limitations defense cannot be determined without the benefit of discovery.  *E.g.*, *Nichols v. Stone*, No. CV WGC-07-3389, 2008 WL 11367533, at *6 (D. Md. Aug. 15, 2008) ("Because resolving whether [the plaintiff] had actual notice or knowledge is a factual determination, and whether the 'continuation of events' doctrine applies to toll the statute of limitations cannot be determined without resolving this factual issue first, it is improper for this [c]ourt, at the motion to dismiss stage, to address this matter."); *Summers Mfg. Co., Inc. v. Tri-Cty. AG, LLC*, 300 F. Supp. 3d 1025, 1044 (S.D. Iowa 2017) ("[A]ffirmative defenses are pled in an effort to put the opposing

---

[6] By way of example as to why it is premature to decide the statute of limitations issue, Plaintiff should be entitled to explore, in discovery, the extent to which TFS has developed and profited from proprietary and trademarked products introduced to market within the statutory period, in which HeLa cells have played a part.

party on notice of possible defenses likely to be developed during discovery"); *FDIC v. Dosland*, 298 F.R.D. 388, 394 (N.D. Iowa 2013) ("[T]he appropriate procedure for clarification of the factual bases for affirmative defenses is discovery.").

TFS asks this Court to take judicial notice of a host of extrinsic materials in an attempt to litigate its affirmative defense at the pleading stage. As discussed below, the Court should not do so. In any event, even if the materials were considered, TFS draws the erroneous conclusion that somehow Plaintiff threatened or even contemplated litigation against TFS "for decades"— presumably before TFS was even formed. *See* TFS Memo. at 11. The materials upon which TFS relies simply do not evince that Plaintiff knew of TFS's *unjust and unfair profiteering* from the tortious injury to Mrs. Lacks outside the limitations period. Indeed, TFS is conspicuously silent about its commercialization efforts.

To be clear, a plaintiff's knowledge or notice of the underlying tortious conduct is required to start the running of the statute of limitations because Maryland has adopted the discovery rule and applied it to unjust enrichment claims. *See Jason*, 134 A.3d at 430. The discovery rule is a tolling doctrine—it extends the statute of limitations period to protect plaintiffs "until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury." *See Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 973 (Md. 2000) ("Thus, before an action is said to have accrued, a plaintiff *must* have notice of the nature and cause of his or her injury.") (emphasis added). There is no reason to think the discovery rule somehow shortens the statute of limitations or allows defendants to bypass the basic requirement of establishing that the plaintiff's claim accrued outside of the limitations period. *See Singer Co., Link Simulation Sys. Div. v. Baltimore Gas & Elec. Co.*, 558 A.2d 419, 425 (Md. Ct. Spec. App. 1989) ("[W]hile the discovery rule may thus delay the accrual of a [claim], it cannot operate to make such an action

21

accrue earlier").  TFS's time-bar argument reflects a core misunderstanding of the effect of the discovery rule and should accordingly be rejected.

### B.      TFS's Reliance on Extrinsic Evidence Is Improper.

Instead of focusing on the allegations in Plaintiff's complaint, TFS instead proffers eighteen extra-record exhibits.  *See* ECF Nos. 20-2 to 20-20.  The general rule is that the Court is limited to the four corners of the complaint on a 12(b)(6) motion.  *Goines v. Valley Community Services Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016).  There are two exceptions to the general rule: (1) the exception for documents that are integral to the complaint and (2) the exception for matters properly subject to judicial notice.  *Zak v. Chelsea Therapeutics Int'l Ltd.,* 780 F.3d 597, 606 (4th Cir. 2015) (internal quotations omitted).  TFS argues that both exceptions apply (TFS Mem. at 11-14), but in fact neither one does.

