**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| **RON L. LACKS, PERSONAL REPRESENTATIVE OF THE ESTATE OF HENRIETTA LACKS,** <br><br> **PLAINTIFF,** <br> **VS.** <br><br> **THERMO FISHER SCIENTIFIC INC.,** <br><br> **DEFENDANT.** | **Case No. 1:21-cv-02524-DLB** |

**BRIEF OF *AMICUS CURIAE* PROFESSOR DELESO A. ALFORD, J.D., LL.M.**
**IN SUPPORT OF PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

Comes now *Amicus Curiae*, Professor Deleso A. Alford, J.D., LL.M., by and through

counsel, Cary J. Hansel and the law firm of Hansel Law, P.C., and files the aforesaid Brief,

stating as follows:

**I.    Introduction**

The plaintiff's opposition is well briefed and correct.  It ought to prevail absent the input

of *amici*.  Yet, in a matter of such importance, nothing can be left to chance.  With this in mind,

Professor Alford and counsel hope to briefly offer some unique analysis in support of the

plaintiff followed by a discussion of the equities and public policy issues implicated.

The scholarship of the Court's *amicus*, Professor Deleso A. Alford, J.D., LL.M., is

focused on the harm done to Black people in general, and the family of Henrietta Lacks in

particular, by those who have experimented on and stolen from Black bodies in the name of

profit, masquerading as medicine.  Professor Alford hopes that her views in support of the plaintiff will aid the Court in reaching a just result.

II.    **Interest of *Amicus Curiae***

*Amicus*, Deleso A. Alford, J.D., LL.M., is the Rachel Emanuel Endowed Professor of Law, Southern University Law Center and Off-Campus Instructional Site (OCIS) Director at Shreve Memorial Library (Shreveport, Louisiana).  She teaches, researches, develops and promotes the integration of cultural competency training in both medical and legal curricula. Professor Alford focuses, as an academic scholar, on bringing racially inflected lessons from the classroom into practical application.

Professor Alford's research and writing includes the seminal published work on precisely the theory underlying this case, *HeLa Cells and Unjust Enrichment in the Human Body*.  *See* 21 Annals Health L. 223 (2012).  As a former Adjunct Professor of Medicine at The University of Central Florida College of Medicine, Professor Alford raised the unjust enrichment claim in the classroom as a means to address notions of medical ethics[1] and health equity[2] with first year medical students.[3]  The course resulted in a peer-reviewed journal publication.  A related

---

[1] TOM L. BEAUCHAMP & JAMES F. CHILDRESS, PRINCIPLES OF BIOMEDICAL ETHICS 12.

[2] Braveman P, Gruskin S. Defining equity in health, J Epidemiol Community Health. 2003; 57(4):254–258. http://dx.doi.org/10.1136/jech.57.4.254.

[3] Barkley, Lisa, Alford, Deleso. Medical Ethics and Health Equity: The Henrietta Lacks Story. MedEdPORTAL Publications; 2015. Available from:  http://dx.doi.org/10.15766/mep_2374-8265.10276; Barkley, Lisa, Alford, Deleso. Medical Ethics and Health Equity: The Henrietta Lacks Story. MedEdPORTAL Publications; 2015. Available from: http://dx.doi.org/10.15766/mep_2374-8265.10276; Author has presented extensively on the claim for unjust enrichment for the descendants of Henrietta Lacks at both legal and medical conferences as well as while serving as a Visiting Scholar in Residence at The University of New Mexico Health Sciences Center (March 21-23, 2018); Stetson University College of Law (Summer 2017); Tuskegee University National Center for Bioethics in Research and Health Care(Summer 2013); The University of New Mexico Health Sciences Center (Summer 2012) Inaugural Diversity Visiting Scholar.

Psychosocial Issues module was also designed to prepare first year medical students to address key issues that impact the provision of healthcare and the doctor-patient relationship.[4]  Professor Alford continues to integrate Mrs. Henrietta Lacks' lived experiences into legal and medical curricula to help students acknowledge moral and ethical conflicts in clinical cases.

Currently, Professor Alford facilitates virtual chat cultural competency teaching modules including topics such as "HeLa Cells and Health Equity" for an audience consisting of LSU Health Sciences Center Shreveport School of Medicine, School of Graduate Studies, and School of Allied Health Professions.[5]

In a similar vein, Professor Alford's forthcoming book, Tuskegee's Forgotten Women: The Untold Side of the U.S. Public Health Services Syphilis Study, sheds light on how women were impacted by the U.S. Public Health Service's choice to experimentally leave syphilis untreated in a poor Black population.  Professor Alford is also the Senior Editor of a book entitled, Enslaved Women in America: An Encyclopedia, Editor, Daina Ramey Berry (Greenwood Press/ABC-CLIO).  Her entry, Medical Experimentation and Surgery, acknowledges the enslaved bodies of Anarcha, Betsey and Lucy and their abuse for gynecologic research.

