**RON L. LACKS, PERSONAL REPRESENTATIVE OF THE ESTATE OF HENRIETTA LACKS,**

         **Plaintiff,**

  **VS.**

**THERMO FISHER SCIENTIFIC INC.,**

         **Defendant.**

**Case No. 1:21-cv-02524-DLB**

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 4

    A.    Physicians at Johns Hopkins Unlawfully Violated Henrietta Lacks's Physical
        Person by Surgically Removing Her Tissue Without Her Consent ...................................... 4

    B.    Mrs. Lacks's Cell Are One of the Most Important and Widely Used Tools in
        Modern Medical Research ................................................................................................ 5

    C.    Like the Rest of the Scientific Community, TFS Knew That HeLa Cells Were
        Ill Gotten and the Result of Non-Consensual and Non-Therapeutic Medical
        Experimentation .............................................................................................................. 5

    D.    TFS Chose to Unfairly and Unjustly Profit from the Wrongful Conduct of
        Johns Hopkins' Physicians ............................................................................................. 6

    E.    Prior Proceedings in This Action .................................................................................... 8

STANDARD OF REVIEW ................................................................................................ 8

ARGUMENT .................................................................................................................... 10

    I.    THE SAC PLEADS A COGNIZABLE UNJUST ENRICHMENT CLAIM ............... 10

        A.    TFS Received a Benefit from Henrietta Lacks ......................................................... 10

        B.    The Benefit Conferred on TFS Was Not Remote ..................................................... 14

        C.    TFS Was Not a Bona Fide Purchaser for Value ...................................................... 19

        D.    Plaintiff Sufficiently Alleges Unjust Enrichment Based on Tortious Conduct .......... 23

    II.    PLAINTIFF TIMELY COMMENCED THIS ACTION ............................................ 27

        A.    The Court Should Decline to Take Judicial Notice of Extrinsic Materials ............... 28

        B.    Either the Separate Accrual Rule or Continuing Violations Doctrine Governs ......... 30

        C.    Plaintiff Did Not Abandon the Continuing Violations Doctrine ............................... 34

CONCLUSION ................................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases:**                                                                                              Page(s)

*78/79 Associates v. Rand*,
    672 N.Y.S.2d 619 (N.Y. Civ. Ct. 1998) ................................................................... 33

*AAA Antiques Mall, Inc. v. VISA, USA, Inc.*,
    558 F. Supp. 2d 607 (D. Md. 2008)......................................................................... 27

*Allegis Group, Inc. v. Jordan*,
    No. GLR-12-2535, 2017 WL 877271 (D. Md. Mar. 6, 2017).................................. 34

*Anglemyer v. WCS Construction, LLC*,
    No. 8:18-cv-02198-PWG, 2019 WL 3458951 (D. Md. July 31, 2019)................... 29

*ARCO National Construction, LLC. v. MCM Management Corp.*,
    No. ELH-20-3783, 2021 WL 4148456 (D. Md. Sept. 10, 2021) ............................. 9

*Baehr v. Creig Northrop Team, P.C.*,
    953 F.3d 244 (4th Cir. 2020) ................................................................................. 14

*Bank of America Corporation v. Gibbons*,
    918 A.2d 565 (Md. Ct. Spec. App. 2007)............................................................... 16

*Baten v. McMaster*,
    967 F.3d 345 (4th Cir. 2020) ................................................................................. 10

*Bell Atlantic Corporation v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................ 8, 9

*Blake v. JP Morgan Chase Bank NA*,
    927 F.3d 701 (3d Cir. 2019) ............................................................................ 30, 31

*Bodner v. Banque Paribas*,
    114 F. Supp. 2d 117 (E.D.N.Y. 2000) ................................................................... 33

*Boyd v. Bell Atlantic-Maryland, Inc.*,
    887 A.2d 637 (Md. 2005) ...................................................................................... 14

*Cain v. Midland Funding, LLC*,
    256 A.3d 765 (Md. 2021) ................................................................................. 27, 32

*CASA de Maryland, Inc. v. Arbor Realty Trust, Inc.*,
    No. DKC 21-1778, 2022 WL 4080320 (D. Md. Sept. 6, 2022) .......................... 27, 32

*City of Almaty, Kazakhstan v. Ablyazov,*
No. 15-CV-5345 (AJN), 2018 WL 1583293 (S.D.N.Y. Mar. 27, 2018)..................................34

*City of Miami General Employees' & Sanitation Employees' Retirement Trust v. RH, Inc.,*
302 F. Supp. 3d 1028 (N.D. Cal. 2018)....................................................................................29

*Clark Office Building, LLC v. MCM Capital Partners, LLLP,*
245 A.3d 186 (Md. Ct. Spec. App. 2021)..........................................................................11, 24

*Coakley & Williams, Inc. v. Shatterproof Glass Corporation,*
706 F.2d 456 (4th Cir. 1983) ....................................................................................................27

*Department of Health & Mental Hygiene v. Kelly,*
918 A.2d 470 (Md. 2007) ..........................................................................................................23

*Diane Sales, Inc. v. American Express Centurion Bank,*
No. GLR-14-1063, 2015 WL 10986308 (D. Md. Oct. 26, 2015)......................................27, 32

*Doe v. Archdiocese of Washington,*
689 A.2d 634 (Md. Ct. Spec. App. 1997)..................................................................................26

*Doe v. Salisbury University,*
123 F. Supp. 3d 748 (D. Md. 2015)...........................................................................................22

*DuBuisson v. National Union Fire Insurance of Pittsburgh, P.A.,*
No. 15 Civ. 2259 (PGG), 2021 WL 3141672 (S.D.N.Y. July 26, 2021) ............................33, 34

*E.I. du Pont de Nemours & Co. v. Kolon Industries, Incorporated,*
637 F.3d 435 (4th Cir. 2011) ......................................................................................................9

*Edwards v. City of Goldsboro,*
178 F.3d 231 (4th Cir. 1999) ....................................................................................................11

*Federal Trade Commission v. Innovative Marketing., Inc.,*
654 F. Supp. 2d 378 (D. Md. 2009)...........................................................................................11

*Fick v. Perpetual Title Company,*
694 A.2d 138 (Md. Ct. Spec. App. 1997)..................................................................................21

*Garcoa, Inc. v. Sierra Sage Herbs LLC,*
No. CV 21-4672 PSG (SPx), 2022 WL 16548874 (C.D. Cal. Oct. 4, 2022) ...........................29

*Georgia Malone & Company, Inc. v. Ralph Rieder,*
973 N.E.2d 743 (N.Y. 2012) .....................................................................................................16

*Goines v. Valley Community Services Board,*
822 F.3d 159 (4th Cir. 2016) ......................................................................................................9

*Goldfarb v. Mayor & City Council of Baltimore*,
791 F.3d 500 (4th Cir. 2015) ............................................................................... 28

*Goldstein v. Metropolitan Regional Information Systems, Inc.*,
No. TDC-15-2400, 2016 WL 4257457 (D. Md. Aug. 11, 2016) ............................ 10

*Goodman v. Praxair, Inc.*,
494 F.3d 458 (4th Cir. 2007) ............................................................................ 3, 9

*Great American Insurance Company v. Nextday Network Hardware Corp.*,
73 F. Supp. 3d 636 (D. Md. 2014) ........................................................................ 19

*Grimes v. Kennedy Krieger Institute, Inc.*,
782 A.2d 807 (Md. 2001) ...................................................................................... 23

*Haley v. Corcoran*,
659 F. Supp. 2d 714 (D. Md. 2009) ...................................................................... 17

*Hamilton & Spiegel, Inc. v. Board of Education of Montgomery County*,
195 A.2d 710 (Md. 1963) ...................................................................................... 17

*Hill v. Cross Country Settlements, LLC*,
936 A.2d 343 (Md. 2007) ................................................................................ 24, 33

*Hobbs v. Martin*,
No. JKB-16-749, 2017 WL 105675 (D. Md. Jan. 11, 2017) .................................. 20

*In re Guidant Corp. Implantable Defibrillators Products Liability Litigation*,
484 F. Supp. 2d 973 (D. Minn. 2007) ................................................................... 18

*Inmi-Etti v. Aluisi*,
492 A.2d 917 (Md. Ct. Spec. App. 1985) ......................................................... 19, 20

*Johnson v. Valu Food, Inc.*,
751 A.2d 19 (Md. Ct. Spec. App. 2000) ............................................................... 26

*Knobel v. Shaw*,
936 N.Y.S.2d 2 (App. Div. 2011) .......................................................................... 33

*Landesbank Baden-Wurttemberg v. Atradius Trade Credit Insurance, Inc.*,
No. 12-cv-2969-JKB, 2013 WL 1175441 (D. Md. Mar. 19, 2013) ........................ 34

*Lawlor v. National Screen Service Corporation*,
349 U.S. 322 (1955) ............................................................................................. 32

*Lewis v. Rippons*,
383 A.2d 676 (Md. 1978) ...................................................................................... 21

iv

*Linton v. Consumer Protection Division*,
225 A.3d 456 (Md. 2020) .............................................................................. 11, 13

*Malfatti v. Mortgage Electronic Registrations Systems, Inc.*,
No. C 11-03142LB, 2013 WL 3157868 (N.D. Cal. Jun. 20, 2013) .......................... 33

*Malibu Media LLC v. Doe*,
No. PWG-13-365, 2014 WL 7188822 (D. Md. Dec. 16, 2014) ............................... 22

*Mandarin Trading Ltd. v. Wildenstein*,
944 N.E.2d 1104 (N.Y. 2011) ........................................................................ 16

*Maryland Casualty Company. v. Blackstone International Ltd.*,
114 A.3d 676 (Md. 2015) .............................................................................. 24

*McCaffrey v. Chapman*,
921 F.3d 159 (4th Cir. 2019) ......................................................................... 8

*McPherson v. Baltimore Police Department*,
494 F. Supp. 3d 269 (D. Md. 2020) .................................................................. 9

*Mehul's Investment Corporation v. ABC Advisors, Inc.*,
130 F. Supp. 2d 700 (D. Md. 2001) .................................................................. 17

*Monterey Mushrooms, Inc. v. HealthCare Strategies, Inc.*,
No. CCB-20-3061, 2021 WL 1909592 (D. Md. May 12, 2021) ......................... 24, 25

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Incorporated*,
591 F.3d 250 (4th Cir. 2009) ....................................................................... 8, 9

*Ohio Valley Environmental Coalition v. Aracoma Coal Company*,
556 F.3d 177 (4th Cir. 2009) ......................................................................... 32

*Paragon Systems, Inc. v. Hughes*,
No. SAG-20-1209, 2020 WL 6292728 (D. Md. Oct. 27, 2020) ............................. 30

*Peete-Bey v. Educational Credit Management Corp.*,
131 F. Supp. 3d 422 (D. Md. 2015) .................................................................. 32

*Pennsylvania Employees Benefit Trust Fund v. Astrazeneca Pharmaceuticals LP*,
No. 6:09-cv-5003-Orl-22DAB, 2009 WL 2231686 (M.D. Fla. July 20, 2009) ......... 18

*Perry v. The American Tobacco Company, Inc.*,
324 F.3d 845 (6th Cir. 2003) ......................................................................... 18

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014) .................................................................................... 31

*Phreesia, Inc. v. Certify Global, Inc.*,
  No. DLB-21-678, 2022 WL 911207 (D. Md. Mar. 29, 2022) .................................... 30

