# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### Northern Division

| |
|---|
| RON L. LACKS, PERSONAL REPRESENTATIVE OF THE ESTATE OF HENRIETTA LACKS, <br><br>       PLAINTIFF, <br><br> v. <br><br> THERMO FISHER SCIENTIFIC INC., <br><br>       DEFENDANT. |

**Case No. 1:21-cv-02524-DLB**

## *AMICI CURIAE* BRIEF OF THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, THE NATIONAL HEALTH LAW PROGRAM, AND THE NATIONAL WOMEN'S LAW CENTER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

### I.      INTRODUCTION

Defendant Thermo Fisher Scientific ("TFS"), a multi-billion-dollar biotechnology corporation,[1] Second Am. Civil Compl. and Req. for Jury Trial (hereinafter "Sec. Am. Compl.") ¶ 1, has been unjustly enriched by its ongoing commercialization and sale of HeLa cells. The unethical origins of HeLa cells are well known by TFS, yet it continues to commercialize them today. In the 1950's, white physicians at Johns Hopkins Hospital regularly conducted non-consensual, non-therapeutic research on patients in the public ward, which had a large population of indigent Black patients. Sec. Am. Compl. ¶ 3, 30. This research included harvesting tissue samples from indigent Black patients to develop a cell line that could survive indefinitely in

---

[1] In deciding a motion to dismiss, all well-pled facts are taken as true, and all reasonable inferences taken from those facts are drawn in the plaintiff's favor. *See Harrell v. Freedom Mortg. Corp.*, 976 F.3d 434, 439 n.5 (4th Cir. 2020) (citation omitted).

laboratory conditions.  *Id.* ¶ 24–26.   While providing treatment for cervical cancer at Johns

Hopkins, doctors cut out tissue from Henrietta Lacks's cervix for their research purposes without

her knowledge or consent, while she was unconscious and under anesthesia.  *Id.* ¶ 30–33.   The

procedure, which had no medical benefit to Mrs. Lacks, left her infertile.  *Id.* ¶ 5.   She died several

months later, never learning that her cells had been used to develop the world's first "immortal"

cell line.  *Id.* ¶ 38.

TFS's enrichment from HeLa cells is unjust because it originated from wrongful conduct

that not only breached duties owed to Mrs. Lacks by her doctors, but was enabled by the historic,

systemic disregard of legal principles regarding medical experimentation as to Black, low-income,

and other systemically oppressed groups.   TFS's continued profit from the sale of HeLa cells

creates a new injury every time it excludes the Lacks Estate from any economic benefit, and

perpetuates an ongoing economic injustice which deserves judicial resolution.

In its Motion to Dismiss, TFS relies on the same logic that was used to justify the medical

experimentation on Mrs. Lacks to defend its continued economic dispossession of the Estate today.

TFS asks the Court to apply discriminatory norms from the 1950's that allowed the nonconsensual

harvesting of Mrs. Lacks's cells, and to ignore consent laws and medical experimentation

principles that should have protected Mrs. Lacks at the time.   TFS further seeks to insulate itself

by pointing to the widespread commercial use of HeLa cells by the medical research community,

and to the benefits to the greater public good that have resulted from the medical experimentation

on Mrs. Lacks.  The implications of TFS's argument are that individuals and entities may continue

to profit from materials obtained illegally and as a result of systemic discrimination, despite

knowing about their unlawful and unethical origins before acquiring such materials.   If the Court

accepts TFS's arguments here, other beneficiaries of historic injustices will be emboldened to continue to shirk their duty to pay for the value of benefits unjustly obtained.

## II.      LEGAL ARGUMENT

### A.  TFS'S ENRICHMENT FROM HELA CELLS IS "UNJUST" IN LIGHT OF THE HISTORICAL DISCRIMINATION AT ISSUE IN THIS CASE

The Estate has stated a claim for unjust enrichment and TFS's Motion should be denied. In Maryland, "[u]njust enrichment consists of three elements: (1) A benefit conferred upon the defendant by the plaintiff; (2) An appreciation or knowledge by the defendant of the benefit; and (3) The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007) (citations omitted).  TFS has profited from HeLa cells, and, in describing the extent of the benefit to the scientific community, its Motion makes clear it has "an appreciation or knowledge" of the benefit. Sec. Am. Compl. ¶ 47; Def.'s Mot. to Dismiss at 4–6, 18 (Civil Docket No. 18) (hereinafter "Mot.").  "The final element of an unjust enrichment claim is a fact-specific balancing of the equities. The task is to determine whether the enrichment is unjust." *Hill*, 936 A.2d at 355 (internal quotations and citations omitted).  The historical facts underpinning TFS's commercialization of HeLa cells demonstrate its enrichment is unjust.