With respect to the first exception, merely referencing the existence of a document, or even quoting from a document is not sufficient to make that document integral to the complaint. *Goines*, 822 F.3d at 166 (limited quotation from or reference to a document on which the plaintiff's claims do not turn is insufficient to make it "integral to the complaint"); *Zak*, 780 F.3d at 607 ("[B]ecause the SEC documents were not explicitly referenced in, or an integral part of, the plaintiffs' complaint, the district court should not have considered those documents in reviewing the sufficiency of the plaintiffs' allegations.").  Rather, it is only documents that have "independent legal significance" to the plaintiff's claim—such as a contract in a breach of contract case, or a libelous writing in a defamation case—that can be integral to the complaint.  *Goines*, 822 F.3d at 166 (quoting *Smith v. Hogan*, 794 F.3d 249, 255 (2d Cir. 2015)); *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (integral document is one that "by its 'very existence [] gives rise to the legal rights asserted'").  None of the documents that

TFS references in its motion come close to meeting this standard.  Plaintiff's claim is not based on legal rights conferred by any specific document but, rather, on TFS's unlawful conduct and well-settled Maryland law.

With respect to the second exception, judicial notice, TFS's argument (TFS Mem. at 9-10) is equally flawed.  Judicial notice cannot "be used as an expedient for courts to consider matters beyond the pleadings and thereby upset the procedural rights of litigants to present evidence on disputed matters." *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 360 (4th Cir. 2013) (citing cases; internal quotation marks omitted); *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 511 (4th Cir. 2015) (courts should "refrain[] from mining the exhibits to determine what, if anything, we could take judicial notice of" in the face of serious factual disputes).  Dismissing a case by taking judicial notice of voluminous hearsay media reports before a plaintiff has had access to any discovery is precisely the kind of misuse of the judicial notice rule that the Fourth Circuit and other courts throughout the country reject.

Judicial notice of the materials that TFS proffers would also bypass the most fundamental protections of the Federal Rules of Evidence.  "Caution must also be taken to avoid admitting evidence, through the use of judicial notice, in contravention of the relevancy, foundation, and hearsay rules." *Am. Prairie Const. Co. v. Hoich*, 560 F.3d 780, 797 (8th Cir. 2009).   The overwhelming majority of the materials that TFS adduces are inadmissible hearsay.  *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prod. Liab. Litig.*, No. 1:17-CV-00944, 2021 WL 2407566, at *5 (D. Md. June 11, 2021) ("[M]edia reports and newspaper articles, if offered for the truth of the matter asserted, are hearsay.") (citing cases).  TFS has provided no foundation—not even an affidavit or declaration—to establish the origin or accuracy of these materials.  *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying

an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). Many of the materials appear to have been selectively edited by TFS. For instance, the exhibit of Rebecca Skloot's book includes only pages 31, 32, 40, and 193. ECF 20-3 at 4-9. It is not surprising, therefore, that courts have repeatedly rejected the use of inadmissible hearsay as a basis for seeking dismissal under Rule 12(b)(6). *See, e.g.*, *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1139 (W.D. Wash. 2006) (granting motion to strike a copy of a study by a professor because "(1) it contains multiple levels of hearsay, and (2) it is evidence outside the scope of a Rule 12(b)(6) motion to dismiss, which is limited to the Complaint and documents of which the Court may take judicial notice"); *Firemans Fund Ins. Co. v. R J Kiln & Co.*, No. CV 11-7460-GW(EX), 2012 WL 13012430, at *4 (C.D. Cal. Mar. 15, 2012) ("Defendant unsuccessfully attempts to wiggle around this rule [*i.e.*, that an affirmative defense may only be established at the pleading stage when a set of undisputed facts is revealed upon which the moving party is entitled to judgment as a matter of law] by incorporating, via a request for judicial notice, the disputed facts required to bolster their affirmative defenses (as to the merits of which the [c]ourt would express no opinion).").

Because judicial notice of the materials TFS attaches to its motion would undermine the fundamental procedural protections of both the Federal Rules of Civil Procedure and the Federal Rules of Evidence, the Court should decline to consider them.

### C. In Any Event, Plaintiff's Allegations Sufficiently Allege That This Action Is Timely.

#### 1. Plaintiff's Claim Cannot Be Time-Barred Because TFS Continues to Sell Mrs. Lacks's Genetic Material to This Day, and Each Instance in Which TFS Sells HeLa Cells Constitutes a Separate Act of Unjust Enrichment.