Professor Alford has spoken, taught and written on legal and medical issues domestically and abroad, with a focus on the integration of critical race feminist theory into law and medical school curriculum.  Her work calls on medical schools and health care professionals worldwide to integrate in educational training and their professional lives the narratives of vulnerable women whose bodies have been used for and affected by medical research and advancement—

---

[4] *Id*; *see* https://med.ucf.edu/academics/md-program/program-modules/m1-first-year-modules.
[5] *See* https://www.lsuhs.edu/our-schools/diversity-affairs.

and whose stories have been neglected in the annals of medical history.  For over a decade, she has been leading the charge for inclusion of the experiences of women as a matter of necessary cultural competency and resulting gender and racial equity in the provision of health care.

Professor Alford earned a B.S., *magna cum laude* at Southern University A&M College, a J.D. at Southern University Law Center, and an LL.M. at Georgetown University Law Center. She also has a Certification in Clinical Bioethics from the Medical College of Wisconsin.  She is a past Fulbright Scholar in Senegal/Cote d'Ivoire; former Delegate to the World Conference Against Racism in Durban, South Africa (2001); and past member of the American Bar Association Special Committee on Bioethics and the Law (2015-2016).

Neither Professor Alford nor undersigned counsel have any financial interest in the outcome of this case.

### III.   <u>The Motion to Dismiss Should be Denied</u>.

As noted above, the plaintiff's briefing is correct and should easily carry the day standing on its own.  *Amicus Curiae* adopts and restates the totality of the plaintiff's position in opposition to dismissal, but offers the following additional analysis for the Court's consideration.

### A.   <u>The Claims are Not Time Barred, and Discovery Should be Permitted</u>.

The plaintiff is correct that Thermo Fisher Scientific Inc. (Thermo Fisher) has been – and continues to be – unjustly enriched every time it profits from HeLa cells.  Each new sale or other profitable use of the cells is a new violation with its own three-year statute of limitations.  One element of the claim here is that the defendant must have been unjustly enriched.  That element is not satisfied in connection with each new sale until the profit therefrom is received.  It is not until profit is derived that the limitations period for each sale begins to run.  The Court's *amicus*

alternatively endorses the plaintiff's briefing to the effect that the continuing violation doctrine tolls the statute of limitations.

The plaintiff also correctly notes that the defense reaches well beyond the pleadings, including to matters uniquely know to the defendant, in laying out its case for limitations.  In such cases, it is important to permit discovery so that the issues can be fairly briefed on a complete record, equally available to all parties.

Amicus wishes to highlight one example where discovery may well reveal whole new violations – each subject to its own limitations period running from the point of discovery by the family.  At Paragraph 43 of the Complaint, the plaintiff notes that Thermo Fisher not only cultivates and sells HeLa cells, but also develops new products using these cells.  The Complaint lists 11 different products Thermo Fisher has derived from the cells stolen form Mrs. Lacks.  *Id*.

While Thermo Fisher might argue (irrelevantly) that its possession and sale of the cells themselves has been known for some time, the plaintiff could not have learned about any of the company's new products using the stolen cells prior to their development.  Even if suit was time-barred as to the buying and selling of the cells (it is not), developing a new product containing the cells is an entirely new instance of unjust enrichment.

Discovery is appropriate to determine when each line was developed and when profit was first derived therefrom – a matter uniquely within the knowledge of the defendant.  Then, the question will be when the plaintiff knew or should have known about the defendant's profit from each new product.  And finally, a proper analysis would include recognition of the fact that each sale of these new products is a unique violation, or, alternatively, that there is a separate continuing violation related to each new product line.

This Court should deny the present motion and allow discovery to proceed so that these issues (and those identified by the plaintiff) can be properly examined and briefed.

**B.**     **Unjust Enrichment Can be – *and Often is* – Brought as a Standalone Claim.**

The defense argument that a Maryland common law claim for unjust enrichment cannot be brought as a standalone claim can be easily swept aside by citation to a series of cases not yet brought to the Court's attention.