*Plitt v. Greenberg*,
  219 A.2d 237 (Md. 1966) ........................................................................... 16, 22

*Quinteros v. Sparkle Cleaning, Inc.*,
  532 F. Supp. 2d 762 (D. Md. 2008) .................................................................. 9

*Rux v. Republic of Sudan*,
  410 F. App'x 581 (4th Cir. 2011) ................................................................... 34

*Ryder v. Ryder*,
  No. 1726 Sept. Term, 2019, 2020 WL 3618918 (Md. Ct. Spec. App. July 2, 2020) ............... 23

*Sard v. Hardy*,
  379 A.2d 1014 (Md. 1977) .......................................................................... 26

*Schandler v. New York Life Insurance Company*,
  No. 09 Civ. 10463 (LMM), 2011 WL 1642574 (S.D.N.Y. Apr. 26, 2011) ........................... 34

*Sensormatic Security Corporation v. Sensormatic Electronics Corporation*,
  249 F. Supp. 2d 703 (D. Md. 2003) ................................................................. 17

*Singer Company, Link Simulation Systems Division v. Baltimore Gas & Electric Company*,
  558 A.2d 419 (Md. Ct. Spec. App. 1989) ............................................................ 32

*SMG Holdings I, LLC v. Arena Ventures, LLC*,
  No. 1778, Sept. Term, 2016, 2018 WL 1391613
  (Md. Ct. Spec. App. Mar. 20, 2018) ............................................................ 11, 12

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
  171 F.3d 912 (3d Cir. 1999) ....................................................................... 18

*Texas Star Nut & Food Company v. Truist Bank*,
  ___ F. Supp. 3d ___, No. GJH-21-2564, 2022 WL 4548638 (D. Md. Sept. 29, 2022) ........... 25

*Trujillo v. Landmark Media Enterprises, LLC*,
  689 F. App'x 176 (4th Cir. 2017) .................................................................. 10

*UBS Financial Services, Inc. v. Thompson*,
  94 A.3d 176 (Md. Ct. Spec. App. 2014), *aff'd*, 115 A.3d 125 (Md. 2015) ...................... 26

*United States v. Garcia*,
  855 F.3d 615 (4th Cir. 2017) ...................................................................... 30

*Upman v. Clarke*,
753 A.2d 4 (Md. 2000) ......................................................................... 26

*Valve Corporation v. Ironburg Inventions Ltd.*,
8 F.4th 1364 (Fed. Cir. 2021) .............................................................. 30

*Villalta Canales v. Caw*,
451 F. Supp. 3d 444 (D. Md. 2020) ..................................................... 11

*Washington County Board of Education v. Mallinckrodt ARD, Inc.*,
431 F. Supp. 3d 698 (D. Md. 2020) ..................................................... 25

*Washington Mutual Bank v. Homan*,
974 A.2d 376 (Md. 2009) ..................................................................... 20

*Waugh Chapel South, LLC v. United Food & Commercial Workers Union Local 27*,
728 F.3d 354 (4th Cir. 2013) ............................................................... 28

*Weinhoffer v. Davie Shoring, Incorporated*,
23 F.4th 579 (5th Cir. 2022) ............................................................... 30

*William J. Lemp Brewing Co. v. Mantz*,
87 A. 814 (Md. 1913) .......................................................................... 19

*Williamson v. Prince George's County, Maryland*,
No. DKC 10-1100, 2011 WL 280961 (D. Md. Jan. 26, 2011) ................. 26

*Zak v. Chelsea Therapeutics International, Ltd.*,
780 F.3d 597 (4th Cir. 2015) ............................................................ 9, 28

## State Constitution and Statutes:

Md. Const., art. 4, § 1 ............................................................................ 17

2021 Md. Laws, ch. 82, § 1 (S.B. 666) .................................................... 17

2021 Md. Laws, ch. 83, § 1 (H.B. 885) .................................................... 17

## Other Authorities:

Suzette M. Malveux, *Statutes of Limitations: A Policy Analysis in the Context of Reparations Litigation*, 74 Geo. Wash. L. Rev. 68 (2005) ......................... 31

Doug Rendleman and Caprice Roberts, *Remedies: Cases and Materials* (9th ed. 2018) .......... 24

*Restatement (Third) of Restitution and Unjust Enrichment* § 1 (Am. Law Inst. 2011) .............. 24

*Restatement (Third) of Restitution and Unjust Enrichment* § 3 (Am. Law Inst. 2011) ................ 14

*Restatement (Third) of Restitution and Unjust Enrichment* § 43 (Am. Law Inst. 2011) ........ 15, 16

*Restatement (Third) of Restitution and Unjust Enrichment* § 44 (Am. Law Inst. 2011) ......... 12 16

*Restatement (Third) of Restitution and Unjust Enrichment* § 51(3) (Am. Law Inst. 2011) ..... 1, 14

*Restatement (Third) of Restitution and Unjust Enrichment* § 52(1) (Am. Law Inst. 2011) ......... 14

*Restatement (Third) of Restitution and Unjust Enrichment* § 53 (Am. Law Inst. 2011) ........ 13, 15

*Restatement (Third) of Restitution and Unjust Enrichment* § 58(1) (Am. Law Inst. 2011) ........ 12

*Restatement (Third) of Restitution and Unjust Enrichment* § 70 (Am. Law Inst. 2011) .............. 33

Evelyne Schuster, *Fifty Years Later:  The Significance of the Nuremberg Cod*e,
    337 New Eng. J. Med. 1436 (1997) .......................................................................... 23

Wright and Miller, 5 Fed. Prac. & Proc. Civ. § 1224 (4th ed. Apr. 2022 Update) ....................... 21

Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1357 (3d ed. Apr. 2022 Update) ........................ 10

**INTRODUCTION**[1]

Henrietta Lacks's physical person was violated by physicians at Johns Hopkins Hospital, who discovered that Mrs. Lacks's cells were immortal. Defendant Thermo Fisher Scientific ("TFS"), one of the world's largest biotechnology companies, has made—and continues to make—millions of dollars in profits by cultivating and selling the so-called HeLa cell line. HeLa cells are Mrs. Lacks's living cells. Try as it may, TFS cannot remove Mrs. Lacks's identity from her cells. TFS knows the profoundly unethical and unlawful origins of the HeLa cell line, but it has chosen to profit from those physicians' misconduct by cultivating, mass-producing, and selling Mrs. Lacks's genetic material for its own profit, without permission of, or compensation, to Mrs. Lacks's Estate or family. Mrs. Lacks and her Estate have never been compensated for the commercialization of her cells.

The law provides a remedy for TFS's egregious conduct. As articulated by the American Law Institute, "a defendant who is enriched by misconduct and who acts [] with knowledge of the underlying wrong to the claimant" is a conscious wrongdoer liable for its profits. *Restatement (Third) of Restitution and Unjust Enrichment* ["*Third Restatement*"] § 51(3) (2011). Johns Hopkins physicians' wrongful taking of Henrietta Lacks's tissue without her informed consent for no medical purpose breached a confidential relationship between physician and patient and constituted tortious conduct. It was also a plain and simple battery. Because TFS has knowingly profited from such tortious conduct by cultivating, mass-producing, and selling HeLa cells, it is liable under Maryland law. Indeed, the Court acknowledged that Plaintiff "make[s] compelling equitable arguments" that, under TFS's view of the law, "Mrs. Lacks and her family and her

---

[1] Pursuant to Court-approved stipulation (ECF No. 86 at 2), Plaintiff adopts and incorporates all arguments in Plaintiff's Opposition to Defendant's Motion to Dismiss (ECF No. 41).

children and grandchildren will never get any recovery here. Her cell line, her body, will continually be replicated, and it's in the possession of [TFS] and other companies who make billions of dollars from this." Tr. at 48:6-11. Even TFS does not seriously dispute that it has benefited substantially from its cultivation, mass-production, and sale of HeLa cells.

Still, as it did on its initial motion to dismiss, TFS has moved to dismiss Plaintiff's Second Amended Complaint ("SAC") on the basis of two flawed arguments.

*First*, although it knew—or plainly should have known—of the scientific community's knowledge of the disreputable origins of the HeLa cell line—TFS maintains that Plaintiff cannot maintain an unjust enrichment claim based on TFS's acquisition and highly profitable commercialization of Mrs. Lacks's tissue. TFS further maintains that even though its commercialization efforts continue (and will continue for the foreseeable future), the efforts of Mrs. Lacks's Estate to obtain redress are simply too late. Under TFS's view of the law, past injustices must stay buried in the past, so it can go on cultivating, mass-producing, and selling for profit Ms. Lacks' cellular material *today and in perpetuity*, without just compensation.

TFS's arguments are unavailing. As to its contention that an unjust enrichment cannot lie because it received no actual benefit from Mrs. Lacks, TFS twists allegations out of context, asserting that Plaintiff's unjust enrichment claim is based solely on the proceeds earned by TFS. The SAC's allegations, however, make clear that Plaintiff's claim is based both on TFS's wrongful acquisition of the HeLa cell line and its ongoing commercialization of it. Contrary to TFS's assertion, proceeds reaped constitute a benefit for unjust enrichment purposes under the *Third Restatement*, to which Maryland courts look for guidance. TFS's contention that it did not benefit directly from Mrs. Lacks is contrary to Maryland law and the *Third Restatement*, and rests on non-binding and wholly inapplicable caselaw.

2

As for TFS's contention that an unjust enrichment claim lies against it because it was a bona fide purchaser for value, that argument founders given the SAC's allegations that TFS knew or should have known *at all relevant times* of the HeLa cell line's origins, including the shameful physical violation of Mrs. Lacks and abuse of trust by her physicians. Simply put, TFS cannot be deemed a bona fide or innocent purchaser. TFS's criticism that the SAC does not allege what price TFS paid for the HeLa cell line or what price it should have paid are thus beside the point.

Equally unpersuasive is TFS's assertion that Plaintiff's unjust enrichment claim fails because a separate tort is not pleaded. Consistent with Maryland law, the Court was correctly skeptical of TFS's argument that unjust enrichment cannot be pled as a standalone claim. Tr. at 13:21-16:20. Were that so, those who, like TFS, wrongfully benefit from tortious conduct could rest assured that they will enjoy complete immunity if redress cannot be pursued against the original tortfeasor. At any rate, even if underlying tortious conduct is required, it is amply pleaded here. The removal of Henrietta Lacks's tissue without her knowledge or consent violated principles of both informed consent and the doctor-patient relationship of trust, and it was undeniably a common law battery.

*Second*, TFS's argument that Plaintiff's claim is untimely is equally meritless. The Court does not need to reach TFS's myriad statute of limitations arguments to sustain Plaintiff's SAC against a Rule 12(b)(6) challenge. As the Court acknowledged, it is well established that statute of limitations issues are "rarely" resolved on a motion to dismiss. *See* Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (only in "rare circumstances"); *see also* Tr. 53:24-25 ("You want to dismiss this case early on based on statute of limitations and it's your burden to do so. It's rarely done."). TFS has failed to identify the date that Plaintiff's claim accrued based on the allegations within the SAC's four corners, and its request that the Court take judicial notice of

extrinsic documents nowhere referenced in the SAC for the truth of their contents is inappropriate.