As shown below, the scientific community has long perpetuated egregious medical injustice against nonconsenting, often unknowing individuals, who were disproportionately Black, low-income, or living at the intersection of those identities.  Because TFS is a direct benefactor of those historical wrongs, principles of justice and fairness embedded in Maryland law dictate that the Estate receive compensation for the use of Mrs. Lacks's cells. *See Bank of Am. Corp. v.*

*Gibbons,* 918 A.2d 565, 569 (Md. Ct. Spec. App. 2007) ("The doctrine of unjust enrichment is applicable where the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money, and gives rise to the policy of restitution as a remedy.") (internal quotations and citations omitted); *County Comm'rs v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 607 (Md. 2000) ("Unjust enrichment . . . provide[s] relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided.") (internal quotations, punctuation, and citations omitted).[2]  Here, TFS's enrichment from HeLa cells is inexorably linked to systemic and historical medical abuse, and justice demands denial of its Motion and compensation to the Estate.

**1. TFS's enrichment relies on acts enabled and sanctioned by systemic discrimination.**

TFS's enrichment from HeLa cells cannot be divorced from the racial and class-based discrimination which allowed the medical research community to disregard medical consent principles and laws with respect to historically marginalized people for centuries.  The seizure, experimentation, and, now, commercialization of Mrs. Lacks's cervical cells are intertwined with an age-old practice of medical exploitation of people, who are disproportionately poor, Black, and Indigenous.  As explained in *The Immortal Life of Henrietta Lacks*:

> Like many doctors of his era, TeLinde [who extracted Ms. Lacks's cells] often used patients from the public wards for research, usually without their knowledge.

---

[2] Contrary to TFS's contention, whether TFS played a part in the nonconsensual harvesting of Mrs. Lacks' cells is not determinative in a claim for unjust enrichment. *See Bank of Am. Corp.*, 918 A.2d at 571-73 (citing *Plitt v. Greenberg*, 219 A.2d 237 (Md. 1966) and the Restatement of Restitution to support holding that a cause of action for unjust enrichment may lie against a transferee with whom the plaintiff had no contract, transaction, or dealing, either directly or indirectly).  Indeed, TFS's ongoing commercialization of cells that were wrongfully extracted by Mrs. Lacks's doctors is the type of situation that the Restatement seeks to address. *See* Restatement (Third) of Restitution and Unjust Enrichment § 43 (Am. L. Inst. 2011) ("Benefits derived from a fiduciary's breach of duty may . . . be recovered from third parties, not themselves under any special duty to the claimant, who acquire such benefits with notice of the breach.").  Moreover, because TFS took possession of the HeLa cells with knowledge of the widely-publicized circumstances of their wrongful origins, it cannot claim the protection afforded to bona fide purchasers. *See Fishman v. Murphy ex rel. Est. of Urban*, 72 A.3d 185, 192 (Md. 2013) (stating elements and burden of proof for bona fide purchaser defense in real property case).

> Many scientists believed that since patients were treated for free in the public wards, it was fair to use them as research subjects as a form of payment. And as Howard Jones once wrote, 'Hopkins, with its large indigent black population, had no dearth of clinical material.'[3]

Lower income people, who were disproportionately Black, were more likely to encounter physicians willing to conduct non-therapeutic and nonconsensual research or experimentation on their bodies, often when in need of medical care. Indeed, a great portion of early American medical research is founded upon nonconsensual experimentation upon systemically oppressed people:

> Southern medicine of the eighteenth and early nineteenth centuries was harsh, ineffective, and experimental by nature. Physicians' memoirs, medical journals, and planters' records all reveal that enslaved [B]lack Americans bore the worst abuses of these crudely empirical practices, which countenanced a hazardous degree of ad hoc experimentation in medications, dosages, and even spontaneous surgical experiments in the daily practice among slaves.[4]

Illustrative of this, James Marion Sims has been deemed the "Father of Gynecology" following his nonconsensual, horrific, and life-threatening experimentation on female slaves to find a cure for childbirth complications.[5]

As discussed in the *Lancet*:

> Medical schools relied on enslaved Black bodies as "anatomical material" and recruited students in southern states by advertising its abundance. This practice was widespread in the 19th and early 20th centuries. American medical education relied on the theft, dissection, and display of bodies, many of whom were Black.[6]