Wholly apart from TFS's improper use of extrinsic evidence, TFS's time-bar argument ignores critical allegations in the complaint that demonstrate that Plaintiff's unjust enrichment

claim—at least in part—is indisputably timely.  The complaint is replete with allegations that *"[t]o this day*, TFS cultivates and sells HeLa cells in multiple product lines to buyers across the globe." ¶¶ 9, 43 (emphasis added).  Each sale of Mrs. Lacks's genetic material is independently capable of sustaining an unjust enrichment claim.  Moreover, because "there is no *unjust* enrichment before there has been *enrichment,*" *Restatement of Restitution* § 70, cmt. F (emphasis added), Plaintiff's claim, based on these recent discrete acts, could not and did not accrue prior to the limitations period.  *See Jason*, 134 A.3d at 431 (no benefit was conferred on defendant so as to trigger statute of limitations until funds were transferred from plaintiff).  Here, as in *Jason*, there was no "benefit conferred" on TFS until it received payment from each sale of Mrs. Lacks's HeLa cells.  Plaintiff's unjust enrichment claim is thus timely.

TFS's motion is based on the mistaken premise that once it engaged in the first act constituting unjust enrichment prior to the expiration of the statute of limitations period, each successive act is simply the "continuing ill effect" of that first act.[7]  But TFS errs in contending that, once it engaged in that first act of unjustly enriching itself, it hereby obtained carte blanche entitlement in perpetuity to engage in new acts of unjust enrichment.

It is widely accepted that, under the separate-accrual rule, "when a defendant commits successive violations, the statute of limitations runs separately from each violation."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014); *accord Blake v. JP Morgan Chase Bank NA*, 927 F.3d 701, 706 (3d Cir. 2019) (discussing the separate-accrual rule); *see also Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 463 (4th Cir. 1983) (permitting otherwise time-barred contract claim to go forward under Maryland law because delivery of replacement

---

[7] To be clear—this threshold factual assertion has *not* been established by TFS, as discussed in the preceding subsection.  The argument presented here is offered in the alternative.

product "constituted a distinct and separate accrual for purposes of computing the limitations period"). As the Third Circuit noted in *Blake*, most causes of action are subject to the separate-accrual rule and thus plaintiffs can sue "for those claims that were timely when they filed suit." *Blake*, 927 F.3d at 706 ("If the law forbids a discrete act, as most [laws] do, then the separate-accrual rule governs each act."). [8]

Here, at each point that TFS sold HeLa cells without compensating Plaintiff, TFS has been unjustly enriched. Each sale represents a separate event of unjust enrichment for which a separate claim accrues. Thus, Plaintiff's claim for unjust enrichment cannot be barred, at a minimum, for those claims that accrued within the three-years of the filing of the complaint.

Cases in this District have consistently applied the separate accrual rule to Md. Code, Cts. & Jud. Proc. § 5-101, the statute that governs the timeliness of this action  *E.g.*, *Johnson v. Silver Diner, Inc.*, No. PWG-18-3021, 2019 WL 3717784, at *6 (D. Md. Aug. 7, 2019) (treating separate wage and hour violations as distinct accruals, and permitting those that occurred within statute of limitations to move forward); *Peete-Bey v. Educ. Credit Mgmt. Corp.*, 131 F. Supp. 3d 422, 434 (D. Md. 2015) (same, but for conversion and state unfair debt collection claims); *Ely v. Sci. Applications Int'l Corp.*, 716 F. Supp. 2d 403, 408 (D. Md. 2010) (same, but in a contract case); *Abbott v. Gordon*, No. DKC 09-0372, 2009 WL 2426052, at *7 (D. Md. Aug. 6, 2009) ("Each alleged interference with Plaintiffs' prospective advantage constitutes a separate cause of action, with its own date of accrual."). Maryland state courts have done the same. *E.g.*, *Am. Hous. Pres.*,

---

[8] The *Blake* court also noted that those causes of action that are not subject to the separate-accrual rule—causes of action that "are diffuse and comprise many acts over a period of time"—are subject to the continuing violations doctrine. *Blake*, 927 F.3d at 706 ("[I]f [the law] forbids diffuse conduct, comprising many acts at different times, then the continuing-violation doctrine applies."). In section II.C.2 below, Plaintiff explains why, in the alternative, the continuing violations doctrine applies here.