In *Mona v. Mona Elec. Grp., Inc.*, only "the unjust enrichment claim was submitted to the jury for decision." *Mona v. Mona Elec. Grp., Inc.*, 176 Md. App. 672, 683–86, 934 A.2d 450, 456–58 (2007). All other claims were dismissed by the trial court. *Id*. After post-trial motions, a significant six-figure judgment was entered on the single unjust enrichment claim by the Circuit Court. *Id*. On appeal, the Court ruled that, "we shall affirm the judgment of the circuit court." *Id*.

Indeed, there are *many* examples of Maryland appellate courts permitting a single count for unjust enrichment to proceed. *See, e.g., Dolan v. McQuaide*, 215 Md. App. 24, 40, 79 A.3d 394, 404 (2013) (reversing summary judgment as to a single count for unjust enrichment and remanding that claim to the trial court); *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 298–99, 936 A.2d 343, 353–54 (2007) (reversing grant of summary judgment and remanding a single count of unjust enrichment to the trial court).

The *Mona* decision, affirming a judgement for a single count of unjust enrichment, entirely refutes the defense's position that such a claim may not stand alone. The same is true of the standalone unjust enrichment claims remanded in *Hill* and *Dolan*. Given these concrete examples, blessed by our appellate courts, the defense is wrong to represent that no standalone claim exists.

### C.      The Defendant Misunderstands what it Means to be a *Bona Fide* Purchaser for Value and it is *Not* Such a Purchaser.

The plaintiff correctly notes that the Complaint is rife with allegations sufficient to demonstrate that the defendant is not a *bona fide* purchaser for value.  *Bona fide* is, of course, Latin for "in good faith."  Thermo Fisher acts in *bad* faith when it knowingly purchases, and sells for profit, the spoils of an unlawful and racist assault.  These are the allegations of the Complaint and they demonstrate that Thermo Fisher's actions are the very opposite of *bona fide*. *See, e.g.*, Complaint at ¶¶ 9-11; 14-15; 22; 41-42, 45.

The defense argues that Thermo Fisher was a "*bona fide*" purchaser allegedly because, "Thermo Fisher played no part in the original collection of HeLa cells from Mrs. Lacks." *See* Defense Motion at 22.  In doing so, the defense misunderstands what it means to act in sufficient good faith to be "*bona fide*" – *both as a matter of law and morality*.

The Maryland Court of Appeals has made the law clear on this point.  The fact that Thermo Fisher did not cut the tissue from Mrs. Lacks' body does *not* render Thermo Fisher's profiteering "*bona fide*":

> …we have not required always that a benefit conferred in an unjust enrichment action come necessarily and directly to the defendant from the plaintiff's own resources. *See Plitt v. Greenberg*, 242 Md. 359, 364, 219 A.2d 237, 241 (1966) ("'**It is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner.'**" (*quoting Empire Oil Co. v. Lynch*, 106 Ga.App. 42, 126 S.E.2d 478, 479 (1963))); *Plitt*, 242 Md. at 364, 219 A.2d at 241 (**"[A] plaintiff could recover money from even an innocent transferee who was without knowledge that he possessed the plaintiff's money."**).

*Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 298–99, 936 A.2d 343, 353–54 (2007).

To avoid liability, Thermo Fisher must not only have paid for the cells, but it must have done so in good faith.  The test is whether, "in equity and good conscience," Thermo Fisher is

entitled to hold the tissue of Mrs. Lacks against the true owners, her heirs.  While the answer appears self-evidently to favor the plaintiff, the plaintiff has, *at the very least*, pleaded the issue sufficiently to defeat the present motion.

In different circumstances, this Court has defined a "*bona fide* purchaser" as one who acquires property without notice of a competing claim.  *Haley v. Corcoran*, 659 F. Supp. 2d 714, 724 (D. Md. 2009).  As the plaintiff's briefing makes clear, even this overly-narrow standard is easily met.  It has been well known to the defendant and all involved for some time that the family of Henrietta Lacks had a "competing claim."  Indeed, this Court's *amicus* wrote a published article about precisely this point nearly a decade ago.  Deleso A. Alford, J.D., LL.M., *HeLa Cells and Unjust Enrichment in the Human Body*, 21 Annals Health L. 223 (2012).

Moreover, the Court's reference in *Haley* to the fact that a *bona fide* purchaser must not have notice of a competing claim appears to have been shorthand for the broader equitable standard.  This is evident from the fact that in *Haley*, and the cases cited therein, the Court was not faced with the other equities at issue here, so the facts of those cases only presented the narrower question of knowledge of a competing claim.