In any event, Maryland courts recognize both the separate accrual and the continuing violations doctrine. Whether Plaintiff's claim is examined under the former or the latter, it is timely asserted. What TFS fails to grasp—but what the Court readily understood—is that the statute of limitations on Plaintiff's unjust enrichment claim is based on TFS's *ongoing* ill-gotten gains *today*, not the initial assault at the hands of the physicians in whom Mrs. Lacks had placed her trust. TFS simply ignores *its* treatment of Henrietta Lacks's genetic material as chattel to be bought and sold *today*, not 70 years ago. Finally, contrary to TFS's erroneous reading of the transcript of the May 2022 motion to dismiss hearing, Plaintiff has not abandoned the continuing violation doctrine as an alternative basis for the timeliness of his claim.

## FACTUAL BACKGROUND

**A. Physicians at Johns Hopkins Unlawfully Violated Henrietta Lacks's Physical Person by Surgically Removing Her Tissue Without Her Consent**

In 1951, at the age of 31, Henrietta Lacks was diagnosed with cervical cancer and was treated in a racially segregated ward at Johns Hopkins. ¶¶ 5, 30, 34.[2] During a surgical procedure, and while Mrs. Lacks was under anesthesia, a white physician at Johns Hopkins cut away two parts of her cervix. ¶¶ 5, 37. This surgical procedure to harvest Mrs. Lacks's tissue was not medically necessary and was not a procedure to which she had consented. ¶¶ 5, 8, 36-37. Importantly, Mrs. Lacks was never told why her tissue had been taken and never gave permission for her cells to be used as they have been. ¶¶ 5, 8, 36.

At the time, Mrs. Lacks's cervical cancer was being treated with exposure to radium. ¶¶

---

[2] Unless otherwise noted, "¶" or "¶¶" refers to paragraphs of the Second Amended Complaint and Request for Jury Trial (ECF No. 87). "Mem." refers to the Memorandum of Law in Support of Thermo Fisher's Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 88-1).

35-36.  Mrs. Lacks was never warned about the risks of the aggressive course of radium treatment for her cancer, which left her infertile.  ¶¶ 5, 31.  Months later, when she was told that the course of treatment left her infertile, Mrs. Lacks stated clearly that she would never have agreed to it had she been informed of the infertility risk.  ¶¶ 5, 36.  The treatment proved completely ineffective.  Mrs. Lacks died of cervical cancer on October 4, 1951.  ¶¶ 5, 39.

**B.      Mrs. Lacks's Cell Are One of the Most Important and Widely Used Tools in Modern Medical Research**

The tissue wrongfully taken from Mrs. Lacks had unique properties.  ¶¶ 6, 38.  Whereas most tissue samples die shortly after they are removed from the body, Mrs. Lacks's cells survived and reproduced in the laboratory.  This exceptional quality meant that it was possible to cultivate Mrs. Lacks's cells into a cell line that could reproduce indefinitely—an immortal cell line.  *Id.*  Indeed, Mrs. Lacks's cells were the first known immortalized human cell line.  To conceal the use of her cells from Mrs. Lacks and her family, medical researchers referred to Henrietta Lacks's cell line as the "HeLa" cell line, using the first two letters of Mrs. Lacks's first and last names.  ¶ 6.

HeLa cells have had a profound impact on medical research and have contributed to numerous scientific discoveries and medical advancements, including the polio vaccine, gene mapping, in vitro fertilization, and many more.  ¶¶ 8, 41.

**C.      Like the Rest of the Scientific Community, TFS Knew That HeLa Cells Were Ill Gotten and the Result of Non-Consensual and Non-Therapeutic Medical Experimentation**

The harvested cervical tissue from Mrs. Lacks's unconscious body was not an isolated incident.  It was John Hopkins' well-known practice, to which the scientific community turned a blind eye.  ¶ 43.  While treating Black women in racially segregated wards, a group of white physicians at Johns Hopkins routinely preyed on Black women suffering from cervical cancer.  ¶¶ 3-4, 27-30.  They would surgically cut away tissue samples from their patients' cervixes without

5

their patients' knowledge or consent.  *Id.*  Johns Hopkins' physicians systematically assaulted their Black patients, who had placed their trust and lives in their physicians' care, and the scientific community knew and did nothing.  ¶¶ 4, 43, 57.

A leading figure in this wrongdoing—Dr. George Gey, then head of tissue culture research at Johns Hopkins—once proclaimed himself "the world's most famous vulture, feeding on human specimens almost constantly."  ¶¶ 3, 28-30.  Another leading figure, Dr. Richard Wesley TeLinde, then chair of gynecology at Johns Hopkins, faced widespread criticism for his practice of frequently removing the cervix, uterus, and substantial portions of the vagina of patients with carcinoma *in situ*, a condition not believed to be deadly at the time.  ¶ 27.  Indeed, as one physician acting under TeLinde's supervision callously summarized, "Hopkins, with its large indigent [B]lack population, had no dearth of clinical material."  ¶ 30.

This dehumanization of Black patients and abuse of trust sadly had all too much precedent. Medical research was often performed on marginalized communities, including Black Americans, without their consent.  The list of abuses is long and includes numerous studies, both documented and undocumented, such as the Tuskegee syphilis study that earned notoriety for its unethical experimentation on Black men in the rural South, the systematic forced sterilization of poor Black women known as the "Mississippi Appendectomy," and the routine testing of mustard gas and other chemical agents on Black men during the Second World War, among numerous others.  ¶¶ 31-33.  Too often, the history of medical experimentation in the United States has been the history of medical racism.  ¶ 2.  This was particularly true at Johns Hopkins.  ¶ 43.

D.     **TFS Chose to Unfairly and Unjustly Profit from the Wrongful Conduct of Johns Hopkins' Physicians**

Despite knowledge of the shameful origins of the HeLa cell line, TFS has chosen to profit from that unlawful conduct *today* and to cultivate, mass-produce, and sell Mrs. Lacks's stolen

genetic material for its own profit without permission of her Estate. ¶¶ 10, 14-17, 47-51. TFS has publicly admitted its awareness of the fact HeLa cells were taken from Mrs. Lacks without her consent. Its website states that "[Mrs.] Lacks and her family were unaware that her tissue was used in this way," and TFS acknowledges "the widespread but unsanctioned use of HeLa cells from Henrietta Lacks." ¶ 46. Yet, to this day, TFS continues to cultivate and sell HeLa cells in multiple product lines to buyers across the globe. ¶ 48. In other words, TFS sells Mrs. Lacks's genetic material, develops and manufactures products incorporating HeLa cells, and seeks intellectual property rights on these products, staking a claim to Mrs. Lacks's stolen tissue. ¶¶ 10, 50. TFS has appropriated Mrs. Lacks's genetic material for its own pecuniary gain, all without payment to or permission from Mrs. Lacks's Estate or family. ¶¶ 10, 17, 46-51.

TFS has known that HeLa cells were stolen from Mrs. Lacks during a medically unnecessary surgical procedure and serious breach of trust by her physicians, yet it has deliberately chosen to use her body for profit. ¶¶ 46-51. Mrs. Lacks is behind every HeLa cell, every HeLa sample, and every HeLa-based product sold by TFS, and the basis for every dollar made as a result.

Because of TFS's actions, Mrs. Lacks's family members have been forced to live with the reality that genetic material of their mother or grandmother is being sold by a large corporation *today* against her and her family's will. This robs the family of one of the most basic comforts any grieving person can ask for—the knowledge that a loved one's body has been treated with dignity. ¶¶ 14, 16. Beyond this harm, the widespread dissemination of Henrietta Lacks's genetic material means that her genetic information is now commonly available—and, as a consequence, some of the most private information about Mrs. Lacks and her family has been exposed to the general public. ¶ 15. Put simply, TFS treats Henrietta Lacks's living cells as chattel to be bought and sold to add to the company's coffers. ¶ 16. Because it made the conscious choice to profit

from the assault of Henrietta Lacks, TFS's ill-gotten gains rightfully belong to her Estate. ¶ 17.

### E.  Prior Proceedings in This Action

Plaintiff, the personal representative of Mrs. Lacks's Estate (¶ 18), commenced this action on October 4, 2021, asserting a single count for unjust enrichment.  ECF No. 1.  TFS moved to dismiss Plaintiff's complaint on December 16, 2021, arguing that that it failed to state an unjust enrichment claim but that, even if it did, the claim was untimely.  ECF No. 20.  On January 26, 2022, Plaintiff filed an amended complaint.  ECF No. 36.  Following the completion of briefing of TFS's motion to dismiss, including the submission of amicus curiae briefs with the Court's leave (ECF Nos. 41, 63, 66-69, 71), the Court heard argument on the motion on May 17, 2022 (ECF Nos. 72, 77), and it also received post-hearing submissions (ECF Nos. 73, 75).

Following an unsuccessful mediation effort, Plaintiff filed the SAC on November 18, 2022.  ECF No. 87.  In pertinent part, Plaintiff's amendments address two areas:  TFS's status as a bona fide purchaser of value and TFS's unjust enrichments.  In this respect, the SAC pleads that TFS is not and cannot be a bona fide purchase for value and that TFS unjustly benefited each time it acquired HeLa cells and each time it cultivates, sells, and receives payment for newly replicated HeLa cells.  ¶¶ 43, 53, 57.  On January 3, 2023, TFS moved to dismiss the SAC.  ECF No. 88.

## STANDARD OF REVIEW

"[I]n considering a motion to dismiss under Rule 12(b)(6), a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff."  *McCaffrey v. Chapman*, 921 F.3d 159, 163-64 (4th Cir. 2019) (citation and internal quotation marks omitted).  A plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A "complaint's factual allegations" need only "produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'"  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591

F.3d 250, 256 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 570). "The issue in reviewing the sufficiency of the pleadings in a complaint is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims." *Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762, 767 (D. Md. 2008).

Importantly, in evaluating a complaint's sufficiency, a court is "generally limited to a review of the allegations of the complaint itself." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016). "Consideration of extrinsic documents … improperly converts the motion to dismiss into a motion for summary judgment." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015); *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011) (district court erred in considering evidence beyond complaint and drawing inferences from it). Such a conversion "is not appropriate when the parties have not had an opportunity to conduct reasonable discovery." *Zak*, 780 F.3d at 606.

Because the statute of limitations argument that TFS raises is an affirmative defense, the burden rests with TFS to prove that Plaintiff's claim is time-barred. *McPherson v. Baltimore Police Dep't*, 494 F. Supp. 3d 269, 284 (D. Md. 2020). "Ordinarily, the defense of limitations is not considered in the context of a motion to dismiss." *ARCO Nat'l Constr., LLC v. MCM Mgmt. Corp.*, No. ELH-20-3783, 2021 WL 4148456, at *13 (D. Md. Sept. 10, 2021) (citing cases). A court may reach the issue of whether a claim is time-barred only "if all facts necessary to the affirmative defense "clearly appear[ ] *on the face of the complaint*." *Goodman*, 494 F.3d at 464 (citation and internal quotation marks omitted; brackets and emphasis added by court). "Only 'in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint' will a court, under Rule 12(b)(6), dismiss a complaint based on an affirmative defense.'" *McPherson*, 494 F. Supp. 3d at 284 (quoting *Goodman*, 494 F.3d at 464). As this Court

expressed, "what's happened to the Lacks family, is unlike any other set of facts that we've seen in our lifetime" and "that makes it particularly challenging here in a court of law to take these facts, these extraordinary facts and apply them to the existing law that we have." Tr. at 23:18-24. Indeed, as the leading federal procedure treatise notes, "[t]he district court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or even extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions." Wright & Miller, 5B Fed. Prac. & Proc. Civ. § 1357 & n. 54 (3d ed. Apr. 2022 Update) (citing cases) (quoted in *Goldstein v. Metro. Reg'l Info. Sys., Inc*., No. TDC-15-2400, 2016 WL 4257457, at *9 (D. Md. Aug. 11, 2016)).[3]

## ARGUMENT

## I.   THE SAC PLEADS A COGNIZABLE UNJUST ENRICHMENT CLAIM

Once again, TFS maintains that Plaintiff fails to state a claim for unjust enrichment (Mem. at 8-17)—and once again its argument fails. As discussed below, TFS received a benefit to the detriment of Mrs. Lacks or her Estate; that benefit was not remote; TFS does not qualify as a bona fide purchaser for value; and no separate cognizable tort claim need be pleaded but, to the extent that underlying tortious conduct must be alleged, it plainly is here.