Dehumanizing medical research did not end with slavery, and was, in many ways, sanctioned by the United States government. For example, the United States Public Health Service denied medical treatment to nearly 400 Black men with syphilis in order to track the disease's full

---

[3] Rebecca Skloot, The Immortal Life of Henrietta Lacks 29 (Crown ed. 2010).
[4] Harriet A. Washington, *Medical Apartheid: The Dark History of Medical Experimentation on Black Americans from Colonial Times to the Present* 29 (Harlem Moon 2008).
[5] Vanessa Northington Gamble, *Under the Shadow of Tuskegee: African Americans and Health Care*, 87 Am. J. Pub. Health 1773, 1774 (1997), https://ajph.aphapublications.org/doi/epdf/10.2105/AJPH.87.11.1773;
[6] Ayah Nuriddin et al., *Reckoning with Histories of Medical Racism and Violence in the USA*, 396 The Art of Medicine 949, 949 (2020), https://doi.org/10.1016/S0140-6736(20)32032-8.

progression during the Tuskegee experiment.[7]  Moreover, the federal Indian Health Service conducted nonconsensual ophthalmological research on Indigenous children in boarding schools in the 1960's and 1970's and forcibly sterilized 3,406 Indigenous women between 1973 and 1976.[8] The United States government, in partnership with Johns Hopkins, also engaged in a medical experimentation program in the 1940's and 1950's where they deliberately and non-consensually infected both prisoners in the United States and over 5,000 Guatemalans with sexually transmitted diseases in order to test the preventative qualities of penicillin.[9]

This sort of inhumane medical experimentation was particularly rampant in Baltimore during the decades before and after the facts underlying this case.  Doctors there reportedly robbed Black graves for dissection during the 1800's.[10]  In 1970's Baltimore, researchers funded by the National Institute of Health induced young Black boys into giving their blood to screen for anemia and other medical problems, but instead used it to conduct genetic testing to determine whether they would be criminals later in life.[11]  More recently, Baltimore families alleged that the Kennedy Krieger Institute, a research institution associated with Johns Hopkins, knowingly allowed their children living in public housing to sustain lead poisoning as part of a nontherapeutic experimentation project to test the effectiveness of partial lead paint remediation in the 1990's. *Grimes v. Kennedy Krieger Inst., Inc.*, 782 A.2d 807, 817 (Md. 2001).

---

[7] Allan M. Brandt, *Racism and Research: The Case of the Tuskegee Syphilis Study* 21 (The Hastings Center  1978) https://dash.harvard.edu/bitstream/handle/1/3372911/Brandt_Racism.pdf?sequence
[8] U.S. Gov't Accountability Off., HRD-77-3, Investigation of Allegations Concerning Indian Health Service 3 (1976), https://www.gao.gov/assets/hrd-77-3.pdf. ; *1976: Government Admits Unauthorized Sterilization of Indian Women*, Nat'l Libr. of Med., https://www.nlm.nih.gov/nativevoices/timeline/543.html (last visited Feb. 18, 2022).
[9] Michael A. Rodriguez and Robert Garcia, *First, Do No Harm: The US Sexually Transmitted Disease Experiments in Guatemala*, 103 Am. J. Pub. Health 2122, 2122 (2013),  https://tinyurl.com/yckk4ke4.
[10] Gamble, *supra*; David C. Humphrey, *Dissection and Discrimination: The Social Origins of Cadavers in America*, 49 Bull. N.Y. Acad. Med. 819 (1973), https://tinyurl.com/4vtrvp43
[11] Diane Bauer, *Maryland Tests for Criminal Potential*, Washington Daily News, January 22, 1970, *reprinted in* Jay Katz et al., *Experimentation with Human Beings: The Authority of the Investigator, Subject, Profession, and State in the Human Experimentation Process* 342–44 (Russell Sage Found. 1972), https://www.russellsage.org/sites/default/files/ExHB-part1.pdf *Special Supplement: The XYY Controversy: Researching Violence and Genetics*, 10 The Hastings Ctr. Rep. 1, 4 (1980), https://doi.org/10.2307/3560454.