*LLC v. Hudson SLP, LLC*, No. 1241 Sept. Term 2015, 2016 WL 7496181, at *9 (Md. Ct. Spec. App. Dec. 20, 2016) ("Failure to assert a claim on an earlier breach of contract that occurred outside of the limitations period does not preclude a plaintiff from bringing a claim for a subsequent, separate, and independent breach of the same contract that occurred within the limitations period."); *Com. Union Ins. Co. v. Porter Hayden Co.*, 698 A.2d 1167, 1192 (Md. Ct. Spec. App. 1997) ("[T]he failure to perform that duty with respect to each separate claim would constitute a distinct breach").  There is no reason here to depart from this general rule.

Because each distinct sale of Mrs. Lacks's genetic material is independently capable of sustaining an unjust enrichment claim, and because TFS continues to sell that purloined genetic material as chattel to this day, the statute of limitations has not expired for a claim based on these recent, discrete acts.  At most, the statute of limitations *might* bar consideration of acts constituting unjust enrichment that occurred more than three years prior to the commencement of this suit.  But there is no basis in law or fact to conclude that Plaintiff's claim in its entirety should be dismissed.  For this reason, TFS's Rule 12(b)(6) motion should be denied.

### 2.    Alternatively, Plaintiff's Claim Is Not Time-Barred Because the Continuing Violations Doctrine Tolls the Statute of Limitations.

Because Plaintiff has sufficiently alleged that TFS was unjustly enriched within the three years preceding the filing of this action, ¶¶ 11, 46, it is unnecessary to apply the continuing violations doctrine to toll the statute of limitations period for those claims.  Plaintiff's claim is timely and was brought within the statute of limitations period under Maryland law.

In any event, as an entirely separate matter, the ongoing continuing nature of TFS's transactions brings this case within the ambit of the continuing violations doctrine.  The continuing violation doctrine prevents statutes of limitations from commencing where the wrong is ongoing and has never ceased.  *See generally Litz v. Maryland Dep't of Env't*, 76 A.3d 1076, 1089 (2013)

("[V]iolations that are continuing in nature are not barred by the statute of limitations merely because one or more of them occurred earlier in time.") (citation and internal quotation marks omitted).  TFS has built a multibillion-dollar business empire from commercialization of Henrietta Lacks's genetic material.  ¶¶ 9-11.  With the knowledge that Mrs. Lacks's tissue was unethically and unlawfully taken by Johns Hopkins' doctors, TFS intentionally engaged in countless successive business transactions over the course of *years* to sell that stolen property and reap tremendous financial gain.  ¶¶ 10-11.  Each and every time that it sold or transacted with Mrs. Lacks's genetic material, TFS received and improperly retained an unjust benefit without her Estate's permission and without compensating her Estate, and it inequitably retained that benefit. Each sale of Mrs. Lacks's cells and the introduction of new proprietary and trademarked products derived from the HeLa cell line constitutes a separate instance of unjust enrichment.

The continuing violations doctrine operates to toll statutes of limitations where, as here, the wrongful conduct is recurrent.  The Maryland Court of Appeals has articulated the principle underlying application of the doctrine as follows: "[E]very repetition of the wrong creates further liability and creates a new cause of action, and a new statute of limitations begins to run after each wrong perpetuated."  *Litz*, 76 A.3d at 1089 (quoting *Jones v. Speed*, 577 A.2d 64, 69 n.4 (Md. 1990) (in turn citing cases)).  "'Although an action for a continuing tort may not be barred by the statute of limitations, damages for such causes of action are limited to those occurring within the 'three[-]year period prior to the filing of the action.'"  *Id.*  (quoting *Shell Oil Co. v. Parker*, 291 A.2d 64, 67 (Md. 1972)).