Accurately put, Maryland law is concerned broadly with "equity and good conscience," which, in some cases, may come down to whether one has notice of a competing claim.  *Plitt v. Greenberg*, 242 Md. 359, 364, 219 A.2d 237, 241 (1966); *Hill v. Cross Country Settlements*, LLC, 402 Md. 281, 298–99, 936 A.2d 343, 353–54 (2007).  But, in this case, a complete analysis of the equities requires – *and Maryland law permits* – a broader view.

## IV.    Common Law Remedies are Designed to Further Important Public Policy Goals, and the Overwhelming Equities Favor Finally Making the Lacks Family Whole.

In her seminal article entitled, *HeLa Cells and Unjust Enrichment in the Human Body*, 21 Annals Health L. 223 (2012), Professor Alford illustrates the viability of a claim against those

8

who unjustly enrich themselves selling human tissue derived from the body of Mrs. Lacks.  The plaintiff's case tracks the proposal in the article and controlling law.

Professor Alford wrote her article to highlight the historical dehumanization of Mrs. Lacks despite the simultaneous extraction of great value from her body.  As noted in plaintiff's complaint, "[t]here is a widespread consensus today that the theft of Mrs. Lacks' cells was profoundly unethical and wrong."[6] Indeed, there can be no doubt that the surgical removal of Henrietta Lacks' healthy cervical tissue for research purposes without her knowledge or consent amounted to an unlawful assault.  To add insult to injury, after her unique and valuable cells were stolen and commoditized, she received nothing in return.  Even her estate remains uncompensated more than 70 years later.

This Court's recognition that defendant Thermo Fisher was unjustly enriched will have the immediate and historic effect of humanizing Mrs. Henrietta Lacks.  This process *starts* with acknowledging the historical wrongs committed against Mrs. Lacks[7] in the segregated ward of Johns Hopkins.  But the defendant must not be permitted to allow the narrative to *end* there; not when Mrs. Lacks' cells live on, profiting Thermo Fisher unjustly.

Defendant Thermo Fisher clearly indicates awareness of its ill-begotten benefit on its own website, where it admits that HeLa cells were removed from Mrs. Lacks and used for research despite the fact that "[Mrs.] Lacks and her family were unaware that her tissue was used in this way."[8]  It is hard to imagine a more explicit admission than the Thermo Fisher website's reference to "the widespread but unsanctioned use of HeLa cells from Henrietta Lacks."[9]  When

---

[6] *See* Plaintiff's Complaint, para. 8 page 3.
[7] *Supra* note 1 at 226- 227.
[8] *See* Plaintiff's Complaint, paras. 7, 39- 41.
[9] *See* Plaintiff's Complaint, paras. 7, 39- 41.

9

a company admits knowing it is in possession of human tissue carved from the body of someone "unaware" and used in ways "unsanctioned" by them, any profit derived by the company from the tissue is grossly unjust.

The benefit enjoyed by Thermo Fisher is evident from its choice to profit from the unlawful conduct of Johns Hopkins' doctors by cultivating and selling HeLa Cells.  Indeed, the Complaint alleges that Thermo Fisher has made millions of dollars in profit from Mrs. Lacks' cell line.[10] This was done and continues without permission from Mrs. Lacks or her Estate.[11]

We are all beneficiaries of advances made possible by the HeLa cell line. [12]  "HeLa cells were vital for developing the polio vaccine; uncovered secrets of cancer, viruses, and the atom bomb's effects; helped lead to important advances like in vitro fertilization, cloning, and gene mapping; and have been bought and sold by the billions." [13]

The defendant selfishly cites the public good to justify its profiteering from the assault of Henrietta Lacks.  But the family does not seek to frustrate the use of the cells to benefit personkind.  Instead, the family only asks to share in the profit derived from what was stolen from the family.  Society's debt to Henrietta Lacks is best repaid to her family, not unrelated profiteers.

A decade ago, *amicus* wrote, "[e]ven though Henrietta's cells launched a multimillion-dollar industry that sells human biological materials, the family never saw any of the profits, and

---

[10] *See* Plaintiff's Complaint, paras. 9, 15, 41-46.
[11] *See* Plaintiff's Complaint, paras. 9, 45.
[12] *Id.* at 223-224.
[13] REBECCA SKLOOT, THE IMMORTAL LIFE OF HENRIETTA LACKS, Review excerpt on book cover (Crown Pub. Group 2010).

for decades after her death, many of her descendants struggled in Baltimore, often going years without health insurance."[14]