### A.   TFS Received a Benefit from Henrietta Lacks

TFS first contends that Plaintiff fails to plead that Mrs. Lacks conferred a benefit on it. Mem. at 9-11. Specifically, TFS maintains that Plaintiff has changed his position and no longer claims that the HeLa cell line was a benefit conferred on it. *See* Mem. at 9, 11, 13-14.

---

[3] *See Baten v. McMaster*, 967 F.3d 345, 368 (4th Cir. 2020) ("[W]here Plaintiffs offer a novel legal theory that can best be assessed after factual development, dismissals at such an early stage are disfavored."); *Trujillo v. Landmark Media Enters., LLC*, 689 F. App'x 176, 178 (4th Cir. 2017) ("Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.").

In refining and expanding the allegations in paragraphs 53-56 of the unjust enrichment count to encompass Thermo Fisher's *ongoing* commercialization and continued replication of Mrs. Lacks's cells, Plaintiff did *not* relinquish Thermo Fisher's receipt of the cell line itself as a benefit conferred upon it. In particular, TFS wrenches paragraphs 53-54 of the SAC out of context.

Underlying Plaintiff's claim are allegations concerning TFS's receipt of the HeLa cell line. Plaintiffs plainly allege that TFS "*appropriated* Mrs. Lacks's genetic material for its own pecuniary gain" and "knew its *possession*, cultivation, and sale of HeLa cells was, is, and will continue to be unjust." ¶¶ 11-12 (emphasis added). Plaintiffs also allege that TFS "never paid fair or sufficient consideration for its HeLa cells." ¶ 57. At a minimum, TFS's receipt of the HeLa cell line is an eminently reasonable, if not compelling, inference to be drawn from the SAC's allegations concerning TFS's commercialization of Mrs. Lacks' cells.[4] To commercialize the HeLa cell line, doubtlessly TFS had to *have come into possession of it*.

At any rate, even were the benefit not the receipt of the HeLa cell line itself, a benefit was nonetheless conferred on TFS in that its commercialization of the HeLa cell line represents the traceable fruits of the wrongful removal of Mrs. Lacks's tissue. Under the *Third Restatement*, which Maryland courts look to for guidance,[5] "[a] claimant entitled to restitution from property

_____

[4] *See*, *e.g.*, *Villalta Canales v. Caw*, 451 F. Supp. 3d 444, 451 (D. Md. 2020) ("In reviewing a Rule 12(b)(6) motion, a court must accept as true all of the factual allegations contained in the complaint and must draw all reasonable inferences [from those facts] in favor of the plaintiff.") (citing cases; internal quotation marks omitted; brackets added by court); *FTC v. Innovative Mktg., Inc.*, 654 F. Supp. 2d 378, 384-85 (D. Md. 2009) (in considering 12(b)(6) challenges, "courts construe the pleading requirements prescribed by Rule 8 liberally and accept 'all well-pleaded allegations in the plaintiff's complaint as true and draw[ ] all reasonable factual inferences from those facts in the plaintiff's favor'") (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)).

[5] *See*, *e.g.*, *Linton v. Consumer Prot. Div.*, 225 A.3d 456, 466 (Md. 2020); *Clark Off. Bldg., LLC v. MCM Cap. Partners, LLLP*, 245 A.3d 186, 197 (Md. Ct. Spec. App. 2021); *SMG Holdings*

may obtain restitution from any traceable product of that property, without regard to subsequent changes of form." *Third Restatement* § 58(1). As articulated by the American Law Institute:

> (1) [a] person who obtains a benefit by conscious interference with a claimant's legally protected interests (*or in consequence of such interference by another*) is liable in restitution as necessary to prevent unjust enrichment, unless competing legal objectives make such liability inappropriate.
>
> (2) For purposes of subsection (1), interference with legally protected interests *includes conduct that is tortious, or that violates another legal duty or prohibition* (other than a duty imposed by contract), *if the conduct constitutes an actionable wrong to the claimant*.

*Third Restatement* § 44 (emphasis added).

Indeed, several of the Illustrations of this rule in the *Third Restatement*'s commentary involve fact patterns where, in the absence of wrongful monetization, the plaintiff would not have a cause of action, but because of the defendant's wrongful monetization, the plaintiff had a valid unjust enrichment claim. For example, Illustration 11 involves a doctor who takes a sample of a patient's blood for medically appropriate reasons, but subsequently sells that sample to researchers for a profit of $25,000. The commentary makes clear that even though the decision to take and retain the sample was medically appropriate, the patient can recover the $25,000 obtained through the wrongful monetization of his blood. Similarly, Illustration 10 involves a local pharmacy which legitimately possessed patients' prescription records but wrongfully sold them to a national pharmacy. The commentary makes clear that patients can sue the local pharmacy for the wrongful monetization of their records, and the national pharmacy for any additional profits it derived from the unlawful monetization. Under the rule that TFS proposes, where wrongful monetization cannot be a standalone benefit for purposes of an unjust enrichment claim, the *Third Restatement* is wrong

---

*I, LLC v. Arena Ventures, LLC*, No. 1778, Sept. Term, 2016, 2018 WL 1391613, at *7 (Md. Ct. Spec. App. Mar. 20, 2018) (unpublished). TFS does not dispute this.

and both of these Illustrations should come out in exactly the opposite way.[6]

Section 53 of the *Third Restatement* is not to the contrary. TFS's contention that the commentary to section 53 establishes that proceeds cannot be a basis for unjust enrichment liability is based on a misquotation.[7] Viewed in this context, it is clear that the "not a basis of liability" language to which TFS points concerns *Third Restatement* § 53, not "proceeds" generally, and that the language clarifies that section 53 is about measuring the amount of money a successful plaintiff should be awarded, not about whether a plaintiff should prevail on its unjust enrichment claim. In other words, the language is there to warn against conflating the rules governing the scope of a prevailing plaintiff's recovery with the rules governing whether a plaintiff should prevail.

The very cornerstone of unjust enrichment is that a defendant should "'not [be] permitted to profit by his own wrong,'" and should "'be stripped of a wrongful gain,'" and that is so even where that gain exceeds the plaintiff's provable loss. *Linton*, 225 A.3d at 466 (quoting *Third Restatement* § 3).[8] As the Fourth Circuit, citing Maryland caselaw, has explained, "[u]nlike a

_____

[6] TFS will likely argue in its reply that both of these Illustrations involve wrongful conduct by an unjust enrichment defendant, but that is irrelevant. Neither Maryland law nor the *Third Restatement* requires that the defendant itself have engaged in the wrongful conduct for unjust enrichment liability; it is enough that it profits from such wrongful conduct. What is relevant about these Illustrations is that they both affirm the viability of claims based on wrongful monetization.

[7] A comparison of how TFS characterizes the *Third Restatement* and what the *Third Restatement* actually says is illuminating. *Compare* Mem. at 12 ("But, the Restatement explains that such proceeds are a 'measurement of unjust enrichment; ... not a basis of liability in restitution ....' *Id.* at cmt. a. Because these proceeds are not 'a basis of liability,' they are not a basis for an unjust enrichment claim.") *with Third Restatement* § 53, cmt. a ("Like the other sections within the present Topic, § 53 supplies rules for the measurement of unjust enrichment; it is not a basis of liability in restitution. The fact that one person has derived a benefit from the use of another's property does not give rise to a liability for 'use value,' for example, unless substantive grounds of unjust enrichment may be established within the rules of this Restatement.").

[8] *See also Linton*, 225 A.3d at 467 ("'Restitution requires full disgorgement of profit by a conscious wrongdoer, not just because of the moral judgment implicit [in *Third Restatement* § 3]

13

statutory cause of action that provides a damages remedy based on *a plaintiff's loss*, the touchstone of unjust enrichment is *a defendant's gain*." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 257 (4th Cir. 2020) (citation and internal quotation marks omitted; emphasis added). Here, TFS has undeniably realized a *huge* gain from the wrong inflicted on Mrs. Lacks.[9]

TFS additionally argues that treatment of proceeds as a benefit would eviscerate the statute of limitations in unjust enrichment cases, where "downstream benefits" may continue to be earned long afterwards. Mem. at 11. That merely encapsulates TFS's remoteness and statute of limitations arguments, which are addressed, respectively, in Sections I.B and II below.

## B. The Benefit Conferred on TFS Was Not Remote

Equally unavailing is TFS's contention that the benefit that it received was too indirect or remote from the underlying wrong to Mrs. Lacks to be cognizable. *See* Mem. at 12-13.

Under the *Third Restatement*, "a defendant who is enriched by misconduct and who acts [] with knowledge of the underlying wrong to the claimant" is a conscious wrongdoer liable for its profits. *Third Restatement* § 51(3). But even "[a] defendant who is not a conscious wrongdoer … may nevertheless be responsible for receiving, retaining, or dealing with the benefits that are the subject of a restitution claim … when a significant cause of the defendant's unjust enrichment is the defendant's … negligence; … unreasonable failure, despite notice and opportunity, to avoid or rectify the unjust enrichment in question; or … bad faith or reprehensible conduct." *Id.* § 52(1);

---

but because any lesser liability would provide an inadequate incentive to lawful behavior.'") (quoting *Third Restatement* § 3. cmt. c).

[9] *See Boyd v. Bell Atl.-Md., Inc.*, 887 A.2d 637, 650 (Md. 2005) ("[T]he relief available for unjust enrichment is not compensatory damages but restitution—the disgorgement of the benefits that it would be unjust for the defendant to keep. … [T]he damages recovery is to compensate the plaintiff and it pays him, theoretically, his losses, but [t]he restitution claim, on the other hand, is not aimed at compensating the plaintiff but at forcing the defendant to disgorge benefits it would be unjust for him to keep.") (citing treatise; internal quotation marks omitted).

*accord id.* § 53, cmt. d ("A defendant who (though not liable in tort) is unjustly enriched as a result of bad-faith conduct may be liable to disgorge profits (including consequential gains) to the same extent as a conscious wrongdoer.").

Indeed, the *Third Restatement* makes clear that unjust enrichment as a result of another's wrongful conduct *can* indeed be a basis for recovery, provided that the defendant profited from the wrongful conduct. Section 43 of the *Third Restatement* prescribes that the underlying wrongful conduct to support an unjust enrichment claim need not have been committed *by* the defendant, so long as the defendant profited from it:

> A person who obtains a benefit: (a) in breach of a fiduciary duty, (b) in breach of an equivalent duty imposed by a relation of trust and confidence, or (c) *in consequence of another's breach of such a duty*, is liable in restitution to the person to whom the duty is owed.