The systemic nature of the nonconsensual, non-therapeutic medical experimentation conducted against Mrs. Lacks, and countless other Black people, is evidenced by the widely documented mistrust in medicine that Black people throughout the United States, and in Baltimore in particular, have developed. This mistrust is directly linked to the history of medical experimentation upon Black people, and is now a significant factor in racial health disparities. As described in a PBS report: "In a city renowned for medical schools and research, there's a striking contrast in the dismal health and life expectancy in some Baltimore neighborhoods. There's a deep distrust of the medical system among many African-American residents, dating back to the 1800s."[12]

TFS acknowledges the history surrounding the nonconsensual taking, cultivation, and commercialization of Mrs. Lacks's cells, Mot. at 4, but nonetheless claims it is the rightful owner of HeLa cells today. According to TFS, "different norms than today" were the reigning authority; and her cells, which TFS now characterizes as a "resource," have been "freely and publicly available for the better part of a century." *Id.* at 2. TFS's contentions merely mirror the flawed logic that underlies deeply rooted historical medical injustice.

2. **Discriminatory "norms" of the past do not insulate TFS from liability for its unjust enrichment today.**

TFS's liability for unjust enrichment is, at least in part, contingent upon whether it knowingly took possession of cells that were wrongfully procured in the first place. Rather than acknowledge medical consent laws, TFS attempts to justify its own actions by relying on discriminatory norms that ignored such protections, especially as applied to Black women.

---

[12] PBS NewsHour, *Baltimore Hospitals Work to Repair Frayed Trust in Black Communities*, Public Broadcasting Service (Feb. 15, 2016), https://www.pbs.org/newshour/show/baltimore-hospitals-work-to-repair-frayed-trust-in-black-communities.

According to TFS, the medical assault took place "under different norms than today." Mot. at 2.[13] However, this court's inquiry must examine the justness of TFS's enrichment in view of relevant laws, rather than egregious "norms" of the past. *See e.g. Brown v. Board of Educ.*, 347 U.S. 483, 492–94 (1954) (declining to "turn the clock back to 1868 when the [Fourteenth] Amendment was adopted, or even to 1896 when *Plessy v. Ferguson* was written," and noting that its current "finding is amply supported by modern authority").

The Maryland Court of Appeals has held that Maryland law, not what medical researchers deem acceptable, should be applied to determine what is appropriate with respect to nontherapeutic human experimentation. *Grimes*, 782 A.2d at 817. In *Grimes*, the plaintiffs brought negligence claims against the Kennedy Krieger Institute based on lead exposure experimentation on children living in public housing. *Id.* at 812-815. The *Grimes* court held that a special relationship exists which imposes duties on researchers with respect to their human subjects in nontherapeutic research projects.[14] *Id.* at 850. The court reviewed applicable consent laws under Maryland law, regulations, and international law and found that the consent obtained from the parents was insufficient to justify the risk of harm to which the children were exposed. *Id.* at 852-57. Reversing summary judgment, the court held that the violations of duties imposed by the law on researchers could support the plaintiffs' claims for negligence. *Id.* at 858. The application of Maryland law, as opposed to discriminatory "norms," is therefore the proper framework to apply in evaluating the fairness of TFS's benefits in this case.

---

[13] TFS claims that informed consent guidelines and rules did not exist until years after the unlawful removal of Mrs. Lacks's cells. Mot. at 2-3.

[14] In so holding, the court recognized the "likely conflict of interest between the goal of the research experimenter and the health of the human subject, especially, but not exclusively, when such research is commercialized," finding that the research community is not "sufficiently concerned with the ethicality of the experiments they review as they are with the success of the experiments." *Id.* at 817, 850.

Medical consent laws, in fact, existed and were enforced in 1951, despite what TFS alleges were the "norms" in existence at the time. Maryland common law unambiguously required consent for medical procedures as long ago as the 1800's. *See State v. Housekeeper*, 16 A. 382, 384 (Md. 1889) ("The consent of the wife [to surgery to remove cancerous cells in her breast], not that of the husband, was necessary."); *McClees v. Cohen*, 148 A. 124, 127 (Md. 1930) (citing cases involving the issue of consent in medical negligence and other tort claims, and finding that plaintiff would be entitled to a favorable verdict if dentist extracted two bottom teeth "in violation of her instructions and without her consent").

Indeed, by 1951, the legality of informed consent had become part of international common law. In 1947, following the adjudication of Nazi atrocities involving human experimentation during World War II, an American military tribunal in the case of *United States v. Brandt* adopted the Nuremberg Code, the "most complete and authoritative statement of the law of informed consent to human experimentation." *Grimes*, 782 A.2d at 835 (internal citations and punctuation omitted). It "requires that the informed, voluntary, competent, and understanding consent of the research subject be obtained," along with nine other conditions that must be satisfied before consent can even be requested. *Id.* As the Maryland Court of Appeals observed in *Grimes*, the Nuremberg Code may be applied, in both civil and criminal cases, by state, federal, and municipal courts in the United States, though it had not been frequently used by courts, in part because cases of medical experimentation were not litigated until decades later. *Id.* at 835–36 (internal citations omitted).