In *Litz*, the plaintiff had discovered in 1996 that the defendant was allowing the discharge of contaminated groundwater onto her property, but did not bring her action until 2010.  In ruling

that the claims were not time barred, the Court of Appeals applied the continuing violations doctrine:

> Nothing in the [c]omplaint indicate[d] that the Town's allegedly negligent actions ceased before March 2007, three years before Litz filed her cause of action in March 2010.   Because a reasonable trier of fact could determine that the allegedly negligent actions by the town were ongoing and continued to occur during the three years prior to Litz filing a claim, it [wa]s not clear on the face of the [c]omplaint that the cause of action for negligence is barred by the statute of limitations.

*Id.* at 1091.

Under *Litz*, when an ongoing tort begins occurring outside of the limitations period and continues during the limitations period, the continuing violations doctrine may apply even when the plaintiff discovered the tort years earlier and its claims would otherwise be time-barred. Therefore, even assuming *arguendo* that TFS's unjust sale of Henrietta Lacks's genetic material began prior to the three-year limitations period and continued into the three years prior to filing the complaint, *Litz* holds that whether and when Plaintiff discovered the tort is immaterial because of its ongoing nature.   Moreover, Plaintiff's complaint goes far beyond merely "indicating" that TFS's acts constituting unjust enrichment "did not cease" within the three years prior to Plaintiff filing the instant complaint.   The complaint explicitly alleges that TFS continues transacting with HeLa cells to this very day and it continues to reap enormous profits.   ¶ 11.

Although much of the case law involves claims of negligence, nuisance, or trespass simply due to the nature of many such torts, courts have applied the doctrine to other claims as well, including unjust enrichment.   *See*, *e.g.*, *Malfatti v. Mortg. Elec. Registrations Sys., Inc.*, No. C 11-03142LB, 2013 WL 3157868, at *5 (N.D. Cal. Jun. 20, 2013) (denying summary judgment on statute of limitations grounds as to the plaintiff's unjust enrichment claim and applying the continuing violations doctrine because of the defendant bank's unjust retention of plaintiff's mortgage payments *during* the statutory period); *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117,

134-36 (E.D.N.Y. 2000) (applying continuing violations doctrine to unjust enrichment claim of Jewish victims and survivors of the Nazi Holocaust in France, and their heirs and beneficiaries, whose assets had been deposited in, processed by, or converted by defendant banks during or after the Holocaust and not returned); *78/79 Assoc. v. Rand*, 175 Misc. 2d 960 (N.Y. Civ. Ct. 1998) (applying continuing violations doctrine to plaintiff's cause of action for violation of New York City's Rent Stabilization Code, concluding that "a cause of action accrue[d] anew with each month's payment of [a] rent overcharge).

For instance, in *Bodner*, descendants of Jewish customers of French financial institutions sued those institutions, claiming damages arising from participation in a scheme to appropriate assets of customers during Nazi occupation and subsequent failure to disgorge assets to them as rightful owners. *Bodner v. Banque Paribas, 114 F. Supp. 2d* at 121-23. Based on the continuing violations doctrine, the court tolled the applicable statute of limitations:

> The nature of plaintiffs' claim is such that the continued denial of their assets, as well as facts and information relating thereto, if proven, constitutes a continuing violation of international law reasonably within the exceptions to the ordinary laws of accrual. Furthermore, plaintiffs could hardly have been expected to bring these claims at the end of World War II, and claim they have been consistently thwarted in their attempts to recover funds and information from defendant banks. As pled, plaintiffs have stated a continuing violation of international law. As such, the statute of limitation has been tolled from running and plaintiffs' claims are not time-barred.

*Id.* at 134-35; *see also Duke Street Ltd. P'ship v. Bd. of Cty Comm'rs*, 684 A.2d 40, 47 (Md. Ct. Spec. App. 1996) (citing nuisance as example of claim that is "in the nature of a 'continuous tort' . . . [that] can extend the period of limitations due to their new occurrences over time").

Here, as in *Bodner*, the nature of Plaintiff's claim is such that the continued sale of Mrs. Lacks's HeLa cells for profit, as well as facts and information relating thereto, if proven, constitutes a continuing violation. Thus, any applicable statutes of limitations have yet to expire.