The impact of wealth echoes through generations.  The doctors whose careers were built on surreptitiously stealing tissue from Mrs. Lacks profited greatly from that theft, winning awards and enjoying long and prosperous employment.  Dr. George Otto Gey, who supervised the theft of tissue from hundreds of unwitting victims and lied about the source of the HeLa cells during his lifetime, won many accolades for what he had done.  Dr. Gey was able to send his own son to medical school – a feat well beyond the means of the Lacks family.[15]  The son became a cardiologist, after completing his internship and residency at Johns Hopkins.[16]  He appears to still be practicing medicine today with a Washington State license listed as active until 2023.[17]

Meanwhile, Mrs. Lacks died shortly after her experience with Dr. Gey, leaving her husband and five children.  One of her grandsons self-published a book, well prior to the filing of this case, which describes matters succinctly:

> The pharmaceutical executive's children will be rich and well off from Henrietta's cells, but my family has to struggle because of it?  It's not right… the money part of it.  The Lacks family has gone this long without it and we really don't think anything is going to come of it.  In fact, I doubt that the family will ever see justice in my lifetime…

Ron Lacks, *Henrietta Lacks, The Untold Story* (January 2020), p. 337.

In the same year Mr. Lacks was self-publishing a book in the hopes of finding some help for his family, the CEO of Thermo Fisher received a compensation package of over *$26 million*.

---

[14] *Id.*  at 230 – 231.
[15] https://en.wikipedia.org/wiki/George_Otto_Gey#Personal_life_and_death.
[16] *Id.*
[17] https://www.doximity.com/pub/george-gey-md.

https://www1.salary.com/THERMO-FISHER-SCIENTIFIC-INC-Executive-Salaries.html.  The

COO was paid over *$11 million*.  *Id*.  The CFO was paid over *$9 million*.  *Id*.  The Executive

Vice President was paid over *$9 million*.  *Id*.  The Senior Vice President was paid over *$4.9

million*.  *Id*.  So, *in a single year*, *just these 4 executives* at Thermo Fisher took home over *$60

million*.  This is the type of wealth unjustly generated in part by Mrs. Lacks' stolen cells.

 Ron Lacks was at least partially correct.  The pharmaceutical executive's children *will* be

rich and well off from Henrietta Lacks' cells – as will their grandchildren and their great

grandchildren, and likely many generations to come.  The question for this Court is whether the

rest of Mr. Lacks' fear is well founded: *will the Lacks family ever see justice in his lifetime*?

 In considering how to answer the question Mr. Lacks has rightfully put to all of us, we

encourage the Court to consider the consequences of allowing the doctors and drug companies to

keep millions made from pilfered cells.  What might we expect in the future from healthcare

providers and pharmaceutical companies in the face of so much to be made without

consequence?

 One might be tempted to rely, for an answer, on our modern sense of medical ethics and

improved regulatory structures.  Before deeming this sufficient, we must recall that, in 1951, it

was considered progressive that a white doctor was willing to treat a Black woman at all.  The

modern "treatment" she received in a segregated ward was to have a radioactive rod inserted into

her vagina, likely hastening her death, and her tissues stolen to later be sold for profit.

 The cutting edge of scientific and medical discovery stays, almost by definition, well

ahead of the ethicists and regulators of the time.  For this reason, effective remedies in the civil

justice system are often the last bulwark against the unconscionable.  An important reason to

deny the motion to dismiss is to hold this line.

The Restatement (Third) of Restitution and Unjust Enrichment § 51(3) (2011) states, "a defendant who is enriched by misconduct and who acts [ ] with knowledge of the underlying wrong to the claimant" is a conscious wrongdoer liable for its profits.  Given that Thermo Fisher "made the conscious choice to profit from the assault of Henrietta Lacks, [its] ill-gotten gains rightfully belong to Mrs. Lacks' Estate."[18] This Court's ruling in favor of the Plaintiff can finally close the gap between the benefit conferred by Mrs. Lacks and the value gained by multi-million-dollar profiteers like Defendant Thermo Fisher.

## CONCLUSION

Accordingly, this Court should deny the defendant's Motion to Dismiss.

Respectfully submitted,

HANSEL LAW, PC

_____/s/ Cary J. Hansel_____
Cary J. Hansel (Bar No. 14722)
cary@hansellaw.com
2514 North Charles Street
Baltimore, MD 21218
T: 301-461-1040
F: 443-451-8606

*Counsel for Amicus Curiae*,
*Deleso A. Alford, J.D., LL.M.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 22nd, 2022, I caused the foregoing to be filed via the Court's electronic filing system, which will make service on all parties entitled to service.

_____/s/ Cary J. Hansel_____
Cary J. Hansel (Bar No. 14722)

---

[18]*See* Plaintiff's Complaint, para. 15, page 5.