*Third Restatement* § 43 (emphasis added). The commentary to this section reinforces this important point: "Benefits derived from a fiduciary's breach of duty may therefore be recovered from third parties, not themselves under any special duty to the claimant, who acquire such benefits with notice of the breach." *Id.*, cmt. g.

Consistent with the *Third Restatement*, the SAC amply alleges that TFS realized a benefit from Mrs. Lacks. The HeLa cell line mass-produced and sold by TFS consists of genetic material wrongfully taken from Mrs. Lacks without her valid consent or knowledge. ¶¶ 10, 17, 46-50. This highly valuable cell line is a benefit to TFS, which has commercialized it for its own handsome profit. ¶¶ 13, 16-17, 47-51. What is more, the SAC alleges that TFS has known and appreciated the unethical and unlawful origins of the HeLa cell line, ¶¶ 7-13, 44-46, and that it nonetheless accepted and retained the benefits. ¶¶ 10-12, 50. In essence, TFS's conduct is nothing more than a perpetuation of the theft of Mrs. Lacks's tissue and the harms that this theft inflicted on Mrs. Lacks and her family. Furthermore, as discussed in Section I.D below, undertaking a surgical

procedure without Mrs. Lacks's knowledge or consent for no medically necessary reason was both

a breach of the doctor-patient relationship (supporting a claim under Section 43 of the *Restatement*)

and tortious conduct (supporting a claim under Section 44 of the *Restatement*).  ¶¶ 4, 27-37.  TFS,

by its own public admission, has profited from this wrongful conduct.  ¶¶ 10, 16, 43-51.  Thus,

black-letter law squarely defeats TFS's insistence that the benefit that it derived from the shameful

invasion of Mrs. Lacks' person was too remote for it to be called to account.

TFS cites a number of cases from the Southern District of New York that applied New

York law (Mem. at 11), but the New York law of unjust enrichment imposes a directness

requirement as concerns the plaintiff and defendant.[10]  In contrast, Maryland law does not require

that the plaintiff have conferred a benefit *directly* on the defendant.   "[A] cause of action

for unjust enrichment may lie against a transferee with whom the plaintiff had no contract,

transaction, or dealing, either directly or indirectly."  *Bank of Am. Corp. v. Gibbons*, 918 A.2d 565,

571 (Md. Ct. Spec. App. 2007).  Even TFS concedes—as it must—the existence of Maryland

authority rejecting a directness element.[11]

Equally unavailing is TFS's reliance on authority from Maryland (one decision) and this

District (three decisions).  Mem. at 10.  Not only do they predate the *Third Restatement* but they

are also factually wide of the mark, because in none of them did the defendant receive even an

---

[10] *E.g.*, *Georgia Malone & Co. v. Ralph Rieder*, 973 N.E.2d 743, 746-48 (N.Y. 2012) (unjust enrichment claim requires sufficient connection and dealings between the parties); *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011) ("Although privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated[.]").

[11] *See* Mem. at 10 n.21 (citing *Plitt v. Greenberg*, 219 A.2d 237, 241 (Md. 1966) ("It is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner.") (citation and internal quotation marks omitted).

indirect benefit from the plaintiff.

In *Hamilton & Spiegel, Inc. v. Board of Education of Montgomery County*, 195 A.2d 710, 712 (Md. 1963), the Maryland Court of Appeals[12] rejected an unpaid school construction project subcontractor's assertion that it was a creditor beneficiary of the contract between the school board and general contractor. In *Mehul's Investment Corp. v. ABC Advisors, Inc.*, 130 F. Supp. 2d 700 (D. Md. 2001), the plaintiff printer complained that the defendant printing services broker had sold to rival printers bid services that should have been steered to the plaintiff under a contract with the defendant's predecessor. *Id.* at 703-04. Judge Chasanow saw no basis for the plaintiff to claim monies earned by others. *Id.* at 709. In *Haley v. Corcoran*, 659 F. Supp. 2d 714, 726-27 (D. Md. 2009), Judge Quarles dismissed an unjust enrichment claim against a title insurer of an allegedly fraudulent foreclosure rescue sale because the plaintiffs did not allege that they had paid or been responsible for the insurer's policy premium. Finally, in *Sensormatic Security Corporation v. Sensormatic Electronics Corporation*, 249 F. Supp. 2d 703 (D. Md. 2003), the plaintiff security equipment franchisee sought commissions earned by ADT, a wholly owned subsidiary of the company that had also acquired the plaintiff's franchisor as a wholly owned subsidiary, alleging that ADT had wrongfully earned those monies from security equipment sales and leases within the plaintiff's exclusive franchise territory. *Id.* at 704-06. Judge Chasanow rejected the claim because those commissions did not derive from any benefit conferred by the plaintiff. *Id.* at 709. Because the defendant did not receive even an indirect benefit from the plaintiff, these cases are inapposite.

Cases involving third-party payor claims in the healthcare context (Mem.at 12) are equally

---

[12] Pursuant to a recent voter-ratified amendment to Maryland's constitution, the Court of Appeals was, effective December 14, 2022, renamed the Maryland Supreme Court, and the Court of Special Appeals became the Appellate Court of Maryland. Md. Const., art. 4, § 1, as amended by 2021 Md. Laws, chs. 82, § 1 (S.B. 666) and 83, § 1 (H.B. 885). This memorandum refers to those courts by the name they were known at the time that the relevant decision was rendered.

inapposite.  In *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 917 (3d Cir. 1999), union health and welfare funds claimed that the defendant tobacco companies and organizations' actions had prevented the reduction of smoking-related illness among the plaintiffs' participants.  Health insurance subscribers alleged in *Perry v. The American Tobacco Co.*, 324 F.3d 845, 847-48 (6th Cir. 2003), that they had paid higher premiums due to the presence of smokers in the insurance pool, whose smoking-related ailments were caused by the tobacco defendants' conduct.  The state employee health plan asserted in *Pennsylvania Employees Benefit Trust Fund v. Astrazeneca Pharmaceuticals LP*, No. 6:09-cv-5003-Orl-22DAB, 2009 WL 2231686, at *1 (M.D. Fla. July 20, 2009), that the defendant pharmaceutical maker had, through fraudulent marketing of its anti-psychotic drug (including promotion of unapproved uses), fueled millions of dollars' worth of unnecessary prescriptions for it (which the plan paid).  In *In re Guidant Corp. Implantable Defibrillators Products Liability Litigation*, 484 F. Supp. 2d 973, 981-85 (D. Minn. 2007), third-party payors alleged that a medical device maker had been unjustly enriched by their having paid for its defective devices implanted in their insureds.

All of these cases that were dismissed on remoteness grounds are far afield.  Healthcare sector third-party payors wind up paying indirectly for virtually all misconduct that makes their insureds ill or which results in their insureds receiving unnecessary or defective drugs or medical devices.  Unjust enrichment claims asserted by third-party payors (or by a payor's participants) against industries that engage in the underlying misconduct thus raise important public policy questions about healthcare system finance and apportionment of culpability that are starkly dissimilar to the issues in this case.  Also, these healthcare-related cases involved attenuated causal relationships between the defendant's misconduct and the financial costs allegedly borne by the plaintiff.  In contrast, Plaintiff's unjust enrichment claim neither implicates knotty public policy

questions nor involves a highly attenuated causal connection. Plaintiff is not a distant party claiming that TFS's misdeeds ultimately inured to the financial detriment of Mrs. Lacks or her Estate. Rather, at the heart of his unjust enrichment claim are the allegations that TFS has long been *consciously aware* of the wrongful taking of Henrietta Lacks' bodily tissue—the source of the HeLa cell line that it obtained—but nonetheless chose to profit from the ignoble removal of her living tissue. *See* ¶¶ 13, 45-50; *see also* ¶¶ 43-44.

### C. TFS Was Not a Bona Fide Purchaser for Value

Next, TFS renews its argument that Plaintiff fails to plead that TFS was not a bona fide purchaser. Mem. at 13-15. Here, too, TFS is wrong. The upshot of TFS's argument is that it has a right to own Mrs. Lacks' living body because it paid good money for it. Its bona fide purchaser argument, however, fails for three reasons.

*First*, irrespective of its knowledge at the time that it acquired the purloined HeLa cells, TFS cannot be a bona fide purchaser of stolen cells. "The general rule, even as to sales and pledges of personal property, is that no one can transfer to another a better title than he has himself[.]" *William J. Lemp Brewing Co. v. Mantz*, 87 A. 814, 816 (Md. 1913) (citation and internal quotation marks omitted). Put another way, "a possessor of stolen goods, no matter how innocently acquired, can never convey good title." *Inmi-Etti v. Aluisi*, 492 A.2d 917, 923 (Md. Ct. Spec. App. 1985) (citation and internal quotation marks omitted). "If the goods are stolen, only 'void' title is obtained, and the thief cannot pass along good title to a good faith purchaser." *Great Am. Ins. Co. v. Nextday Network Hardware Corp.*, 73 F. Supp. 3d 636, 641 (D. Md. 2014).

The SAC plausibly alleges that Mrs. Lacks's cells were taken without her consent or knowledge by Johns Hopkins physicians in an unethical and unlawful biopsy. TFS cannot have obtained good title over these cells because no one in the chain of sale between Johns Hopkins and

TFS has ever had good title to HeLa cells. This is true even if TFS "innocently acquired" HeLa cells. *Inmi-Etti*, 492 A.2d at 923.

*Second*, the SAC plausibly alleges that at all relevant times—at any point during the HeLa cell line's existence—TFS understood enough about the wrongful origins of the cell line to know it was *not* acting in good faith by acquiring it. *See Washington Mut. Bank v. Homan*, 974 A.2d 376, 390 (Md. 2009) (among requirements to qualify as bona fide purchaser for value, one must purchase "without notice or knowledge of any infirmity in the title of his [or her] vendor") (citation omitted).[13] To survive a motion to dismiss based on bona fide purchaser status, a plaintiff need only plead enough to allow a "sufficient inference of bad faith by Defendant in retaining Plaintiff's money." *Hobbs v. Martin*, No. JKB-16-749, 2017 WL 105675, at *4 (D. Md. Jan. 11, 2017).

The SAC alleges sufficient facts to meet this standard. Prior to the revelation of Mrs. Lacks's identity as the origin of the HeLa cell line, Johns Hopkins physicians engaged in the systematic harvesting of cell samples from Black patients at Johns Hopkins without their consent or knowledge. ¶ 30. "[T]he scientific community knew that physicians at Johns Hopkins had performed unconsented-to, non-therapeutic medical experimentation on its Black patients and turned a blind eye to Johns Hopkins' unlawful and tortious conduct and complete breach of trust and confidence to its patients." ¶ 43. This misconduct existed alongside similar schemes targeted at Black people by medical researchers across the country, such as the Tuskegee syphilis study. ¶¶ 31-33. The SAC contains ample allegations—not least of all TFS's public admission (¶ 46)—that indicate TFS's knowledge of the HeLa cell line's origin. ¶ 44. Given this, at any point during the

---

[13] Therefore, although TFS tries to deflect by arguing that Plaintiff does not allege what price TFS paid for the HeLa cells—which Plaintiff is not required to plead and, in any event, that information is in TFS's knowledge or possession—as opposed to what price Plaintiff believes it should have paid (Mem. at 15), TFS sidesteps the threshold requirement that it must have been a *bona fide* or innocent purchaser.