In addition to various rights under Maryland common law, there is also no question that a portion of TFS's profits are derived from an egregious violation of Mrs. Lacks's fundamental rights. As Justice Stevens' concurring opinion in *Washington v. Harper* noted, "[e]very violation

of a person's bodily integrity is an invasion of his or her liberty. The invasion is particularly intrusive if it creates a substantial risk of permanent injury and premature death. Moreover, any such action is degrading if it overrides a competent person's choice to reject a specific form of medical treatment." *Washington v. Harper*, 494 U.S. 210, 237 (1990) (Stevens, J., concurring) (citing *Doe v. Bolton*, 410 U.S. 179, 213 (1973) (Douglas, J., concurring) (the Fourteenth Amendment protects the "freedom to care for one's health and person" (emphasis deleted)). And, where the military secretly administered LSD to a serviceman for experimentation in *United States v. Stanley*, Justice O'Connor stated that:

> No judicially crafted rule should insulate from liability the involuntary and unknowing human experimentation alleged to have occurred in this case . . . the "voluntary consent of the human subject is absolutely essential . . . to satisfy moral, ethical and legal concepts." If this principle is violated the very least that society can do is to see that the victims are compensated, as best they can be, by the perpetrators.

*United States v. Stanley*, 483 U.S. 669, 709–10 (1987) (O'Connor, J., dissenting) (quoting *United States v. Brandt* (The Medical Case), 2 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, p. 181 (1949)).

Today, Maryland law requires more than consent, but "full and continuous disclosure," especially where financial conflicts of interest exist and research subjects are vulnerable. *Grimes*, 782 A.2d at 851. In deciding whether Plaintiff has stated a claim for unjust enrichment, this Court should not look to unethical norms of the past, but to these laws, which not only respect and uphold Mrs. Lacks's bodily autonomy, but also her ongoing interest in her cells today.

**3. The widespread use and exploitation of HeLa cells does not negate TFS's liability.**

TFS suggests that the "widespread reliance on HeLa cells" and their function as "an essential resource for medical research labs worldwide" make it untenable to state a claim against TFS. Mot. at 18–19. As the *Grimes* court highlighted, "[u]tilitarianism was the ethic of the day"—

a framework that medical researchers disproportionately applied to systemically oppressed people, and which TFS espouses in defense of its actions here. *Grimes*, 782 A.2d at 836 (citations omitted).

That the medical research community routinely acquires and distributes HeLa cells without consent "for the greater good" does not justify TFS's conduct. *See id.* at 815 (finding that research cannot be appropriate and the actions of researchers cannot be proper "[i]f the research methods, the protocols, are inappropriate"). In *Grimes*, the Maryland Court of Appeals found that nonconsensual research was not excused simply because "the experiment was . . . a 'for the greater good' project." *Id.* Scientific advancements made at the expense of the subject cannot be divorced from the real impacts on the subject's bodily autonomy:

> It is essential to recognize that society's interest in knowledge may not coincide with an individual subject's interest; the individual subject stands to gain nothing and lose everything, including his or her right of self–determination ... Researchers, under competitive pressure and also financial pressure from corporate backers, operate under a paternalistic approach to research subjects, asserting professional expertise and arguing experimental necessity while minimizing the right to self-determination—a key aspect of the exercise of autonomy—of their subjects. The result is a greater or lesser degree of ethical effacement.

*Id.* at 839 (citing Jeffrey H. Barker, *Human Experimentation and the Double Facelessness of a Merciless Epoch*, 25 N.Y.U. Rev. Law & Soc. Change 603, 617–20 (1999)). Here, too, TFS cannot avoid liability by insulating a system that has exploited Black bodies in the name of medical progress for centuries.

## B. THE COURT SHOULD ALLOW PLAINTIFF'S CASE TO PROCEED BECAUSE TFS'S WRONGFUL CONDUCT IS ONGOING AND CONSTITUTES A CONTINUING HARM.