TFS cites no authority holding otherwise.  Contrary to TFS's assertion (TFS Mem. at 16), neither *Walton v. Network Solutions*, 110 A.3d 756, 768 (Md. 2015), nor *Cain v. Midland Funding, LLC*, 256 A.3d 765, 791 (Md. Ct. App. 2021), precludes application of the continuing violations doctrine to unjust enrichment claims.

According to TFS, *Cain* established a bright-line rule that "the continuing harm doctrine does not apply to unjust enrichment claims."  TFS Memo. at 16.  In fact, the Court *declined* to endorse the invitation of the defendant in that case to adopt such a rule.  The Court merely made the factual observation that "the doctrine is *usually* applied in nuisance, trespass, and other tort cases."  *Id.* at 790 (emphasis added).  But "usually" is a far cry from "only."  Instead, the Court focused carefully and exclusively on the precise facts of the case. [9]

Factually, *Cain* is readily distinguishable.  The plaintiffs alleged that the defendant debt collection agency had been unlicensed when it obtained judgments against them and sought to invoke the continuing violations doctrine to toll the statute of limitations because the defendant continued to garnish their wages (though properly licensed) during the three years preceding the suit's filing.  *Id.* at 791.  In holding that the continuing violations doctrine did not apply, the Maryland Court of Appeals concluded that the wrong had not been the collection activity itself but, rather, the defendant's unlicensed status when it initiated collection actions and obtained judgments against the plaintiffs, and that the plaintiffs had improperly attempted to extend their accrual date by relying on collection activities *after* the defendant had become licensed.  *Id.* at 793.

---

[9] *Id.* at 793, 805 ("We are not persuaded to apply the continuing harm doctrine under the facts of this case"; "We decline to apply the continuing harm doctrine where the alleged continuing harm is [defendant's] attempts to collect on the judgments after it became licensed"; "We decline to apply the continuing harm theory to extend the accrual date for Petitioners' claims").

Because those collection activities within the statutory period were legitimate, the plaintiffs were not entitled to invoke the continuing harm rule.  *Id.*

Importantly, the court recognized long established precedent holding that "[t]he continuing harm doctrine permits recovery by an injured party caused by a *tortfeasor's* sequential breaches of an ongoing duty by imposing a new limitations period for each breach."  *Id.* at 790 (emphasis added).  It applies where, as here, "the violation or the wrongful act is ongoing or continuing in nature (as opposed to the continued ill effects from the original alleged violation)"; in such cases, "the ongoing violations will not be barred by the statute of limitations merely because one or more of them occurred earlier in time."  *Id.* at 792.

Thus, unlike TFS here, which is continuing to mass-produce and sell Mrs. Lacks's genetic material to this very day, the defendant in *Cain* had not continued the same unjust conduct (*i.e.*, unlicensed collection efforts) that gave rise to the plaintiffs' claim.   TFS's unjust commercialization of Mrs. Lacks's genetic material has never been lawful.

*Walton* is likewise inapposite.  TFS cites the case for the proposition that "continually sending [the plaintiff] e-mails was [not] a 'continuing harm'" under the Maryland Consumer Protection Act, because there was "no intrusion by way of trespass or nuisance onto appellant's property, justifying the application for the continuing harm doctrine."  TFS Mem. at 16.  Unlike here, the court held that the plaintiff did not have a continuous and ongoing duty or relationship with the defendant that excused him from bringing suit within three years.  *Walton*, 110 A.3d at 769.  Moreover, it is evident from the plain language of the court's ruling that, although a trespass or nuisance may justify application of the doctrine, those causes of action are not an exhaustive list of the circumstances justifying its application.

To be sure, Maryland courts decline to apply the continuing violation doctrine where—unlike the present case—there were clearly no additional wrongful actions taken by the defendant after the initial wrongful conduct and the harm to the plaintiffs was merely the "continuing ill effects of prior tortious acts." For example, in *MacBride v. Pishvaian*, 937 A.2d 233 (2007), *abrogated in part by Litz*, 76 A.3d 1076, the court rejected the continuing violations doctrine in a tenant's suit against her landlord for unfair and deceptive trade practices. *Id.* at 240-41.[10] The court held that that the deteriorating condition of the property due to water intrusion and mold issues was "'merely the continuing ill effects from the original alleged violation, and not a 'series of acts or course of conduct . . . that would delay accrual of a cause of action to a later date.'" *Id.* at 241 (quoting *Duke Street Ltd. P'ship*, 684 A.2d at 47) (emphasis omitted).