20

cell line's existence, TFS knew or should have known that it could not purchase HeLa cells in good faith, and it would be incorrect to hold otherwise on a motion to dismiss.[14]

TFS devotes little, if any discussion, to the post-public revelation period, focusing only on the pre-public revelation period. That is a tacit admission of the viability of Plaintiff's claim to the extent it is based on purchases of HeLa cells that occurred after the public disclosure of Mrs. Lacks' identity.[15] As the Court expressed, "Why wouldn't a subsequent separate acquisition of the HeLa cell line be a separate unjust enrichment claim?" Tr. at 67:15-17.

Furthermore, TFS's primary objection to Plaintiff's argument regarding the pre-public-disclosure period is that Plaintiff alleges the scientific community's knowledge during this period on information and belief. TFS asserts that Plaintiff's allegation is conclusory and that he has to support his information and belief pleading. That is incorrect. Parties need not plead the facts supporting an information and belief pleading.[16] Indeed, the Court acknowledged that it "[s]eems

---

[14] *See Lewis v. Rippons*, 383 A.2d 676, 680 (Md. 1978) ("A purchaser cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him. If he neglects to make such inquiry, he will be guilty of bad faith and must suffer from his neglect. That which is sufficient to excite inquiry is notice of such facts as would lead an ordinarily prudent man to make an examination.") (citation and internal quotation marks omitted); *Fick v. Perpetual Title Co.*, 694 A.2d 138, 146 (Md. Ct. Spec. App. 1997) ("A purchaser whenever he has sufficient information to put him on inquiry, in equity is considered as having notice; and in such case he will not be deemed a *bona fide* purchaser.") (citation and internal quotation marks omitted).

[15] Indeed, TFS itself has suggested such purchases exist. ECF No. 73 at 2 n.4 ("The reference to ATCC as the source of the HeLa cells in many of the listed patents is to the American Type Culture Collection, a non-profit organization that today sells HeLa cells, including to companies like Thermo Fisher, for $520.00."). Plaintiff references this material outside of the SAC for the limited purpose of noting TFS's omission regarding this point, and in doing so does not waive his argument in Section II.A below that the Court should not take into account any of the extrinsic evidence that TFS has cited.

[16] Wright and Miller, 5 Fed. Prac. & Proc. Civ. § 1224 (4th ed. Apr. 2022 Update) ("Such supporting allegations seem to be unnecessary and inconsistent with the philosophy of the federal pleading rules, except when the stricter pleading requirements of Federal Rule of Civil Procedure

like a very appropriate use of upon information and belief pleading." Tr. at 30:13-14.

Even assuming that a party needed to independently plead facts to establish the plausibility of an information and belief pleading, Plaintiff's discussion of the systematic abuses at Johns Hopkins paired with the widespread abuses in medical research at the time of Mrs. Lacks's battery (¶¶ 3, 5, 27-33, 35-37) would satisfy this standard. *See*, *e.g.*, *Malibu Media LLC v. Doe*, No. PWG-13-365, 2014 WL 7188822, at *4 (D. Md. Dec. 16, 2014) (information and belief pleading justified "where the belief is based on factual information that makes the inference of culpability plausible") (citation and internal quotation marks omitted). Nor is Plaintiff's information and belief allegation conclusory—it alleges a particular factual scenario, with a greater degree of specificity than is required.[17] Because Plaintiff has plausibly alleged that TFS was on notice of the wrongful origin of the cells, TFS cannot be a bona fide (i.e., innocent) purchaser.

*Third*, there is no basis to believe that Maryland courts would hold that any consideration in this context constitutes "fair or sufficient consideration" or that a bona fide purchaser rule would apply against this fact pattern. It is certainly true that Maryland generally requires a plaintiff to plead the absence of bona fide purchaser status in unjust enrichment cases involving traditional property. *Plitt v. Greenberg*, 219 A.2d 237, 241 (Md. 1966). This, however, is not a traditional property case. As Plaintiff's counsel described at oral argument:

> MR. CRUMP: Henrietta Lacks lives. She lives today with each new cell that Thermo Fisher Scientific duplicates and sells for unsanctioned profit. Thermo Fisher utilizes Henrietta Lacks's cells as chattel property, as if she wasn't real, seeking intellectual property rights and staking a claim to Ms. Lacks as if Ms. Lacks can be dissociated from her very own HeLa cells.

9, which relate to such matters as fraud and special damages, are involved or the matter pleaded in some way casts aspersions on the defendant's moral character.").

[17] *Cf. Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 768 (D. Md. 2015) (complaint survived 12(b)(6) challenge based on information and belief allegation that defendant "'possesses communications evidencing Defendants' deliberate indifference in imposing wrongful discipline on Plaintiffs on the basis of their gender'").

> The legal fiction of chattel property has been manipulated to sanction ill treatment of [B]lack bodies and create a legal dehumanization of [B]lack people in this country throughout history.

Tr. at 22:10-16.  This point is not just moral.  No legal authority indicates that Maryland courts would hold any amount of consideration is sufficient to constitute "fair or sufficient consideration" in this context or that Maryland courts would extend the bona fide purchaser doctrine outside of the traditional property context to the sale of the living tissue of a human being.  Such an extension would be inconsistent with Maryland's adoption of the principles of the Nuremberg Code[18] and with the Commonwealth's longstanding and deep commitment to the principle of bodily integrity.[19]  Similarly, the Maryland judiciary's deep and longstanding commitment to racial equality and to correcting past racial injustice would be completely undermined by extending the bona fide purchaser doctrine to this unprecedented context.[20]  This Court should not extend the bona fide purchaser doctrine in the unprecedented and improper way that TFS demands.

### D. Plaintiff Sufficiently Alleges Unjust Enrichment Based on Tortious Conduct

Finally, TFS again maintains that Plaintiff's unjust enrichment claim fails because the SAC

---

[18] The *New England Journal of Medicine* has called the Nuremberg Code, formulated in 1947—years before the wrongful conduct by Johns Hopkins physicians—"the most important document in the history of the ethics of medical research."  Evelyne Schuster, *Fifty Years Later: The Significance of the Nuremberg Cod*e, 337 New Eng. J. Med. 1436, 1436 (1997).

[19] *See Grimes v. Kennedy Krieger Inst., Inc.*, 782 A.2d 807, 849-50 (Md. 2001) (adopting principles of Nuremberg Code); *Dep't of Health & Mental Hygiene v. Kelly*, 918 A.2d 470, 481 (Md. 2007) (discussing how informed consent requirements "embody an individual's liberty interest in bodily integrity").

[20] *See Ryder v. Ryder*, No. 1726 Sept. Term, 2019, 2020 WL 3618918, at *6 (Md. Ct. Spec. App. July 2, 2020) (unpublished) ("Our duty and fealty to the constitutions of our state and country command that we strive toward equality.  Let us, in reaffirming our commitment to equal justice under law for all, make it know that, in Maryland, the lives of people of color do matter.") (quoting Chief Judge Mary Ellen Barbera, "Statement of Equal Justice Under Law," June 9, 2020).

does not plead an actionable underlying tort. Mem. at 15-17. As before, that contention is unavailing for two independent reasons.

*First*, "both the Maryland Court of Special Appeals and the United States District Court for the District of Maryland have permitted cases to go forward with a sole claim for unjust enrichment remaining." *Monterey Mushrooms, Inc. v. HealthCare Strategies, Inc.*, No. CCB-20-3061, 2021 WL 1909592, at *3 (D. Md. May 12, 2021) (citing cases); *see* Tr. at 14:25-15:2 (Court noted that it had "found cases in the Maryland state courts where a solo unjust enrichment claim has either survived on its own or survived after dismissal of other claims"). Under Maryland law, "[u]njust enrichment is a claim [] that may not be reduced neatly to a golden rule"—it is a flexible doctrine that frequently depends on fact-specific inquiries. *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007); *accord Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 114 A.3d 676, 690 (Md. 2015) ("[U]njust enrichment is both elemental and elusive.").

No underlying tort needs to be pleaded. Restitution based on a defendant's unjust enrichment is an independent cause of action that does not depend on any other violation of the law.[21] The central purpose of restitution is to undo a defendant's unjust enrichment: "A person who is unjustly enriched at the expense of another is subject to liability in restitution." *Third Restatement* § 1. Requiring that an independent tort count be pled would make unjust enrichment a purely derivative claim and immunize those who, like TFS, benefit from misconduct committed against the plaintiff by an original wrongdoer who, for whatever reason, can no longer be held to

---

[21] *See Clark Off. Bldg.*, 245 A.3d at 190 ("Unjust enrichment first was established as an *independent* basis of liability in the common law in *Restatement of Restitution* (1937)[.]") (emphasis added); Doug Rendleman and Caprice Roberts, *Remedies: Cases and Materials* 517 (9th ed. 2018) ("A defendant's civil liability to a plaintiff for restitution based on the defendant's unjust enrichment is a substantive branch of the common law like property, contract, and tort. The plaintiff may seek restitution *as a freestanding remedy based on the defendant's unjust enrichment alone*.") (emphasis added).

account.  *See* Mem. of *Amici Curiae* Doug Rendleman and Caprice Roberts (ECF No. 67) at 4-6

(leading academics on law of unjust enrichment and restitution explaining that unjust enrichment

"does not require that plaintiff additionally pursue a tort cause of action").

Here, Plaintiff sufficiently alleges that TFS has unjustly benefitted from commercializing

Mrs. Lacks's genetic material for its own profit and unjustly retained those benefits without the

consent of or compensation to Mrs. Lacks' Estate.  Thus, Plaintiff may obtain disgorgement of

TFS's ill-gotten gains without alleging any underlying tortious conduct by TFS or anyone else.

The cases that TFS cites stand for a far narrower proposition:  When a plaintiff alleges that

a defendant was unjustly enriched *because of* an alleged underlying tort (rather than independent

conduct), but the court determines that the conduct alleged was *not*, in fact, tortious, then the

defendant cannot have been unjustly enriched.  *See Monterey Mushrooms,* 2021 WL 1909592, at

\*3 (explaining this distinction) (citing cases); *see also* Tr. at 10:7-16:23 (Court questioned whether,

based on existing law, an unjust enrichment claim requires that the plaintiff plead a separate tort).[22]

*Second*, to the extent that some cases require that tortious conduct be pled,[23] the SAC amply

does so.  Plaintiff unequivocally alleges gravely unethical and wrongful conduct by Johns

Hopkins' physicians—both tortious conduct and breach of a confidential relationship.  ¶¶ 3-5, 23-

7, 31-35.  The SAC alleges that the very genetic material that TFS now sells for profit was the

---

[22] TFS contends that certain cases are unpersuasive because the defendant there did not move to dismiss on the basis of no separate tort having been pleaded.  Mem. at 16-17.  Putting to one side the dubiousness of that distinction, Judge Blake's decision in *Monterey Mushrooms* was rendered on the defendant's motion to dismiss.  *See* 2021 WL 1909592, at \*1, \*3-4.