In evaluating whether the Estate has alleged facts to show its claim is timely, it is important to consider the nature of the claim. Each time TFS sells and retains the profits from HeLa cells without consent and without justly compensating Plaintiff, this activity constitutes a new instance

of unjust enrichment and the statute of limitations runs anew. *See Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989), *aff'd sub nom. Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990) (where the plaintiff alleged an ongoing violation, the statute of limitations would not have begun to run until the violation ended); *see also Palmer v. Board of Educ.*, 46 F.3d 682, 685–686 (7th Cir. 1995) ("A wrongful act does not mark the accrual of a claim, however; the time begins with injury rather than with the act that leads to injury . . . A series of wrongful acts [] creates a series of claims."). In addition, the continuous sale of Mrs. Lacks' living tissue without her Estate's permission, consent, or any form of compensation, is precisely the kind of ongoing wrongful conduct that the continuing violations doctrine is designed to protect against. *See generally Litz v. Maryland Dep't of Env't*, 76 A.3d 1076, 1089 (Md. 2013) (explaining continuing violations doctrine).

A district court in New York found ongoing violations where, as in this case, there has been a "continued denial of assets." *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 134 (E.D.N.Y. 2000). In *Bodner v. Banque Paribas*, Holocaust survivors alleged unjust enrichment, claiming that the defendant banks' "refusal and failure to return the looted assets improperly deprived plaintiffs of their property and afforded defendants a substantial windfall from over fifty years of interest and investment returns." *Id*. at 122. The court ultimately rejected defendants' statute of limitations defense, holding that the plaintiffs' claims were not time-barred because defendants' continued failure to return plaintiffs' assets, and denial of information about the assets, constituted a continuing violation of international law. *Id*. at 134–35. Similarly, in the present case, the Estate's claim should not be dismissed as time-barred because of the nature of TFS's ongoing nonconsensual commercialization and sale of HeLa cells.

Contrary to Defendant's position, TFS's ongoing enrichment is not merely a "continuing ill effect," Mot. at 17, but constitutes a present and ongoing economic harm. The longer TFS fails to compensate Plaintiff, the greater the magnitude of Plaintiff's economic harm. While the sale of HeLa cells has contributed to TFS's $32.22 billion in revenue, Mrs. Lacks's own family has received nothing.[15]

Both TFS's conduct and its defenses of this conduct are emblematic of practices and policies that have contributed to the historical wealth-stripping of Black communities in the United States. Courts have recognized the compounding effect of historically discriminatory policies on generational wealth. *See, e.g.*, *Vitolo v. Guzman,* 999 F.3d 353, 371, n.8 (6th Cir. 2021) (noting that "a long tradition of intentional discrimination by the federal government in housing and banking . . . created generational wealth and stability for white families and generational poverty and instability for African-Americans and other people of color."). As stated in a report from the Center for American Progress, "the Black-white wealth gap is not an accident but rather the result of centuries of federal and state policies that have systematically facilitated the deprivation of Black Americans."[16] The role of private businesses, such as TFS, in enabling and perpetuating these disparities cannot be ignored. Notably, "private businesses and governments institutionalized racism and discrimination. They also encouraged and sanctioned violence targeting Black lives and property."[17] TFS's ongoing profit from HeLa cells without just compensation to Plaintiff compounds the impact of these historical harms.

As discussed above, Mrs. Lacks was specifically vulnerable to medical exploitation by virtue of her status as a poor, Black woman living under the "norms" of the 1950's. These same

---

[15] Compl. ¶ 38.
[16] Christian E. Weller & Lily Roberts, *Eliminating the Black-White Wealth Gap is a Generational Challenge*, Center for American Progress (Mar. 19, 2021), https://tinyurl.com/5b4ehx2a.
[17] *Id.*

identities are also what made her and her family vulnerable to structural economic exploitation and dispossession, which continues to harm the Estate today. Given the reality that HeLa cells are widely available in the public domain, are likely to continue to be sold for profit, and have already begot substantial profits, the Estate should not be denied the opportunity to share in these economic benefits and accrue the generational wealth of which they have thus far been robbed. In light of TFS's ongoing denial of economic benefit to the Estate, Plaintiff's claim should not be time-barred.

### III.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be denied in its entirety.

Dated: February 24, 2023.


Respectfully submitted,


/s/  *Dorian L. Spence*
Dorian L. Spence
Federal Bar No.: 23894
Lawyers' Committee For Civil Rights Under Law
1500 K Street N.W.
Washington, D.C., 20005
Telephone: (202) 662-8324 (phone)
Facsimile: (202) 783-0857
Email:dspence@lawyerscommittee.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing documents were filed through CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on February 24, 2023.

*/s/ Dorian L. Spence*
Dorian L. Spence