In contrast, TFS's repeated transactions and profiting from the mass-production and sale of Mrs. Lacks's genetic material (all while knowing of the shocking origins of the HeLa cell line) is plainly a series of discrete acts that, under *MacBride*, would warrant application of the continuing violations doctrine. ¶¶ 8-11, 21, 41-44. Plaintiff has sufficiently alleged that TFS was unjustly enriched in the three years preceding the filing of this action. ¶¶ 11, 42-46.

In short, TFS's ongoing wrongful conduct supports application of the continuing violations doctrine. In any event, application of the that doctrine is not necessary to preserve Plaintiff's unjust enrichment claim. The complaint sufficiently alleges that TFS is *currently* selling Mrs. Lacks's genetic material and is *currently* being unjustly enriched by such sales. Consequently, the Court

---

[10] TFS incorrectly refers to *MacBride* as an unjust enrichment case. *See* TFS Mem. at 17. The only claim that the Maryland Court of Appeals considered in its analysis was an unfair and deceptive trade practices count. *See* 937 A.2d at 235-41. Fraud, negligence, and breach of contract counts were not at issue on appeal, and an unjust enrichment claim had been dismissed earlier. *See id.* at 236 & n.4.

can properly reject TFS's statute of limitations argument at the pleading stage without even reaching the continuing violation or harm doctrine.

* * *

In sum, under well-settled law, the complaint sufficiently alleges the elements of unjust enrichment, and Plaintiff's claim is timely asserted.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should deny TFS's Rule 12(b)(6) motion.[11]


DATED:  February 11, 2022          /s/ Kim Parker
                                   Kim Parker, Esquire
                                   Federal Bar No.: 23894
                                   **LAW OFFICES OF KIM PARKER, P.A.**
                                   2123 Maryland Ave.
                                   Baltimore, MD 21218
                                   Telephone: 410-234-2621
                                   Fax: 443-486-1691
                                   kp@kimparkerlaw.com

                                   Christopher A. Seeger (*admitted pro hac vice*)
                                   Jeffrey S. Grand*
                                   Christopher L. Ayers *(admitted pro hac vice)*
                                   Nigel P. Halliday *(admitted pro hac vice)*
                                   Yasmine G. Meyer*
                                   **SEEGER WEISS LLP**
                                   55 Challenger Road, 6th Floor
                                   Ridgefield Park, NJ  07660
                                   Telephone: 212-584-0700
                                   Fax: 212-584-0799
                                   cseeger@seegerweiss.com
                                   jgrand@seegerweiss.com
                                   cayers@seegerweiss.com
                                   nhalliday@seegerweiss.com
                                   ymeyer@seegerweiss.com

---

[11] If the Court grants any part of TFS's motion, this Court should afford Plaintiff leave to amend its complaint because amendment would not be futile.

Ben Crump *(admitted pro hac vice)*
Christopher O'Neal*
**BEN CRUMP LAW, PLLC**
717 D Street, N.W. Suite 310
Washington D.C. 20004
Telephone: 860.922.3030
ben@bencrump.com
chris@bencrump.com

*Application for Pro Hac Vice Admission
Pending*
ATTORNEYS FOR RON L. LACKS, PERSONAL
REPRESENTATIVE OF THE ESTATE OF HENRIETTA
LACKS

## <u>HEARING REQUESTED</u>

Plaintiff request that a hearing be held concerning Defendant's Motion to Dismiss and the instant Opposition to the same.

/s/ Kim Parker

_____

Kim Parker

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY, that on this 14th day of February, 2022, a copy of Plaintiff's Opposition to the Defendant's Motion to Dismiss was sent by this Court's electronic delivery system to all counsel of record.

/s/ Kim Parker

_____

Kim Parker