[23] TFS relies on *Texas Star Nut & Food Co. v. Truist Bank*, ___ F. Supp. 3d ___, No. GJH-21-2564, 2022 WL 4548638 (D. Md. Sept. 29, 2022) (Mem. at 15-16), but, there, Judge Hazel held that an unjust enrichment claim should be dismissed if the plaintiff "'has not stated a claim for *tortious conduct*.'"  *Id.* at \*5 (quoting *Washington Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, 431 F. Supp. 3d 698, 718 (D. Md. 2020) (in turn citing cases)) (emphasis added).  Neither he nor the *Washington County* decision that he relied upon held that a separate tort *count* must be lodged.

product of a medically unnecessary surgical procedure by Mrs. Lacks's physicians without her knowledge or consent. ¶¶ 9, 15, 42-46. Maryland courts have long recognized that physicians must obtain a patient's consent before they are legally entitled to perform medical procedures.[24]

Such conduct by Mrs. Lacks's physicians was also a breach of a confidential relationship. The doctor-patient relationship is confidential because it is "one in which 'two persons stand in such a relation to each other that one must necessarily repose trust and confidence in the good faith and integrity of the other.'"[25] The Johns Hopkins physicians' removal of their patient's tissue without her knowledge or consent and purely for their personal gain (¶¶ 3-5, 27-30, 35-41) was a gross breach of the doctor-patient relationship.

Alternatively, the SAC's allegations make out the elements of the simple common law tort of battery. Johns Hopkins physicians' excision of tissue from Mrs. Lacks without her knowledge or permission represented non-consensual bodily trauma.[26] At the hearing on its initial motion to

---

[24] *See, e.g.*, *Sard v. Hardy*, 379 A.2d 1014, 1019 (Md. 1977) ("The fountainhead of the doctrine of informed consent is the patient's right to exercise control over [her] own body, at least when undergoing elective surgery, by deciding for [her]self whether or not to submit to the particular therapy."); *id.* at 1021 (characterizing "protection of the patient's fundamental right of physical self-determination" as "the very cornerstone of the informed consent doctrine").

[25] *UBS Fin. Servs., Inc. v. Thompson*, 94 A.3d 176, 186 (Md. Ct. Spec. App. 2014) (quoting *Upman v. Clarke*, 753 A.2d 4, 9 (Md. 2000), *aff'd*, 115 A.3d 125 (Md. 2015)); *accord Sard*, 379 A.2d at 1019-20 (noting that some courts "have bottomed the physician's duty to disclose on the fiducial quality of the physician-patient relationship") (citing cases).

[26] *See Doe v. Archdiocese of Washington*, 689 A.2d 634, 640 (Md. Ct. Spec. App. 1997) ("A battery is the intentional, unpermitted touching of the body of another that is harmful or offensive to the person who was touched. The gist of the action is ... absence of consent to the contact on the plaintiff's part.") (internal citations and quotation marks omitted); *Williamson v. Prince George's Cnty.*, No. DKC 10-1100, 2011 WL 280961, at *5 (D. Md. Jan. 26, 2011) ("'The elements of the tort of battery consist of the unpermitted application of trauma by one person upon the body of another person.'") (quoting *Johnson v. Valu Food, Inc.*, 751 A.2d 19, 21 (Md. Ct. Spec. App. 2000)).

dismiss, TFS did not dispute that Mrs. Lacks was the victim of a battery.  Tr. at 16:3-21.[27]

## II.     PLAINTIFF TIMELY COMMENCED THIS ACTION

A defendant who breaks the law and gets away with it because the statute of limitations runs on its initial lawbreaking does not secure a free pass to break the law in the same way in the future.  Two fundamental doctrines mandate this result.  The first is the separate accrual rule, which applies when the lawbreaking takes the form of many discrete acts.  The second is the continuing violations doctrine, which applies when the lawbreaking takes the form of an ongoing, continuous violation.  These intertwined doctrines ensure that past lawbreaking cannot insulate continued or future lawbreaking.

Both doctrines are settled law in Maryland,[28] and both doctrines can apply to unjust enrichment claims.[29]  Moreover, as Plaintiff laid out in his response to TFS's initial motion to dismiss, either doctrine fairly describes the fact pattern before the Court:  TFS's continued, repeated, and conscious choice to profit from the living tissue of Henrietta Lacks.

The Court, though, need not address this question now.  The SAC does not set forth the

---

[27] Because the SAC pleads tortious conduct as the underpinnings of Plaintiff's unjust enrichment claim, TFS's suggestion that a purported intra-District split warrants resolution through certification of a question to the Maryland Supreme Court (Mem. at 17 n.24) would be a pointless exercise and thereby frustrate principles of judicial efficiency and economy.

[28] *E.g.*, *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 463 (4th Cir. 1983) (applying Maryland UCC and allowing otherwise time-barred claim to proceed because subsequent conduct "constituted a distinct and separate accrual for purposes of computing the limitations period"); *CASA de Maryland, Inc. v. Arbor Realty Tr., Inc.*, No. DKC 21-1778, 2022 WL 4080320, at *22 (D. Md. Sept. 6, 2022); *Cain v. Midland Funding, LLC*, 256 A.3d 765, 793 (Md. 2021).

[29] *E.g., AAA Antiques Mall, Inc. v. VISA, USA, Inc.*, 558 F. Supp. 2d 607, 610 n.4 (D. Md. 2008) (recognizing continuing violations doctrine would apply to unjust enrichment claim); *Diane Sales, Inc. v. Am. Express Centurion Bank*, No. GLR-14-1063, 2015 WL 10986308, at *2 (D. Md. Oct. 26, 2015) (treating separate instances of unjust enrichment in multi-year fraud scheme as separate instances of unjust enrichment and applying separate accrual rule).

date on which TFS was unjustly enriched. TFS's efforts to direct the Court beyond the SAC are inconsistent with clear direction from the Fourth Circuit that judicial notice cannot be used as an end-run around the Federal Rules' protections against premature dismissal. *See* Tr. at 53:12-17.

### A.     The Court Should Decline to Take Judicial Notice of Extrinsic Materials

As a threshold matter, TFS's reliance on a slew of extrinsic materials—that it contends are subject to judicial notice (Mem. at 6-7, 20-23)— is unavailing. Judicial notice cannot "be used as an expedient for courts to consider matters beyond the pleadings and thereby upset the procedural rights of litigants to present evidence on disputed matters." *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 360 (4th Cir. 2013) (citing cases; internal quotation marks omitted); *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 511 (4th Cir. 2015) (courts should "refrain[] from mining the exhibits to determine what, if anything, we could take judicial notice of" in the face of serious factual disputes). In *Waugh Chapel* and *Goldfarb*, the Fourth Circuit rejected the use of judicial notice as "an expedient" to circumvent Rule 12(b)(6)'s limits on when affirmative defenses can be decided. The core premise of TFS's judicial notice argument is that this Court should bypass the traditional framework for deciding statute of limitations issues and summarily decide the question now. Binding precedent forbids this.

Furthermore, judicial notice is proper only when an adjudicative fact is not subject to reasonable dispute and as long as the noticed facts are construed in the light most favorable to the plaintiff. *Zak*, 780 F.3d at 607. The determination of whether a fact properly is considered depends on the manner in which the proponent seeks to use the information. *Id.* at 607-08, 611 (vacating and remanding where district court failed to construe facts from SEC documents in light most favorable to plaintiff).

Courts "frequently decline to take judicial notice of filings which are incomplete or

truncated." *City of Miami Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc*., 302 F. Supp. 3d 1028, 1034 n.1 (N.D. Cal. 2018).  That is because where an incomplete record or filing is sought to be judicially noticed, the adjudicative facts are subject to a reasonable dispute.  *See, e.g.*, *Garcoa, Inc. v. Sierra Sage Herbs LLC*, No. CV 21-4672 PSG (SPx), 2022 WL 16548874, at *2 (C.D. Cal. Oct. 4, 2022) (declining to take judicial notice of online publication from NIH's library because exhibit "appear[ed] incomplete and [wa]s thus subject to reasonable dispute").

Such is the case here, where TFS asks the Court to take judicial notice of piecemeal public records.  For example, it points to a June 26, 2008 record from the Federal Procurement Data System, but fails to reference a February 3, 2021 purchase of Pierce HeLa Protein Digest Standard."[30]  TFS also relies on a 2014 U.S. General Service Administrative ("GSA") contract (notably with a March 2024 end date), but fails to reference GSA contracts for Hela-S3 Total RNA 100ug on August 1 and 9, 2019, and May 29, 2020.[31]

Moreover, where Maryland courts take judicial notice of a public record, they do so "*not for the truth of its contents, but for the fact that the record exists*." *Anglemyer v. WCS Constr., LLC*, No. 8:18-cv-02198-PWG, 2019 WL 3458951, at *5 (D. Md. July 31, 2019) (emphasis

---

[30] Federal Procurement Data System, Dep't of the Navy Purchase Order No. N0017321P0426 (Feb.                                              3,                                              2021), https://www.fpds.gov/ezsearch/search.do?indexName=awardfull&templateName=1.5.3&s=FPDS.GOV&q=N0017321P0426 (under the "view" tab:  Product Or Service Information/Description Of Requirement:  "Pierce HeLa Protein Digest Standard") (last visited Feb. 17, 2023).

[31] USASpending.gov Award Profile for Contract No. SPE2D619F5MQ6 https://www.usaspending.gov/award/CONT_AWD_SPE2D619F5MQ6_9700_SPE2DE19D0007_9700 USASpending.gov Award Profile for Contract No. SPE2D619F6XQ8 https://www.usaspending.gov/award/CONT_AWD_SPE2D619F6XQ8_9700_SPE2DE19D0007_9700 USASpending.gov Award Profile for Contract No. SPE2D620F4A6Y https://www.usaspending.gov/award/CONT_AWD_SPE2D620F4A6Y_9700_SPE2DE19D0007_9700 (all last visited Feb. 17, 2023).

added).[32]  Indeed, the Court already expressed doubt that it can take judicial notice of such materials "for purposes of determining the accrual date of the claim."  Tr. at 60:21-22.  This is doubly true for TFS's remarkable claim that an archived copy of a webpage from one of its subsidiaries' websites is a proper subject for judicial notice.  Leaving aside that "a private internet archive falls short of being a source whose accuracy cannot reasonably be questioned as required by Rule 201," *Weinhoffer v. Davie Shoring, Inc.*, 23 F.4th 579, 584 (5th Cir. 2022), even courts that have erroneously taken judicial notice of archived webpages have done so only for the fact that a website *had* particular content, not the factual accuracy thereof.  *See Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021).  A broader holding would establish that everything historically on the Internet is properly subject to judicial notice—which is not the law.

### B.    Either the Separate Accrual Rule or Continuing Violations Doctrine Governs

Its misguided efforts at judicial notice aside, TFS's argument that Plaintiff's claim is time-barred fails, whether the separate accrual or the continuing violations doctrine applies.

The "separate-accrual approach to computing the limitations period is appropriate where the law forbids a discrete act, as most do." *Phreesia, Inc. v. Certify Glob., Inc.*, No. DLB-21-678, 2022 WL 911207, at *9 (D. Md. Mar. 29, 2022) (citing cases; internal quotations marks omitted). "But if [the law] forbids diffuse conduct, comprising many acts at different times, then the continuing-violation doctrine applies." *Blake v. JP Morgan Chase Bank NA*, 927 F.3d 701, 706

---

[32] *Accord Paragon Sys., Inc. v. Hughes*, No. SAG-20-1209, 2020 WL 6292728, at *2 n. 3 (D. Md. Oct. 27, 2020) ("[T]he Court may take judicial notice of the fact that the document Defendants submit exists, but it will not draw inferences from the contents of the document, especially where those inferences are hostile to plaintiff.") (citation and internal quotation marks omitted). The *Paragon Systems* court recognized that this approach was warranted based on "this stage of the proceedings"—the fact the case was being decided on a motion to dismiss. Tellingly, the primary authority upon which TFS relies, *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017), involved judicial notice *at trial*.

(3d Cir. 2019).  Operating in tandem, these doctrines mean that an ongoing course of wrongful conduct cannot be shielded from liability through a statute of limitations.

The separate accrual doctrine is not an exception to the statute of limitations.  Rather, it is an application of the standard rule that a cause of action accrues when each element of a plaintiff's claim has occurred, and the plaintiff thus can sue, to the context of successive violations of law.  *Id.* ("A corollary of the standard rule is the separate-accrual rule.").  It recognizes that, just as courts cannot unilaterally extend statutes of limitations outside of the circumstances provided by traditional equitable doctrines, the inverse is true as well—where a plaintiff "seeks relief solely for conduct occurring within the limitations period … courts are not at liberty to jettison [the legislature's] judgment on the timeliness of suit."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014). The continuing violations doctrine accomplishes the same result in the context of continuing wrongful conduct.[33]

That an ongoing course of wrongful conduct is generally not shielded from liability through statutes of limitations is not an accident.  In the analogous context of the application of res judicata to an ongoing course of wrongful conduct, the Supreme Court has explained that an ongoing course of wrongful conduct "may frequently give rise to more than a single cause of action" regardless of "whether the defendants' conduct be regarded as a series of individual torts or as one continuing

---

[33] *See generally* Suzette M. Malveux, *Statutes of Limitations:  A Policy Analysis in the Context of Reparations Litigation*, 74 Geo. Wash. L. Rev. 68, 88 (2005) ("[T]he continuing violations doctrine allows a plaintiff to bring a cause of action where there is a continuous series of injuries that stem from an initial injury.  The doctrine permits a plaintiff to obtain relief for a time-barred act of misconduct by connecting it to similar acts of misconduct that occurred within the limitations period.  The courts treat the series of acts as one continuous act that ends before the statute of limitations period expires.  [T]he statute of limitations is not tolled per se, but rather left open until a final injury has accrued.") (footnotes and internal quotation marks omitted).

tort[.]" *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-28 (1955).[34] This is because any alternative approach would grant lawbreakers "a partial immunity from civil liability for future violations." *Lawlor*, 349 U.S. at 329; *Ohio Valley Env't Coal.*, 556 F.3d at 211. Such immunity is inconsistent with the rule of law.

Maryland has adopted both the separate accrual rule and the continuing violations doctrine. *E.g.*, *Cain,* 256 A.3d at 791-93; *CASA de Md.*, 2022 WL 4080320, at *22. Applying either doctrine, Maryland federal and state courts have consistently held that claims involving an ongoing course of wrongful conduct are not time barred.[35]

Here, too, TFS is engaged in an ongoing wrongful course of conduct—it is *currently* selling Mrs. Lacks's genetic material and is *currently* being unjustly enriched by such sales. Given this, either the separate accrual doctrine or continuing violations doctrine permits Mrs. Lacks's Estate to sue over TFS's present conduct.

TFS appears to argue that the separate accrual doctrine has been limited to conduct that is prohibited by statute and hence does not apply to unjust enrichment claims. Mem. at 24-25.[36]

---

[34] *See also Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 211 (4th Cir. 2009) ("The fact that the two suits involve challenges to very similar courses of conduct does not matter; a prior judgment cannot be given the effect of extinguishing claims which did not even then exist.[.]") (citation and internal quotation marks omitted).

[35] *E.g.*, *Peete-Bey v. Educ. Credit Mgmt. Corp.*, 131 F. Supp. 3d 422, 434 (D. Md. 2015) (where debt collector improperly garnished debtor's wages over multi-year period, debtor could sue for conversion based on those garnishments occurring within preceding three years); *Diane Sales*, 2015 WL 10986308, at *2 (where defendant was unjustly enriched through multi-year fraud scheme, plaintiff could sue for those instances of unjust enrichment occurring within preceding three years); *Singer Co., Link Simulation Sys. Div. v. Baltimore Gas & Elec. Co.*, 558 A.2d 419, 424 (Md. Ct. Spec. App. 1989) (where electric company was sued under contract and negligence theories for repeatedly failing to provide power to customer, customer could sue for those outages occurring within preceding three years).

[36] TFS frames the issue as one of legality, claiming that its conduct is legal, and that the separate accrual rule does not extend to legal conduct. Unjust enrichment, though, inherently

That is not so. The exemplar cases cited in footnote 35 above involved common law claims—specifically negligence, breach of contract, conversion, and unjust enrichment. This approach accords with the *Third Restatement*, which explains that the "accrual of a claim in restitution or unjust enrichment is governed by the same general logic as any other sort of claim." *Third Restatement* § 70, cmt. f. As a consequence, "[o]ccasionally, a claimant will be able to point to different grounds of unjust enrichment occurring at different stages of the parties' dealings with each other. Although restitution on one theory may be time-barred, restitution on another theory may yield a viable claim." *Id.* Consistent with this approach, courts outside of Maryland have applied either the separate accrual or continuing violations doctrine to unjust enrichment claims.[37]

To be clear, if TFS were not engaged in an ongoing course of wrongful conduct, it is possible that neither the separate accrual nor the continuing violations doctrine would apply. For example, had TFS sold Mrs. Lacks's cells prior to the statute of limitations period and simply continued to passively receive additional payments from those earlier sales within the statutory period, it might not be engaged in ongoing wrongful conduct. *See DuBuisson v. Nat'l Union Fire*

---

involves unlawful conduct because of the common law prohibition on unjust enrichment. *Hill*, 936 A.2d at 352 (citing authorities; internal quotation marks omitted).

[37] *E.g.*, *Malfatti v. Mortg. Elec. Registrations Sys., Inc.*, No. C 11-03142LB, 2013 WL 3157868, at *5 (N.D. Cal. Jun. 20, 2013) (denying summary judgment on statute of limitations grounds as to plaintiff's unjust enrichment claim and applying continuing violations doctrine because of defendant bank's unjust retention of plaintiff's mortgage payments *during* statutory period); *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 134-36 (E.D.N.Y. 2000) (applying continuing violations doctrine to unjust enrichment claim of Jewish victims and survivors of Nazi Holocaust in France, and their heirs and beneficiaries, where victims' assets had been deposited in, processed by, or converted by defendant banks during or after the Holocaust); *Knobel v. Shaw*, 936 N.Y.S.2d 2, 6 (App. Div. 2011) ("[T]he part of the claim that is based on the individual defendants' keeping all the profits from the properties for themselves is viable for the six years preceding the commencement of this action."); *78/79 Assocs. v. Rand*, 672 N.Y.S.2d 619, 623 (N.Y. Civ. Ct. 1998) (applying continuing violations doctrine to Rent Stabilization Code violation; concluding that claim accrued anew with each month's payment of rent overcharge).

*Ins. of Pittsburgh, P.A.*, No. 15 Civ. 2259 (PGG), 2021 WL 3141672, at *17 (S.D.N.Y. July 26, 2021); *Schandler v. New York Life Ins. Co.*, No. 09 Civ. 10463 (LMM), 2011 WL 1642574, at *9 (S.D.N.Y. Apr. 26, 2011). Similarly, had it done nothing more than passively receive interest on money previously obtained from wrongful sales, TFS might not be engaged in ongoing wrongful conduct. *See City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-5345 (AJN), 2018 WL 1583293, at *4 (S.D.N.Y. Mar. 27, 2018). Such hypotheticals, though, are not the case here—where TFS freely admits that *it continues to cultivate and sell* Mrs. Lacks's living cells to this day.

## C. Plaintiff Did Not Abandon the Continuing Violations Doctrine

Citing the transcript of the May 2022 hearing on its first motion to dismiss, TFS maintains that Plaintiff abandoned the continuing violations doctrine as a basis for the timeliness of his claim. Mem. at 24. That is demonstrably inaccurate. At the hearing, the following colloquy took place:

> THE COURT: Let me ask you on the statute of limitations issue. You argue both, I think, that the separate accrual doctrine and the continuing violation doctrine apply. Is it both or either?
> MR. SEEGER: *I honestly believe that either doctrine could apply, and I'm happy to go through it.* But to be honest with you, Your Honor, we don't need to get to the continuous acts doctrine. The separate accrual doctrine will satisfy the purposes of this case and what this family needs from it. The continuous acts doctrine, I will admit, is a little bit more complicated. And it was employed, as I said, in the Eastern District of New York. It's a different fact pattern. We don't need to stretch the law that far.
> THE COURT: Okay. So let's focus on separate accrual.
> MR. SEEGER: Okay.

Tr. at 63:4-18 (emphasis added). Plaintiff's counsel's statement makes clear that Plaintiff did *not* abandon the continuing violations doctrine. At most, it shows that Plaintiff's counsel viewed that doctrine as an alternative argument, and it is axiomatic that parties may argue in the alternative.[38]

---

[38] *E.g.*, *Rux v. Republic of Sudan,* 410 F. App'x 581, 586 (4th Cir. 2011); *Allegis Grp., Inc. v. Jordan*, No. GLR-12-2535, 2017 WL 877271, at *2 n.4 (D. Md. Mar. 6, 2017); *Landesbank Baden-Wurttemberg v. Atradius Trade Credit Ins., Inc.*, No. 12-cv-2969-JKB, 2013 WL 1175441, at *3 n. 2 (D. Md. Mar. 19, 2013).

**CONCLUSION**

In sum, the SAC sufficiently alleges the elements of unjust enrichment, and Plaintiff's claim is timely asserted. Dismissal is especially inappropriate given the novel nature of this claim. Accordingly, the Court should deny TFS's motion.[39]

DATED: February 17, 2023

Respectfully submitted,

*/s/ Kim Parker*

Kim Parker
Federal Bar No.: 23894
**LAW OFFICES OF KIM PARKER, P.A.**
2123 Maryland Ave.
Baltimore, MD 21218
Telephone: 410-234-2621
kp@kimparkerlaw.com

Christopher A. Seeger (*admitted pro hac vice*)
Christopher L. Ayers (*admitted pro hac vice*)
Jeffrey S. Grand (*admitted pro hac vice*)
Nigel P. Halliday (*admitted pro hac vice*)
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 212-584-0700
cseeger@seegerweiss.com
jgrand@seegerweiss.com
cayers@seegerweiss.com
nhalliday@seegerweiss.com

---

[39] If the Court grants any part of TFS's motion, Plaintiff respectfully requests that he be afforded leave to further amend his complaint because amendment would not be futile.

Ben Crump *(admitted pro hac vice)*
Christopher O'Neal *(admitted pro hac vice)*
Nabeha Shaer (*motion for pro hac vice admission to be filed*)
**BEN CRUMP LAW, PLLC**
633 Pennsylvania Avenue, N.W.
Floor 2
Washington D.C. 20004
Telephone: 860-922-3030
court@ BenCrump.com
chris@BenCrump.com
Nabeha@BenCrump.com

ATTORNEYS FOR RON L. LACKS, PERSONAL
REPRESENTATIVE OF THE ESTATE OF
HENRIETTA LACKS

**HEARING REQUESTED**

Plaintiff requests that a hearing be held concerning Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint and the instant opposition to the same.

*/s/ Kim Parker*
Kim Parker


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 17th day of February, 2023, a copy of Plaintiff's Opposition to the Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint was sent by this Court's electronic delivery system to all counsel of record.

*/s/ Kim Parker*
Kim Parker